1    KATHI VIDAL (State Bar No. 194971)
     kvidal@winston.com
2    MATTHEW R. MCCULLOUGH (State Bar No. 301330)
     mrmcullough@winston.com
3    CARSON SWOPE (State Bar No. 353352)
     cswope@winston.com
4    **WINSTON & STRAWN LLP**
     255 Shoreline Drive, Suite 520
5    Redwood City, CA 94065
     Telephone: (650) 858-6500
6    Facsimile: (650) 858-6550

7    LEELLE B. SLIFER (*pro hac vice* forthcoming)
     lslifer@winston.com
8    JONATHAN HUNG (*pro hac vice* forthcoming)
     johung@winston.com
9    **WINSTON & STRAWN LLP**
     2121 N. Pearl Street, Suite 900
10   Dallas, TX 75201
     Telephone: (214) 453-6500
11   Facsimile: (214) 453-6400

12   Attorneys for Plaintiffs X.AI CORP. and X.AI LLC

13            **UNITED STATES DISTRICT COURT**

14        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| X.AI CORP. and X.AI LLC, | **Case No. 3:25-cv-08133** |
| Plaintiffs, | **COMPLAINT FOR:** |
| vs. | **(1) MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1836 ET SEQ.)** |
| OPENAI, INC., OPENAI GLOBAL, LLC, and OPENAI OPCO, LLC, | **(2) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS; AND** |
| Defendants. | **(3) UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200 ET SEQ.)** |
| | **JURY TRIAL DEMANDED** |

Plaintiffs X.AI Corp. and X.AI LLC (collectively, "xAI"), for their Complaint against Defendants OpenAI, Inc., OpenAI Global, LLC, and OpenAI OpCo, LLC (collectively, "OpenAI"), state as follows:

**INTRODUCTION**

1.     The desire to win the artificial intelligence ("AI") race has driven OpenAI to cross the line of fair play. OpenAI violated California and federal law by inducing former xAI employees, including Xuechen Li, Jimmy Fraiture, and a senior finance executive, to steal and share xAI's trade secrets. By hook or by crook, OpenAI clearly will do anything when threatened by a better innovator, including plundering and misappropriating the technical advancements, source code, and business plans of xAI.

2.     What began with OpenAI's suspicious hiring of Xuechen Li—an early xAI engineer who admitted to stealing the company's entire code base—has now revealed a broader and deeply troubling pattern of trade secret misappropriation, unfair competition, and intentional interference with economic relationships by OpenAI. OpenAI's conduct, in response to being out-innovated by xAI whose Grok model overtook OpenAI's ChatGPT models in performance metrics, reflects not an isolated lapse, but a strategic campaign to undermine xAI and gain unlawful advantage in the race to build the best artificial intelligence models.

3.     Unbeknownst to xAI at the time, when Li's theft of xAI's code base and failure to return it prompted xAI to file *X.AI Corp. et al. v. Li*, Case No. 3:25-cv-07292 (Aug. 28, 2025) (Lin, J.), at least two other parallel OpenAI efforts were afoot. Another early xAI engineer—Jimmy Fraiture—was also harvesting xAI's source code and airdropping it to his personal devices to take to OpenAI, where he now works. Meanwhile, a senior finance executive brought another piece of the puzzle to OpenAI—xAI's "secret sauce" of rapid data center deployment—with no intention to abide by his legal obligations to xAI.

4.     Upon his departure, the senior finance executive refused to sign his Termination Certification to confirm he would return and protect xAI's trade secrets and Confidential Information. And when xAI confronted the senior finance executive about his breaches of his confidentiality obligations, he responded with a crass comment leaving little doubt as to his intentions:

1
2
3
4
5
6
7
8
9
10
11
12
13

| | |
|---|---|
| From: | ▉▉▉▉▉▉ |
| Sent: | Sun, 27 Jul 2025 08:53:18 -0700 |
| To: | Alex Spiro |
| Subject: | Re: Breach of xai confidentiality |

[EXTERNAL EMAIL from ▉▉▉▉▉▉ ]

**This message needs your attention**
• This is a personal email address.
• This is their first email to your company.

Suck my dick

Sent from Gmail Mobile

On Sun, Jul 27, 2025 at 7:06 AM Alex Spiro <alexspiro@quinnemanuel.com> wrote:

We have learned of several breaches by you of xai's confidentiality obligations. As you are aware, you are bound by those obligations after your departure from the company.
We treat breaches of confidentiality seriously for the protection of the employees, company and mission.
Please cease and desist all further breaches of this agreement or you will leave us no choice but to pursue legal action. For now, we reserve all rights and waive none and will continue to monitor.
I hope and expect this will be my final communication to you on this matter.
Alex Spiro

14    5.    As detailed in xAI's complaint against Li, AI is the defining technology of the modern

era. Its development stands to reshape economies and society. Other than the advent of the internet,

the extent of AI's potential influence on daily life has no analog in recent history.

17    6.    xAI began offering AI products in late 2023 with generative AI technology, including

a chatbot powered by its Grok Large Language Model ("LLM"). Beyond Grok's performance as a

chatbot, xAI has demonstrated unmatched operational speed in constructing data centers of

unprecedented computing power. xAI's recently released Grok 4 is the culmination of years of

research and development, and billions of dollars in investments. Such technological and business

innovations are the result of xAI's talented employees, superior engineering, and accumulated

expertise. Grok is a preeminent frontier model, representing the cutting edge of AI research and

development and pushing the boundaries of what AI can do across multiple domains. Competing

alongside OpenAI's ChatGPT and Google's Gemini, xAI's newest release—Grok 4—is one of the

most, if not the most, advanced and powerful generative AI systems in the world, leading industry

benchmarks in reasoning and pretraining capabilities. Within 18 months, xAI's Grok overtook

28

2

1  OpenAI's models in certain performance metrics, and it has remained a top performer in the frontier
2  model space.

3      7.    xAI is known for innovation. It offers features more innovative and imaginative than
4  those offered by its competitors, including OpenAI.

5      8.    OpenAI, on the other hand, has raised substantial sums of money since approximately
6  seven years prior to xAI's formation and quickly rose to dominance among generative AI companies
7  simply by being the "first mover" with the release of its consumer accessible service, ChatGPT, in
8  2022. Threatened by the innovativeness and creativity of xAI's code (developed in part, and later
9  stolen, by Li and Fraiture) and the unprecedented rapidity with which xAI is able to deploy data centers
10 with the massive computational resources to train and run AI (known to the senior finance executive
11 only through his tenure at xAI), OpenAI has engaged in unfair and illegal business practices by
12 specifically targeting xAI employees and using them to steal xAI Confidential Information and trade
13 secrets.

14     9.    OpenAI is not merely soliciting or hiring a competitor's employees. OpenAI is waging
15 a coordinated, unfair, and unlawful campaign: OpenAI is targeting those individuals with knowledge
16 of xAI's key technologies and business plans—including xAI's source code and its operational
17 advantages in launching data centers—then inducing those employees to breach their confidentiality
18 and other obligations to xAI through unlawful means.

19     10.   For example, OpenAI used the same recruiter at the same time to specifically target
20 both Li and Fraiture—two of xAI's earliest engineering hires—based on their access to and detailed
21 knowledge of xAI's innovative source code and to induce them to steal xAI Confidential Information.
22 Li and Fraiture, in the midst of being recruited by OpenAI and induced with job offers including
23 significant compensation, both stole xAI's source code and other confidential material, and copied it
24 to their personal computers and/or cloud accounts for use at OpenAI. Tellingly, xAI has uncovered
25 highly suggestive, encrypted communications between Li and OpenAI's recruiter that coincided with
26 Li's theft of xAI's trade secrets.

27     11.   OpenAI also specifically targeted an xAI senior finance executive, who had been
28 working at xAI for only a few months, based on what he knew about xAI's industry-leading data center

operations, which he admitted was "the secret sauce of xAI." The senior finance executive only learned of that "secret sauce" through his work with xAI's trade secrets, as he had no prior experience with data centers or the AI industry at all. He jumped ship from his senior finance role at xAI to a new (and less prestigious) role at OpenAI working on spending strategy for OpenAI's data center operations. The senior finance executive has, on multiple occasions, expressed a flagrant disregard for his confidentiality obligations to xAI, including through the crude sexual expletives he sent to xAI's counsel when confronted about his theft of company trade secrets.

12.    It has become clear that OpenAI is determined to preserve its hegemony at any cost, and not based solely upon the merits of its own accomplishments. OpenAI has no qualms with plundering and misappropriating the technical advancements, source code, and business plans of xAI. These actions have harmed not only xAI and the incentive to develop innovative technologies, but also the consumers who rely on fair competition between AI companies and the models they create.

## NATURE OF THE ACTION

13.    This is an action for willful and malicious misappropriation of xAI's Confidential Information and trade secrets under 18 U.S.C. § 1836 *et seq.* by OpenAI, intentional interference with prospective economic relations, and unfair competition under Cal Bus. & Prof. Code § 17200 *et seq.*

## PARTIES

14.    X.AI LLC is a Nevada limited liability company and wholly owned subsidiary of X.AI Corp.

15.    Defendant OpenAI, Inc. is a registered nonprofit organization incorporated under the laws of Delaware, with a place of business in San Francisco, California.

16.    Defendant OpenAI Global, LLC is a limited liability company formed under the laws of Delaware, with a place of business in San Francisco, California.

17.    Defendant OpenAI OpCo, LLC is a limited liability company formed under the laws of Delaware, with a place of business in San Francisco, California.

## JURISDICTION AND VENUE

18.    Jurisdiction is proper in this district pursuant to 28 U.S.C. § 1331 because xAI asserts claims under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* This Court has

1    supplemental jurisdiction over xAI's additional claims because they form part of the same case or

2    controversy. 28 U.S.C. § 1367(a).

3        19.    This Court has personal jurisdiction over OpenAI, because each OpenAI Defendant

4    entity lists its principal place of business as 1455 3rd St., San Francisco, CA 94158 in its most recent

5    filings with the California Secretary of State.

6        20.    Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because

7    OpenAI resides in this district, and because OpenAI poached multiple employees at issue in this case

8    who worked for xAI in this district, meaning that a substantial part of the events or omissions giving

9    rise to xAI's claims occurred in this district.

10                                **GENERAL ALLEGATIONS**

11    **The Ascent of Artificial Intelligence**

12        21.    The rise of widely publicly available generative AI products is one of the most

13    transformative technological shifts of the 21st century. Generative AI refers to systems that can create

14    new content—text, images, music, code, and more—by learning patterns from massive datasets.

15    Unlike traditional AI, which classifies or predicts, giving rote or stilted responses, generative AI

16    produces outputs that are similar to what would be expected when a human responds in a conversation.

17        22.    The advent of modern AI is often credited to the rapid rise and popularization of large

18    language models (LLMs), a class of AI systems designed to understand and generate human-like text

19    and other outputs. However, LLMs represent but one of the groundbreaking advancements in artificial

20    intelligence. Generative AI has seen extremely rapid development in other areas in recent years,

21    particularly in the fields of image generation, video generation, speech generation, and multimodal

22    generation—the simultaneous generation of multiple output modalities at once.

23        23.    These generative AI models are built upon sophisticated architectures that enable the

24    models to generate content that demonstrates human-like semantic and conceptual understanding, but

25    at speeds far exceeding human capability. Such generative AI models have become a foundational

26    technology across industries, powering virtual assistants, educational platforms, creative tools, and

27    enterprise automation systems. Their ability to scale across domains and adapt to user needs has made

28    them indispensable in modern digital infrastructure.

24.     The development of such generative AI models requires extraordinary financial and technical resources. Building a state-of-the-art model involves data acquisition and processing, computational infrastructure, and expert talent. Immense capital investment is necessary to curate high-quality datasets, operate thousands of high-performance graphical processing units (or GPUs), and employ top-tier AI researchers.

25.     Generative AI models have delivered immense value to individuals and society at large. They enhance productivity by, among other things, automating routine tasks, improving access to education through personalized tutoring, supporting healthcare professionals with diagnostic assistance, and empowering creators with tools for content generation. These models are transforming how we communicate and interact, while their scalability allows organizations to process and generate vast amounts of content with unparalleled efficiency. The societal benefits of generative AI are profound, and the next steps in advancing generative AI depend greatly on the protection of intellectual property and trade secrets that underpin its development.

26.     OpenAI released its first generative AI chatbot product, ChatGPT, in November 2022, which marked the beginning of widespread public access to conversational generative AI tools. ChatGPT uses versions of its generative pre-trained transformer (hence, "Chat<u>GPT</u>") models—such as GPT-3.5, GPT-4, and GPT-o3—as its underlying LLMs.

27.     Since ChatGPT's public debut in late 2022, generative AI—particularly in the form of conversational chatbots capable of back-and-forth messaging streams—has rapidly become a fixture in daily life. By August 2024, nearly 40% of U.S. adults aged 18 to 64 reported using generative AI tools, either at work or at home. This widespread adoption occurred at a faster pace than that of the personal computer or the internet, making generative AI one of the most swiftly embraced technologies in modern history.

28.     During this same period, and leveraging on its first-mover position, OpenAI's ChatGPT has quickly reached over 180 million users globally by mid-2025.

**<u>xAI and Its Groundbreaking Technology</u>**

29.     xAI began offering AI products in November 2023 and, through extensive investment in human capital and technology, has become one of the most innovative generative AI companies.

xAI's vision is to advance human comprehension and capabilities through its advanced AI, including xAI's generative AI model, Grok.

30.    Grok is a conversational generative AI developed by xAI that is capable of many functions, including (a) performing natural language processing tasks, including answering questions, retrieving information, writing creatively, and assisting with coding, (b) interpreting, editing, and generating images or videos in various styles from fanciful to photorealistic, and also (c) generating natural language audio responses in response to oral prompts from a user.

31.    Grok is a preeminent frontier model, representing the cutting edge of AI research and development and pushing the boundaries of what AI can do across multiple domains. Competing alongside OpenAI's GPT models and Google's Gemini, xAI's newest release—Grok 4—is one of the most, if not *the* most, intelligent generative AI systems, leading certain industry benchmarks in reasoning and pretraining capabilities.

32.    Grok 4 is the culmination of years of research and development, and billions of dollars in investments. These efforts have required the collaboration of highly skilled teams of engineers, scientists, and other professionals, all working to advance the state of the art in AI.

33.    Experts predict that the value of AI technology will exceed hundreds of billions of dollars this year, and over a trillion dollars by decade's end. Moreover, advanced AI models can cost billions of dollars to develop. Thus, maintaining the utmost secrecy in the development of AI models is of critical importance.

34.    xAI's strategy to succeed is based on innovation. In less than two years it has delivered arguably the most intelligent AI model in the world, including features more innovative and imaginative than those offered by its competitors, including OpenAI. xAI's innovation is protected by xAI's Confidential Information and trade secrets.

**xAI Protects Its Confidential Information and Trade Secrets**

35.    Trade secrets protect nearly all of xAI's developments—model weights, training data, tuning methods, know-how, and more. With xAI's daily innovative advancements, its ability to rely on trade secrets protection is critical not only to its competitive position but for its ongoing operations and protection of its investments in its technology.

36.     To foster innovation, and protect its confidential and proprietary information, including its trade secrets, xAI has implemented a variety of industry standard—and industry leading—practices, such as: routinely conducting security awareness training for all employees; conducting background checks on employees and contractors who may access xAI data; conducting secure development and data handling training for employees with access to sensitive data, after which such employees must complete an assessment to demonstrate understanding; employing a team dedicated to information security; adopting the NIST 800-171 Rev.3 framework as a baseline for internal security standards; achieving SOC 2, Type II compliance; securing endpoints, including employee devices, with ongoing patch maintenance and full disk encryption; and maintaining a formal written information security policy, among other practices.

37.     In addition, as a condition of employment, xAI requires each employee to enter into an Employee Confidential Information and Invention Assignment Agreement such as those attached here as Exhibits 1–3. The agreements (1) prohibit xAI employees from disclosing, using, or publishing all confidential knowledge, data, or information ("Confidential Information") belonging to xAI during and after their employment; (2) require xAI employees to acknowledge that the employment creates a relationship of confidence and trust with respect to xAI's Confidential Information, which xAI has a protectable interest therein; (3) require xAI employees to return all Confidential Information to xAI and permanently delete any Confidential Information on their personal devices upon termination of their employment; and (4) require xAI employees to maintain xAI's confidentiality during and after their employment. *See, e.g.*, Exhibit 1.

38.     The employees' agreements with xAI further require that employees certify their return of Confidential Information upon leaving the company. *See, e.g.*, Exhibit 1 ¶ 8 (requiring employee to sign a "termination statement if required to do so by [xAI]").[1] By signing the termination statement ("Termination Certification") of the form seen in Exhibit 4, employees verify that they have complied with all the agreement's terms. Exhibit 4 at 1. The Termination Certification also requires departing

---

[1] There are some variations in the form of the agreements, but the substance of the requirement to sign a termination statement if required to do so by xAI is consistent across the documents that xAI employees sign as a condition of their employment.

employees to certify that they have undertaken a diligent search for all xAI documents and returned them to the company. *Id.* It provides that "if [the employee has] used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any … Confidential Information, [the employee] agree[s] to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems." *Id.*

**Threatened by Grok, OpenAI Resorts to Poaching Specific xAI Employees to Access the xAI Confidential Information Most Needed by OpenAI to Unscrupulously Abscond with xAI's Innovative Technology**

39.     Grok's innovative technology has the potential—if combined with sufficient scale—to disrupt the status quo in generative AI. But OpenAI has enacted a strategy to benefit itself from xAI's own innovations and to maintain the status quo.

40.     OpenAI has thus resorted to the repeated and relentless poaching of xAI employees with access to the xAI Confidential Information most critical to xAI's technical and operational innovations and using those employees to steal xAI's Confidential Information. This includes stealing xAI's source code—responsible for the training and development of Grok models as well as the infrastructure used to deploy Grok—and stealing xAI's business plans, data center deployment strategy, and related partner deals that are key to understanding xAI's operational efficiency in launching new data centers.

41.     OpenAI's targeted scheme to poach specific employees with access to the precise xAI Confidential Information most crucial to xAI's business, and to use those employees to steal xAI's Confidential Information, throws fair competition out the window. This scheme transcends any notions of ordinary employee mobility. OpenAI's brazen conduct is nothing more than a calculated campaign of stealing xAI's Confidential Information and proprietary business knowledge that not only harms xAI, but undermines the integrity of innovation in the industry and thereby also harms consumers of AI.

**OpenAI Poaches Xuechen Li to Access xAI Source Code**

42.     Xuechen Li joined xAI on or about February 26, 2024, and worked in Northern California. Li was among the company's first 20 engineers to be hired by xAI. An accomplished researcher in the AI community, Li earned a Ph.D. in Computer Science from Stanford University in 2024 and has authored numerous AI-related articles published in various scholarly journals.

43.     Li's responsibilities included developing and training Grok. In this role, Li had access to and responsibility for components across the entirety of xAI's technology stack.

44.     To support his job responsibilities, xAI granted Li restricted and controlled access to its confidential documents and proprietary information, including source code. xAI provided this access only for the purpose of enabling Li to perform his job duties.

45.     As a condition for his employment and access to xAI's Confidential Information and trade secrets, xAI required Li to sign an Employee Confidential Information and Invention Assignment Agreement, which he executed on February 26, 2024. *See* Exhibit 1.

46.     Li's Employee Confidential Information and Invention Assignment Agreement imposes clear obligations upon him, as an xAI employee, regarding xAI's Confidential Information, including that it:

(a)     Requires that Li acknowledge that the employment "creates a relationship of confidence and trust" with respect to xAI's Confidential Information, which the company "has a protectable interest therein" (Exhibit 1 ¶ 1.1);

(b)     Requires Li to maintain xAI's confidentiality "during and after [the employee's] employment," and prohibits disclosure, use, or publication of Confidential Information unless required for the employee's work or expressly authorized by an officer of xAI (*id.*);

(c)     Requires Li, upon termination, to return "any and all" materials containing or disclosing Confidential Information, including documents, notes, and devices, along with all copies, and "any other material containing or disclosing … Confidential Information." (*id.* ¶ 8);

(d)     Requires Li to provide xAI with a computer-usable copy of any Confidential Information stored on personal devices or systems and to "permanently delete and expunge" such information from those systems (*id*.);

(e)     Requires Li to "agree to provide [xAI] access to [the employee's] system as reasonably requested to verify that the necessary copying and/or deletion is completed" (*id*.); and

(f)     Requires Li to "agree to: (a) provide [xAI] any and all information needed to access any [xAI] property or information returned or required to be returned … , including without limitation any login, password, and account information." *Id*. ¶ 8.

47.     By signing the agreement, Li also agreed that, prior to leaving the company, he would complete and sign xAI's "termination statement if required to do so by [xAI]." *Id*.

48.     As with many of its employees ultimately poached by OpenAI, xAI wanted to retain Li as a productive and successful employee who would continue to contribute to xAI's business. Indeed, in recognition of the prospective future contributions that xAI expected to receive from Li's work, xAI awarded Li substantial equity as part of his compensation package and provided liquidity to Li, allowing Li, on an exceptional basis, to sell millions of dollars of his equity in June and July 2025.

49.     Unbeknownst to xAI, OpenAI was in contact with Li at the same time that xAI was spending millions investing in xAI's future working relationship with Li. OpenAI's contact with Li was part of a larger strategy to pilfer xAI employees with intimate knowledge of xAI's most valued Confidential Information and trade secrets.

50.     OpenAI's contact with Li began at least as early as July 2025.

51.     On information and belief, Li made a presentation to OpenAI for an interview on July 13, 2025, containing xAI's Confidential Information. On information and belief, as described further below, Li attempted to delete (or did delete) this presentation from his personal cloud account on August 13 after xAI had uncovered his theft of trade secrets, in an attempt to cover up the subject matter of his discussions with OpenAI.

52.     Li later admitted, in a handwritten confession prepared while represented by counsel, that he had taken, in addition to xAI's source code, a *slide deck* specifically pertaining to xAI's highly sensitive and confidential AI model training and tuning methods.

53.     Apparently unsatisfied with the information Li shared on July 13, OpenAI did not make an offer at the time and instead strung Li along until after Li had taken a copy of xAI's entire source code.

54.     On July 23, OpenAI Research Talent Advisor Tifa Chen sent a message request to Li via the encrypted messaging application Signal. On July 24, Chen sent Li a message on Signal indicating that a link to, on information and belief, a cloud storage location was sent to Li.

55.     The very next day, July 25, Li uploaded the **entire xAI source code base** to a personal cloud account. Li then deleted his browser history and system logs to hide evidence of his misdeeds. Indeed, Li later admitted to deleting the system logs to try to cover his tracks.

56.     At 11:20 a.m. on July 25, Li downloaded from his personal cloud account the entire exfiltrated set of xAI source code onto his personal laptop.

57.     At 3:28 p.m. on July 25—four hours after Li's successful pilfering of xAI's source code—Chen expressed disbelief, sending Li a message on Signal that equated to "no way!"

58.     Two minutes later, at 3:30 p.m., upon information and belief Chen had a virtual meeting with Li.

59.     Two days later, Li again downloaded xAI Confidential Information to his personal laptop at 11:21 a.m. on July 27.

60.     The next day, on July 28 at 6:07 p.m., Chen communicated OpenAI's offer of multiple millions of dollars. This huge bounty was OpenAI's quid to Li's quo—the xAI source code and presentation he pilfered from xAI—and was part of OpenAI's larger scheme to obtain access to critical xAI trade secret information to neutralize xAI while providing an unfair advantage to OpenAI to the detriment of consumers.

61.     By August 1, Li had signed his offer letter with OpenAI. Li now turned to attempting to hide evidence of his theft, all while under this agreement with OpenAI.

62.    Li's theft of xAI Confidential Information and misappropriation of trade secrets—which occurred as Li was regularly and actively communicating with OpenAI via encrypted chats and nondescriptly titled meetings—is beyond dispute. Li, with his attorney present, admitted in a handwritten document he provided to xAI that he misappropriated xAI's source code and presentation on xAI's highly valued training and tuning techniques.

63.    During interviews with xAI discussing his theft, however, Li hid OpenAI's involvement, failing to mention that he had accepted an offer to work for them, let alone any of his clandestine conversations with Chen. Indeed, when asked directly where he was going to work upon departing xAI, Li demurred, stating (falsely) that he believed it would violate a nondisclosure agreement to reveal the name of his future employer.

64.    Li signed the Termination Certification required by his agreements with xAI on August 1, 2025. *See* Exhibit 4. In this statement, as xAI would later learn, he falsely certified he had returned "all Company documents … and any materials of any kind which contain or embody any confidential or proprietary information." *Id.* at 1. He also reiterated his agreement to "hold in confidence and not disclose, use or publish any of the Company's Confidential Information"—an agreement he had already violated, and which he attempted to cover up. *Id.*

65.    As for the critical main cloud account where Li uploaded xAI's entire source code base and other Confidential Information, Li's efforts to obfuscate became increasingly evident. On August 11, Li changed the password to his main personal cloud account where he had uploaded xAI's Confidential Information.

66.    Li's native iPhone iOS password manager application further reflected that the password associated with his main personal cloud account was "[l]ast updated" the following day, on August 12.

67.    Forensic artifacts show that Li was continuing to access that same main personal cloud account of his through August 14.

68.    Specifically, on August 12, Li searched for and visited URLs about file recovery relating to the cloud service where he had stored xAI Confidential Information. Late that night, at 10:24 p.m., Li then downloaded yet another copy of the xAI Confidential Information he had

exfiltrated to his personal cloud account to his personal laptop. Immediately following this, at 10:28 p.m., he once again accessed his personal cloud account—specifically, on information and belief, the folder that he had been using to store xAI Confidential Information.

69.     The next morning, at 8:08 a.m. on August 13, Li accessed the Trash folder in his personal cloud account. The Trash folder is where a user must go to permanently delete files in that account. Li then accessed the Trash folder again at 9:40 a.m., 9:42 a.m., and 10:19 a.m.

70.     At 10:24 a.m. on August 13, Li accessed the slides that, on information and belief, he presented to OpenAI on July 13. He again followed this up with a visit to the Trash folder at 10:50 a.m.

71.     However, on August 18, when, with Li's authorization, xAI attempted to use the password stored in the password manager application of Li's iPhone to attempt to access Li's main personal cloud account—in order to remove the volume of xAI's source code and other Confidential Information stored therein—the password did not work.

72.     And yet, when asked on that very same day, August 18, Li suddenly claimed that he could not remember the password to his main personal cloud account, even though he had just changed it on August 11, and even though he was accessing the same account just *four days earlier*.

73.     Therefore, Li either (1) manually updated the password listed in the password manager app on August 12 with a fake one that could not grant access to his cloud account, or (2) changed the password *yet again* after August 12, but did not update the password in the app. This, combined with the fact that Li was successfully accessing the account days later by entering a different, newer password not reflected in the app, shows a deliberate pattern of obfuscation. Li's story about "forgetting" his password—a story he maintains to this day, forcing xAI to go through a laborious and costly account recovery process which has still not resulted in xAI's recovery of its trade secrets—is so implausible on several fronts that Li must have been trying to hide his misconduct and impede xAI's recovery of its trade secrets. Indeed, as noted above, after being confronted with xAI's logs conclusively showing his theft and attempts to cover his tracks, Li has since confessed to xAI interviewers that he stole xAI's entire codebase and sought to conceal it.

74.     On August 11, Li added a new device to the encrypted messaging app Signal that he had been using to communicate with Chen.

75.     Li intended to start officially at OpenAI on August 19, but because by then xAI had uncovered his theft of xAI's source code and other Confidential Information, Li claims he informed OpenAI that he had to delay his official start date.

76.     Pursuant to the legal action xAI took against Li in *X.AI Corp. et al. v. Li*, Case No. 3:25-cv-07292 (August 28, 2025) (Lin, J.), Li was then temporarily restrained, on September 2, "from having any role or responsibility at OpenAI … until xAI has confirmed that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted." Exhibit 6 ¶ 3. OpenAI later confirmed that it was Li who stopped communicating with OpenAI and that OpenAI only revoked his offer after xAI obtained a temporary restraining order against Li working at OpenAI.

77.     Despite representing to the Court that he "has been completely cooperative" and "voluntarily handed over" the devices in question, and despite being subject to a TRO that requires Li to "otherwise cooperate with xAI as necessary to provide xAI access to such accounts and devices," Li continues to try to hide evidence of his wrongdoing and his communications with OpenAI. On September 23—after OpenAI's counsel began representing OpenAI and responding relating to both Li and other former xAI employees—Li attempted to revoke access to his devices and accounts that he had previously authorized xAI to access "until xAI has confirmed that it has located and deleted all Confidential Information from the Account and Devices."

78.     Practically speaking, Li stole xAI's ***entire codebase***, the value of which cannot be understated—especially to OpenAI, which stands to gain the most from its misappriation as a company facing a competitive threat from xAI's Grok.

79.     Upon information and belief, OpenAI targeted Li because of his access to xAI Confidential Information and trade secrets, including the entire source code base, and directed, endorsed, financially rewarded, and/or otherwise encouraged Li to steal xAI's Confidential Information and trade secrets for OpenAI to obtain and use this information to neutralize xAI.

80.     Upon information and belief, OpenAI directed, endorsed, financially rewarded, and/or otherwise encouraged Li to delete evidence of his wrongdoing after signing his formal offer. Li's

actions—undertaken in the less than three-week time period between signing his offer and his expected start date—are attributable to OpenAI under agency principles and/or through vicarious liability.

**OpenAI Poaches Jimmy Fraiture to Further Access xAI Source Code**

81.     Jimmy Fraiture joined xAI on or about April 22, 2024—just months after xAI launched. Fraiture was the second engineering hire in xAI's London operation and was among the company's initial group of approximately 50 engineers.

82.     Fraiture was a senior, capable, and highly trusted engineer. As the leader of xAI's production inference team, Fraiture was responsible for maintaining and developing inference clusters ("ICs") that provide critical functions to xAI's customers using Grok.

83.     The code that Fraiture and his team at xAI were responsible for is unique to xAI for a number of reasons, one being its superior reliability as compared to xAI's competitors for serving production traffic. If OpenAI obtained access to this code, it could immediately enhance the stability and scalability of its own production systems and negate this technological innovation of xAI.

84.     To support his job responsibilities, xAI granted Fraiture restricted and controlled access to its confidential documents and proprietary information, including confidential source code. xAI provided this access only for the purpose of enabling Fraiture to perform his job duties.

85.     As a condition for his employment and access to xAI's Confidential Information and trade secrets, xAI also required Fraiture to sign an Employee Confidential Information and Invention Assignment Agreement, which he executed on March 4, 2025. Exhibit 2. Fraiture's employment agreement further required him to provide a "signed statement confirming that you have complied" with the provision requiring "return to the Company all property … including all written or electronic material … belonging to any Group Company."

86.     As with Li, xAI wanted to retain Fraiture as a productive and successful employee who would continue to contribute to xAI's business. Indeed, in recognition of the prospective future contributions that xAI expected to receive from Fraiture's work, xAI awarded Fraiture substantial stock options and shares as part of his compensation package and provided liquidity to Fraiture by facilitating the sale of millions of dollars worth of his xAI shares in July 2025.

87.     Unbeknownst to xAI, OpenAI had been in contact with Fraiture since early July as part of its ongoing efforts to target xAI employees with access to specific xAI Confidential Information that was directly related to xAI's innovative technology, such as the infrastructure code for which Fraiture and his team were responsible.

88.     At least as early as July 17, 2025, Chen—the very same recruiter who was in regular contact with Li—set a calendar invite to meet with Fraiture.

89.     On information and belief, Chen and Fraiture communicated via Signal as well, although xAI does not have access to those communications.

90.     Fraiture then scheduled a visit to OpenAI on July 24 and in advance of this visit—while still employed at xAI—signed a non-disclosure agreement with OpenAI on July 22, despite having agreed to "not, without [xAI London Ltd.'s] express written consent, directly or indirectly engage in any … business activity which is directly or indirectly competitive with, or would otherwise conflict with, your employment by the Company."

91.     On July 29, Fraiture received a formal employment offer from OpenAI. On information and belief, Fraiture had accepted this offer by July 30. On September 2, Fraiture began employment with OpenAI. On information and belief, Fraiture's offer from OpenAI included substantial compensation to reward him for and/or induce him to share and/or use xAI Confidential Information to benefit OpenAI.

92.     Just two days after receiving the offer from OpenAI, on July 31, Fraiture betrayed the trust and faith xAI had placed in him by copying xAI source code and trade secrets from his xAI-issued laptop to his personal device by using the AirDrop feature to wirelessly transmit compressed source code files. xAI's records show that he used the AirDrop feature to transfer, or attempt to transfer, xAI Confidential Information at least five times on July 31. Fraiture admitted that he maintained a copy of this confidential xAI source code on his personal (non-xAI-issued) laptop for at least a few weeks.

93.     Fraiture stole the majority of xAI's code for which he and his team at xAI were responsible, which as explained above uniquely relates to xAI's innovative technology for serving production traffic.

94.     Fraiture further stole extensive infrastructure and training code that was written by other persons and teams at xAI. These parts of the xAI code base are extremely sensitive and enable xAI to train its generative AI models such as Grok-3 and Grok-4—a key component of xAI's success, which represented a competitive threat to OpenAI.

95.     Fraiture also stole personal experimental folders of four of xAI's co-founders and a further six xAI employees. These personal experimentation folders are used to work on new and experimental code and therefore reflect insights into xAI's potential future innovations, research directions, and/or novel techniques not yet deployed but that may reflect future competitive threats to OpenAI. Fraiture did not contribute to the experimental code the co-founders and other employees were personally experimenting with, and he accessed their experimental code for the sole purpose of stealing it.

96.     Fraiture also stole a video recording of a lengthy internal, xAI "All-Hands" meeting, in which xAI founder Elon Musk conveyed significant confidential nonpublic information in relation to xAI's future plans and immediate targets, product roadmap, commercial contract terms, and other confidential and sensitive information. This video included information relating to xAI's strategic priorities relating to xAI's business practices, which are a competitive differentiator between xAI and OpenAI. Recognizing the value of its contents, Fraiture secretly exfiltrated it to his personal device hours later.

97.     Much like Li, after having accepted his offer with OpenAI, Fraiture turned to deleting evidence of his wrongdoing. In an August 29 meeting with xAI's Insider Threat team, Fraiture lied and claimed that he had tried but failed to transfer xAI source code to his personal device and that he had never transferred the code. Fraiture later admitted that this statement was untrue and that he had in fact copied xAI source code to his personal computer and left it there for a few weeks before deleting the evidence from his personal device.

98.     Within his first week of starting at OpenAI, Fraiture came to OpenAI's offices in California, where recruiter Tifa Chen—who also spearheaded communications with Li—is based.

99.     Upon information and belief, OpenAI targeted Fraiture because of his access to xAI Confidential Information and trade secrets, including the source code base, and directed, endorsed,

financially rewarded, and/or otherwise encouraged Fraiture to steal xAI's Confidential Information and trade secrets for OpenAI to obtain and use this information to neutralize xAI. Fraiture stole this information after having signed a non-disclosure agreement signed in anticipation of future employment with OpenAI, and thus his actions are attributable to OpenAI under agency principles and/or through vicarious liability.

100.    Upon information and belief, OpenAI directed, endorsed, financially rewarded, and/or otherwise encouraged Fraiture to delete evidence of his wrongdoing after signing his formal offer. Fraiture's actions—undertaken while Fraiture was on garden leave, but still employed by xAI, after signing his OpenAI offer—are attributable to OpenAI under agency principles and/or through vicarious liability.

101.    On information and belief, OpenAI continues to employ Fraiture even after being notified that he copied xAI source code. OpenAI has therefore ratified his conduct and continued to financially reward him with employment after learning of his misappropriation.

**OpenAI's Poaching of Li, Fraiture, and Other xAI Employees Reflects a Deliberate Scheme to Target Specific xAI Confidential Information**

102.    OpenAI's actions with respect to both Fraiture and Li—occurring at roughly the same time through communications with the exact same OpenAI recruiter, Tifa Chen—reflect a deliberate and intentional strategy to gain access to xAI Confidential Information by illegal means. xAI's source code was so vital to OpenAI that it hatched at least two identical plans half a world apart just to make sure that OpenAI would get what it so desperately wanted if one of its schemes fell through.

103.    But OpenAI's unlawful campaign was not limited to these two employees. OpenAI has targeted and continues to target other xAI employees with access to the specific xAI Confidential Information related to xAI's and Grok's most significant technological innovations that OpenAI is now employing in order to provide itself unfair advantages that are derived from xAI's research and innovation.

104.    As yet another example, OpenAI recently targeted a senior finance executive at xAI.

105.    To support his job responsibilities, xAI granted the senior finance executive restricted and controlled access to its confidential documents and proprietary information, including

competitively sensitive information about xAI's computing costs and contractual terms. xAI provided this access only for the purpose of enabling him to perform his job duties.

106.    As a condition for his employment and access to xAI's Confidential Information and trade secrets, xAI also required the senior finance executive to sign an Employee Confidential Information and Invention Assignment Agreement, which he executed on April 8, 2025. Exhibit 3. This agreement required him to sign a "termination statement" upon the end of his employment to ensure return and protection of xAI Confidential Information. *Id.* ¶ 8. Despite agreeing to this requirement, the senior finance executive has refused to sign his Termination Certification. Exhibit 5. Indeed, when confronted about his refusal, he simply lied, claiming that he never received the certification, even though xAI's records clearly document that he did.

107.    In his role, the senior finance executive had access to key xAI Confidential Information and trade secrets regarding xAI's finances, partner deals, and data center operations, the efficiency of which xAI has invested significantly into optimizing. For example, xAI has developed chip installation techniques that are significantly faster than existing methods.

108.    The senior finance executive himself acknowledged that xAI's data center operations are its "secret sauce," explaining: "The secret sauce of xAI? The data center team. Their speed and precision blew me away. I would NEVER want to compete against them."

109.    Despite claiming that he would never want to compete against xAI's data center teams, recently, after only a few months at his job at xAI, the senior finance executive quit and began employment with OpenAI soon after in a lesser role as "business finance operator" reporting to the CFO and working on spending strategy for data centers.

110.    On information and belief, OpenAI offered the senior finance executive a job based entirely on his knowledge of xAI Confidential Information. Indeed, the senior finance executive had zero knowledge of or experience working with data centers for AI before working at xAI. On information and belief, OpenAI offered him a data center-focused position to induce him to share xAI Confidential Information with OpenAI and/or use that information on OpenAI's behalf.

111.    Upon information and belief, the senior finance executive quit his job at xAI and accepted this demotion as part of a corrupt bargain to use and exploit xAI's Confidential Information for the benefit of OpenAI.

112.    In the senior finance executive, OpenAI found a kindred spirit who simply did not care about xAI's legitimate interests in protecting its trade secrets. When xAI reached out to the senior finance executive—whose confidentiality agreement required him to work with xAI regarding the return of xAI Confidential Information—specifically regarding confidentiality concerns, he responded with a crude and disdainful sexual remark:



113.    When xAI's HR team reached out again to talk with the senior finance executive, including because he refused to sign a termination statement confirming his compliance with his confidentiality obligations to xAI, he responded again with profanity:



114.    OpenAI's efforts to target specific xAI Confidential Information are reflected in OpenAI's recent hiring spree of former xAI employees who worked on xAI data center solutions or the development of Grok 4, including Uday Ruddarraju, Sreekanth Pothanis, Mike Dalton, Hieu Pham, and Ethan Knight. As with all the other xAI employees discussed above, OpenAI did not merely hire them because it needed additional manpower but instead targeted these employees based on their access to particular xAI Confidential Information. For example, Ruddarraju and Pothanis were involved in xAI's Supercompute Division, with access to sensitive xAI Confidential Information regarding deployment of the very same NVIDIA GPUs used in xAI's data centers that OpenAI wants to heavily rely upon for its business.[2] Deployment of these GPUs is an important part of xAI's data center operations, which, as noted above, are widely recognized in the industry as a key competitive differentiator.

115.    In sum, in just a few months, OpenAI poached no fewer than eight xAI employees as part of a deliberate scheme to gain access to specific xAI Confidential Information that OpenAI needed to harm xAI and benefit itself. Two of those employees have admitted to stealing xAI's trade secrets on their way out the door to OpenAI, and xAI has obtained highly suggestive, secret communications between one of those employees and an OpenAI employee that coincided precisely in time with the exfiltration. Moreover, a third employee, who was hired by OpenAI for a role specifically targeted at the most sensitive and valuable aspect of his tenure at xAI, responded with profanity in response to a specific admonition not to share xAI's Confidential Information and refused to sign an attestation that he did not do so. OpenAI has turned to these unscrupulous and illegal tactics to fend off a highly innovative challenger in xAI.

## **FIRST CAUSE OF ACTION**

### **(Trade Secrets Misappropriation: 18 U.S.C. § 1836 *et seq.*)**

116.    xAI realleges and incorporates by reference Paragraphs 1 through 115 as though fully set forth herein.

---

[2] Gyana Swain, *Oracle to Spend $40B on Nvidia Chips for OpenAI Data Center in Texas*, NETWORK WORLD (May 26, 2025), https://www.networkworld.com/article/3995015/oracle-to-spend-40b-on-nvidia-chips-for-openai-data-center-in-texas.html.

117.    The Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"), allows an "owner of a trade secret that is misappropriated" to "bring a civil action [if] the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

118.    18 U.S.C. § 1836(b)(3)(A)(i) provides that "a court may grant an injunction to prevent any actual or threatened misappropriation."

119.    The DTSA defines a trade secret to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" that "(A) the owner thereof has taken reasonable measures to keep ... secret; and (B) ... derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

120.    The DTSA defines misappropriation to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" and "disclosure or use of a trade secret of another without express or implied consent by a person" who "used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5). "Improper means" include theft, misrepresentation, and "breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6).

121.    xAI dedicated and continues to dedicate substantial time and resources toward developing its trade secrets.

122.    At all relevant times, xAI has made reasonable efforts to ensure its trade secrets remain confidential, proprietary, secret, and available for xAI's commercial use only, including as alleged above in Paragraphs 35–38, which are incorporated herein by reference.

123.    The xAI trade secrets Li and Fraiture misappropriated included, without limitation, cutting-edge AI technologies that differentiate xAI's models and operation from those of other generative AI companies. Li and Fraiture had no legitimate reason to possess xAI's trade secrets outside the context of their work at xAI or on any of their personal devices and/or accounts. To the

contrary, they, by their own admission, wrongfully placed xAI's trade secrets onto their personal devices and/or accounts.

124.    The xAI trade secrets the senior finance executive had in his possession and, upon information and belief, misappropriated, included, without limitation, detailed knowledge of xAI's industry-leading data center operations, which he admitted was "the secret sauce of xAI." The senior finance executive refused to even agree, upon his departure, to return xAI's trade secrets and keep xAI's trade secrets confidential, instead responding with a crass comment leaving little doubt as to his, and OpenAI's, intentions.

125.    Upon information and belief, Li, Fraiture, and the senior finance executive stole or otherwise misappropriated xAI's Confidential Information and trade secrets at the behest and for the benefit of OpenAI, including after they had signed agreements with OpenAI such as their employment offers or Fraiture's non-disclosure agreement made in anticipation of future employment, such that Li, Fraiture, and the senior finance executive were acting as agents for OpenAI, and OpenAI is vicariously liable for their conduct.

126.    Upon information and belief, OpenAI also directed, instructed, financially rewarded, and/or otherwise encouraged Li, Fraiture, and the senior finance executive to steal or otherwise misappropriate xAI's Confidential Information and trade secrets.

127.    Upon information and belief, Li actually shared xAI Confidential Information and trade secrets with OpenAI at least during an apparent interview presentation that took place on July 13, 2025.

128.    Li and Fraiture's conduct, and on information and belief the senior finance executive's conduct, on behalf of OpenAI amounted to misappropriation because they acquired xAI's trade secrets by improper means.

129.    Upon information and belief, OpenAI itself acquired these trade secrets through improper means, including from Li, Fraiture, and/or the senior finance executive. Li and Fraiture's theft of xAI's Confidential Information and trade secrets was contemporaneous with their communications with the very same OpenAI recruiter Tifa Chen regarding employment—sometimes occurring within minutes of communications with OpenAI. Chen was acting within the scope of her

employment at OpenAI in the course of her communications with Li and Fraiture, and OpenAI is vicariously liable for her actions and any subsequent acquisition of trade secrets from Li and/or Fraiture.

130.    Many of OpenAI's communications with at least Li occurred over the encrypted messaging application Signal, which also has the capability of permanently deleting all messages. The content, timing, and use of such communications reflects a willful and intentional decision by OpenAI to seek to acquire trade secrets through illegal and improper means.

131.    OpenAI's offer of substantial financial compensation to Li, and on information and belief to Fraiture and the senior finance executive, reflects an attempt to induce, encourage, and/or reward the theft and other misappropriation of trade secrets and therefore further constitute improper means used by OpenAI to acquire xAI's trade secrets.

132.    The trade secrets Li, Fraiture, and/or upon information and belief the senior finance executive misappropriated relate to Grok, xAI's advanced AI model, and xAI's data center operations. xAI customers, including customers located throughout the U.S., access Grok through the internet, including by using web browsers (grok.com), mobile phone apps, and by API access. Internet traffic serving some of these customers and data centers crosses state boundaries. Grok and xAI's data centers are thus a product or service used or intended for use in interstate commerce.

133.    These trade secrets have independent economic value to AI providers like xAI. The trade secrets are the result of the culmination of billions of dollars of investment and multiple years of AI development and training.

134.    OpenAI can easily weaponize these misappropriated trade secrets to, at a minimum, improve competing products such as ChatGPT with Grok's more innovative and imaginative features that make Grok one of the most, if not the most, intelligent generative AI chatbots, to undermine xAI's product roadmap, and to disrupt xAI's expansion strategy.

135.    The trade secrets OpenAI misappropriated could save it billions in R&D dollars and years of engineering effort, handing it an unfair and significant advantage in the AI race.

136.    The trade secrets OpenAI misappropriated could enable it to improve its data center deployments to match the speed of xAI's deployments, which are widely recognized in the industry as a key innovation by xAI.

137.    xAI has suffered and will continue to suffer injury because of OpenAI's misappropriation of trade secrets, including diminished value of its trade secrets, loss of its competitive advantage, loss of business, and harm to its reputation and goodwill.

138.    Additionally, because OpenAI has committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of xAI's rights, xAI is entitled to recover punitive damages from OpenAI, in an amount according to proof at trial.

139.    Li and Fraiture both deleted evidence of their wrongdoing after having signed formal employment offers with OpenAI. This deletion evidences bad faith, and because it was performed in concert with OpenAI and while under contract for future employment with OpenAI acting as agents or putative employees of OpenAI, OpenAI is further liable for this bad-faith conduct, which further entitles xAI to recover punitive damages.

## SECOND CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage)

140.    xAI realleges and incorporates by reference Paragraphs 1 through 139 as though fully set forth herein.

141.    As alleged herein, OpenAI has intentionally interfered with xAI's prospective economic advantage.

142.    xAI had established economic relationships with its former employees, including, but not limited to, Li, Fraiture, the senior finance executive, Pothanis, Ruddarraju, Dalton, Pham, and Knight.

143.    Through those relationships, xAI stood to obtain a reasonably probable economic benefit. Indeed, many of the aforementioned engineers had been among the first ever hired at xAI, meaning that they had the deepest institutional knowledge about xAI's proprietary technology and confidential business strategy and operations, including those around xAI's unparalleled data center operations.

144.     xAI incurred significant expenses in developing and maintaining its relationships with these individuals in order to obtain the prospective benefits of future work they might perform for xAI, including providing salary and stock options to these individuals. xAI further provided liquidity by facilitating the sale of millions of dollars worth of stock from Li and Fraiture at the same time as they were, unbeknownst to xAI, communicating with OpenAI recruiter Tifa Chen as part of OpenAI's unlawful scheme to acquire xAI trade secrets. xAI provided this liquidity in anticipation of the prospective benefits that it reasonably expected to obtain from Li and Fraiture's continued work for xAI.

145.     OpenAI knew of xAI's prospective economic advantage. OpenAI knew of the economic relationship between xAI and its employees and knew that xAI stood to gain reasonably probable economic benefit from retaining those employees, especially those who specialized in technologies and operations in which xAI maintains competitive advantages over OpenAI.

146.     OpenAI then specifically targeted employees who had access to xAI Confidential Information and trade secrets in targeted areas—specifically including xAI's superior data center strategy, know-how, and expertise. As OpenAI CEO Sam Altman admitted in an interview at the New York Times DealBook Summit in December 2024, he had "tremendous respect for how quickly they [xAI] built that data center"[3]—referring to xAI's Colossus, the largest AI supercomputer in the world.

147.     OpenAI knowingly and intentionally interfered with xAI's prospective economic advantage at least by violating the DTSA, including through OpenAI's targeted poaching of xAI Confidential Information and trade secrets, through xAI employees who had access to such information. This conduct was and is independently wrongful.

148.     The economic relationship that xAI had with its former employees was actually disrupted, including through the departure of such xAI employees that possessed institutional and highly sensitive knowledge about xAI's innovations in AI and data center operations.

149.     xAI has suffered economic harm as a result, including at least through the costs of attempting to recover and prevent any further dissemination of its Confidential Information and the

---

[3] New York Times Events, *The Next Frontier: Sam Altman on the Future of A.I. and Society*, YouTube (Dec. 4, 2024), https://www.youtube.com/watch?v=tn0XpTAD_8Q.

cost of forensic examinations into former employees that OpenAI has tortiously interfered with. xAI has further suffered economic harm from any disruption to its technological development and operational deployments as a result of losing these employees due to OpenAI's interference. xAI further suffered economic harm from the substantial liquidity it provided to Li and Fraiture in anticipation of their ongoing technical contributions to xAI's technology at the same time that, unknown to xAI, OpenAI was actively interfering with their ongoing relationship with xAI.

## THIRD CAUSE OF ACTION

### (Unfair Competition: Cal. Bus. & Prof. Code § 17200 *et seq.*)

150.    xAI realleges and incorporates by reference Paragraphs 1 through 149 as though fully set forth herein.

151.    Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL") prohibits unfair competition, meaning "any unlawful, unfair or fraudulent business act or practice."

152.    OpenAI has engaged in conduct that is unlawful.

153.    OpenAI's conduct is unlawful at least because it violates the Defend Trade Secrets Act and has caused harm to xAI as alleged in the First Cause of Action, which is incorporated by reference herein.

## PRAYER FOR RELIEF

xAI prays for the following relief:

(a)    Restitution and disgorgement of any ill-gotten Confidential Information and trade secrets in Defendants' possession acquired through the wrongful acts described above;

(b)    A money judgment against Defendants for that amount of ordinary damages, trebled damages, punitive damages, and/or restitution, in an amount to be determined at trial;

(c)    Pre- and post-judgment interest;

(d)    Costs of the suit, including reasonable attorneys' fees and expenses;

(e)    Temporary, preliminary, and/or permanent injunctive relief barring OpenAI's unlawful competition and practices, including the conduct described above and any other similar wrongful acts, requiring the return of any xAI Confidential Information, requiring the removal of any xAI Confidential Information from OpenAI's products and systems,

1  requiring the destruction of any OpenAI technology or AI models developed using xAI
2  Confidential Information, and any other measures necessary to remediate any harm
3  caused to xAI; and

4  (f)    Such other relief as the Court deems equitable and proper.

5  **<u>DEMAND FOR JURY TRIAL</u>**

6  Plaintiffs hereby demand a trial by jury on all appropriate issues raised in this Complaint.

7

8  Dated: September 24, 2025                    **WINSTON & STRAWN LLP**

9                                               By: */s/ Kathi Vidal*

10                                              KATHI VIDAL (State Bar No. 194971)
                                                kvidal@winston.com
11                                              MATTHEW R. MCCULLOUGH (State Bar
                                                No. 301330)
12                                              mrmcullough@winston.com
                                                CARSON SWOPE (State Bar No. 353352)
13                                              cswope@winston.com
                                                **WINSTON & STRAWN LLP**
14                                              255 Shoreline Drive, Suite 520
                                                Redwood City, CA 94065
15                                              Telephone: (650) 858-6500
                                                Facsimile: (650) 858-6550
16
                                                LEELLE B. SLIFER (*pro hac vice*
17                                              forthcoming)
                                                lslifer@winston.com
18                                              JONATHAN HUNG (*pro hac vice*
                                                forthcoming)
19                                              johung@winston.com
                                                **WINSTON & STRAWN LLP**
20                                              2121 N. Pearl Street, Suite 900
                                                Dallas, TX 75201
21                                              Telephone: (214) 453-6500
                                                Facsimile: (214) 453-6400
22

23

24

25

26

27

28

29