# EXHIBIT 1

**EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT**

As a condition of my becoming employed (or my continued employment) by **X.AI Corp.**, a Nevada corporation, or any of its current or future subsidiaries, parents, affiliates, successors or assigns (collectively, the "**Company**"), which I acknowledge to be good and valuable consideration for my obligations hereunder, I hereby enter into this Employee Confidential Information and Invention Assignment Agreement (the "**Agreement**") and agree as follows:

1. **Confidential Information Protections.**

    1.1. **Recognition of Company's Rights; Nondisclosure**. I understand and acknowledge that my employment by Company creates a relationship of confidence and trust with respect to Company's Confidential Information (as defined below) and that Company has a protectable interest therein. At all times during and after my employment, I will hold in confidence and will not disclose, use, or publish any of Company's Confidential Information, except as such disclosure, use or publication may be required in connection with my work for Company, or unless an officer of Company expressly authorizes such disclosure. I will obtain Company's written approval before publishing or submitting for publication any material (written, oral, or otherwise) that discloses and/or incorporates any Confidential Information. I hereby assign to Company any rights I may have or acquire in such Confidential Information and recognize that all Confidential Information shall be the sole and exclusive property of Company and its assigns. I will take all reasonable precautions to prevent the inadvertent accidental disclosure of Confidential Information. Notwithstanding the foregoing, pursuant to 18 U.S.C. Section 1833(b), I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

    1.2. **Confidential Information**. The term "**Confidential Information**" shall mean any and all confidential knowledge, data or information of Company. By way of illustration but not limitation, "Confidential Information" includes (a) trade secrets, proprietary technology, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques, and any other work product of any nature and all Intellectual Property Rights (as defined below) therein (collectively, "**Inventions**"), including all Company Inventions (as defined below); (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of Company and other non-public information relating to customers and potential customers; (d) information regarding any of Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by Company, and other non-public information relating to business partners; (e) non-public information regarding other Company personnel, consultant lists, employee lists, compensation and employee and consultant skills that have not been disclosed by the individuals themselves; (f) information regarding stockholders, affiliates of stockholders and sponsors of Company; and (g) any other non-public information that a competitor of Company could use to Company's competitive disadvantage.

    1.3. **Permitted Communications and Activities**. Notwithstanding the foregoing, Company agrees that I am free to use information that I knew prior to my employment with Company or that is, at the time of use, generally known in the trade or industry through no breach of this Agreement or act or omission by me. I understand that nothing in this Agreement prevents me from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that I have

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

reason to believe is unlawful. Company further agrees that this Agreement does not limit my right to discuss my compensation or the compensation of others in a manner consistent with each employee's right to privacy, to disclose other terms and conditions of my employment, to report possible information about reasonably suspected violations of law or regulation to the Equal Employment Opportunity Commission, the United States Department of Labor, the National Labor Relations Board, the Securities and Exchange Commission, or any other federal, state or local government or law enforcement agency (unless subject to the attorney-client privilege), or public body or other third parties, to disclose information about suspected violations of the law to persons in the Company who have authority to address the violation, to engage in any communications or other activity protected by Section 7 of the National Labor Relations Act, to engage in political speech or activities in my own personal capacity, or to make other disclosures expressly protected under the applicable provisions of law or regulation, including but not limited to "whistleblower" statutes and any applicable statutes that protect political speech or activities.

1.4. **Third Party Information**. I understand, in addition, that Company has received and, in the future, will receive from third parties their confidential and/or proprietary knowledge, data or information ("**Third Party Information**") subject to a duty on Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for Company) or use Third Party Information, except in connection with my work for Company, or unless expressly authorized by an officer of Company in writing.

1.5. **Term of Nondisclosure Restrictions**. I understand that Confidential Information and Third Party Information is never to be used or disclosed by me, except as expressly provided in this Section 1, and I agree that the restrictions in Section 1 are intended to continue indefinitely, even after my employment by Company ends. If a temporal limitation on my obligation not to use or disclose such information is required under applicable law, and the Agreement or its restriction(s) cannot otherwise be enforced, I agree and Company agrees that the two year period after the date my employment ends will be the temporal limitation relevant to the contested restriction; provided, however, that my obligation not to disclose or use trade secrets that are protected without time limitation under applicable law shall continue indefinitely.

1.6. **No Improper Use of Information of Prior Employers and Others.** During my employment by Company, I will not improperly use or disclose confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person.

2. **Assignments of Inventions.**

    2.1. **Definitions**. As used in this Agreement, the term "**Intellectual Property Rights**" means all trade secrets, Copyrights, trademarks, mask work rights, patents and other intellectual property rights recognized by the laws of any jurisdiction or country; the term "Copyright" means the exclusive legal right to reproduce, perform, display, distribute and make derivative works of a work of authorship (as a literary, musical, or artistic work) recognized by the laws of any jurisdiction or country; and the term "**Moral Rights**" means all paternity, integrity, disclosure, withdrawal, special and any other similar rights recognized by the laws of any jurisdiction or country.

    2.2. **California Labor Code Section 2870(a) Notice**. I acknowledge that California Labor Code section 2870(a) (the "**Specific Inventions Law**") provides that I cannot be required to assign to Company any Invention that I develop entirely on my own time without using Company's equipment, supplies, facilities or trade secret information, except for Inventions that either (a) relate at the time of conception or reduction to practice to Company's business, or actual or demonstrably anticipated research or development, or (b) result from any work performed by me for Company (the "**Non-Assignable Inventions**"). To the extent that a provision in this Agreement purports to require me to assign an Invention otherwise excluded in this Section 2.2 to Company, the provision is against the public policy of the state of California and is

unenforceable. This limited exclusion does not apply to any patent or Invention covered by a contract between Company and the United States or any of its agencies requiring full title to such patent or Invention to be in the United States.

2.3. **Excluded Inventions.** Attached hereto as Exhibit A is a list describing all existing Inventions, if any, that (a) are owned by me or in which I have an interest and were made or acquired by me prior to my date of first employment by Company, and (b) may relate to Company's business or actual or demonstrably anticipated research or development, and (c) are not to be assigned to Company ("**Excluded Inventions**"). If no such list is attached, I agree that no Inventions that would be classified as Excluded Inventions exist as of the date of this Agreement. I acknowledge and agree that if I use any Excluded Inventions and/or Non-Assignable Inventions in the scope of my employment, or if I include any Excluded Inventions and/or Non-Assignable Inventions in any product or service of Company, or if my rights in any Excluded Inventions and/or any Non-Assignable Inventions may block or interfere with, or may otherwise be required for, the exercise by Company of any rights assigned to Company under this Agreement, (i) I will immediately notify Company in writing and (ii) unless Company and I agree otherwise in writing, I hereby grant to Company, in such circumstances (whether or not I give Company notice as required above), a non-exclusive, perpetual, transferable, fully-paid, royalty-free, irrevocable, worldwide license, with rights to sublicense through multiple levels of sublicensees, to reproduce, make derivative works of, distribute, publicly perform, and publicly display in any form or medium, whether now known or later developed, make, have made, use, sell, import, offer for sale, and exercise any and all present or future rights in, such Excluded Inventions or Non-Assignable Inventions. To the extent that any third parties have any rights in or to any Excluded Inventions or any such Non-Assignable Inventions, I hereby represent and warrant that such third party or parties have validly and irrevocably granted to me the right to grant the license stated above.

2.4. **Assignment of Company Inventions.** Inventions assigned to Company in this subsection or to a third party as directed by Company pursuant to Section 2.6 are referred to in this Agreement as "**Company Inventions.**" Except for Excluded Inventions and Non-Assignable Inventions, I hereby assign to Company all my right, title, and interest in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made, conceived, developed, prepared, produced, authored, edited, amended, reduced to practice, or learned or set out in any tangible medium of expression or otherwise created, in whole or in part, by me, either alone or with others, during my employment by Company, and all printed, physical, and electronic copies, and other tangible embodiments of Inventions. To the extent required by applicable Copyright laws, I agree to assign in the future (when any copyrightable Inventions are first fixed in a tangible medium of expression) my Copyright rights in and to such Inventions. Any assignment of Company Inventions (and all Intellectual Property Rights with respect thereto) hereunder includes an assignment of all Moral Rights. To the extent such Moral Rights cannot be assigned to Company and to the extent the following is allowed by the laws in any country where Moral Rights exist, I hereby unconditionally and irrevocably waive the enforcement of such Moral Rights, and all claims and causes of action of any kind against Company or related to Company's customers, with respect to such rights. I further acknowledge and agree that neither my successors-in-interest nor legal heirs retain any Moral Rights in any Company Inventions (and any Intellectual Property Rights with respect thereto).

2.5. **Obligation to Keep Company Informed.** During the period of my employment, I will promptly and fully disclose to Company in writing all Inventions authored, conceived, or reduced to practice by me, either alone or jointly with others. At the time of each such disclosure, I will advise Company in writing of any Inventions that I believe constitute Non-Assignable Inventions; and I will at that time provide to Company in writing all evidence necessary to substantiate that belief. Company will keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to Company pursuant to this Agreement relating to Non-Assignable Inventions. I will preserve the confidentiality of any Invention that does not fully qualify for protection under the Specific Inventions Law.

2.6. **Government or Third Party.** I agree that, as directed by Company, I will assign to a third party, including without limitation the United States, all my right, title, and interest in and to any particular Company Invention.

2.7. **Ownership of Work Product.** I agree that Company will exclusively own all work product that is made by me (solely or jointly with others) within the scope of my employment, and I hereby irrevocably and unconditionally assign to Company all right, title and interest worldwide in and to such work product. I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by Copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101). I understand and agree that I have no right to publish on, submit for publishing, or use for any publication any work product protected by this Section, except as necessary to perform services for Company.

2.8. **Enforcement of Intellectual Property Rights and Assistance.** I will assist Company in every proper way to obtain, and from time to time enforce, United States and foreign Intellectual Property Rights and Moral Rights relating to Company Inventions in any and all countries. To that end, I will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Intellectual Property Rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such Intellectual Property Rights to Company or its designee, including the United States or any third party designated by Company. My obligation to assist Company with respect to Intellectual Property Rights relating to such Company Inventions in any and all countries will continue beyond the termination of my employment, but Company will compensate me at a reasonable rate after my termination for the time actually spent by me at Company's request on such assistance. In the event Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in this paragraph, I hereby irrevocably designate and appoint Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act for and on my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this Agreement with the same legal force and effect as if executed by me. I hereby waive and quitclaim to Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Intellectual Property Rights assigned under this Agreement to Company.

2.9. **Incorporation of Software Code.** I agree that I will not incorporate into any Inventions, including Company software, or otherwise deliver to Company any software code licensed under the GNU General Public License or Lesser General Public License or any other license that, by its terms, requires or conditions the use or distribution of such code on the disclosure, licensing, or distribution of any source code owned or licensed by Company, except in strict compliance with Company's policies regarding the use of such software.

3. **Records.** I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that is required by Company) of all Confidential Information developed by me and all Company Inventions made by me during the period of my employment at Company, which records will be available to and remain the sole property of Company at all times.

4. **Duty of Loyalty During Employment.** I agree that during the period of my employment by Company, I will not, without Company's express written consent, directly or indirectly engage in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my employment by Company.

5. **No Solicitation of Employees, Consultants or Contractors.** To the extent permitted by applicable law, I agree that during the period of my employment and for the one year period after the date my employment ends for any reason, including but not limited to voluntary termination by me or involuntary termination by Company, I will not, as an officer, director, employee, consultant, owner, partner, or in any other capacity, either directly or through others, except on behalf of Company, solicit, induce, encourage, or participate in soliciting, inducing or encouraging any person known to me to be an employee, consultant, or independent contractor of Company to terminate his or her relationship with Company, even if I did not initiate the discussion or seek out the contact.

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

6. **Reasonableness of Restrictions.**

   6.1. I have read this entire Agreement and understand it. I agree that this Agreement does not prevent me from earning a living or pursuing my career. I agree that the restrictions contained in this Agreement are reasonable, proper, and necessitated by Company's legitimate business interests. I represent and agree that I am entering into this Agreement freely and with knowledge of its contents with the intent to be bound by this Agreement and the restrictions contained in it.

   6.2. In the event that a court finds this Agreement, or any of its restrictions, to be ambiguous, unenforceable, or invalid, I and Company agree that the court will read this Agreement as a whole and interpret the restriction(s) at issue to be enforceable and valid to the maximum extent allowed by law.

   6.3. If the court declines to enforce this Agreement in the manner provided in subsection 6.2, Company and I agree that this Agreement will be automatically modified to provide Company with the maximum protection of its business interests allowed by law and I agree to be bound by this Agreement as modified.

7. **No Conflicting Agreement or Obligation**. I represent that my performance of all the terms of this Agreement and as an employee of Company does not and will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement.

8. **Return of Company Property**. When I leave the employ of Company, I will deliver to Company any and all drawings, notes, memoranda, specifications, devices, formulas and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Confidential Information of Company. I agree that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and I agree to provide Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed. I further agree that any property situated on Company's premises and owned by Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company's personnel at any time with or without notice. Prior to leaving, I agree to: (a) provide Company any and all information needed to access any Company property or information returned or required to be returned pursuant to this paragraph, including without limitation any login, password, and account information; (b) cooperate with Company in attending an exit interview; and (c) completing and signing Company's termination statement if required to do so by Company.

9. **Legal and Equitable Remedies.**

   9.1. I agree that it may be impossible to assess the damages caused by my violation of this Agreement or any of its terms. I agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to Company, and Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that Company may have for a breach or threatened breach of this Agreement.

   9.2. In the event Company enforces this Agreement through a court order, I agree that the restrictions of Section 5 will remain in effect for a period of 12 months from the effective date of the Order enforcing the Agreement.

10. **Notices**. Any notices required or permitted under this Agreement will be given to Company at its headquarters location at the time notice is given, labeled "Attention Chief Executive Officer," and to me at my address as listed on Company payroll, or at such other address as Company or I may designate by written notice to the other. Notice will be effective upon receipt or refusal of delivery. If delivered by certified or registered mail, notice will

be considered to have been given five business days after it was mailed, as evidenced by the postmark. If delivered by courier or express mail service, notice will be considered to have been given on the delivery date reflected by the courier or express mail service receipt.

11. **Publication of This Agreement to Subsequent Employer or Business Associates of Employee.**

    11.1. If I am offered employment or the opportunity to enter into any business venture as owner, partner, consultant or other capacity while the restrictions described in Section 5 of this Agreement are in effect, I agree to inform my potential employer, partner, co-owner and/or others involved in managing the business with which I have an opportunity to be associated of my obligations under this Agreement and also agree to provide such person or persons with a copy of this Agreement.

    11.2. I agree to inform Company of all employment and business ventures which I enter into while the restrictions described in Section 5 of this Agreement are in effect and I also authorize Company to provide copies of this Agreement to my employer, partner, co-owner and/or others involved in managing the business with which I am employed or associated and to make such persons aware of my obligations under this Agreement.

12. **General Provisions.**

    12.1. **Governing Law; Consent to Personal Jurisdiction**. This Agreement will be governed by and construed in accordance with the laws of the state of your primary work location ("**State Law**"). I hereby expressly consent to the personal jurisdiction and venue of the state and federal courts located in the state of my primary work location for any lawsuit filed there against me by Company arising from or related to this Agreement.

    12.2. **Severability**. In case any one or more of the provisions, subsections, or sentences contained in this Agreement will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect the other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained in this Agreement. If moreover, any one or more of the provisions contained in this Agreement will for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it will be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it will then appear.

    12.3. **Successors and Assigns**. This Agreement is for my benefit and the benefit of Company, its successors, assigns, parent corporations, subsidiaries, affiliates, and purchasers, and will be binding upon my heirs, executors, administrators and other legal representatives.

    12.4. **Survival**. This Agreement shall survive the termination of my employment, regardless of the reason, and the assignment of this Agreement by Company to any successor in interest or other assignee.

    12.5. **Employment At-Will**. I agree and understand that nothing in this Agreement will change my at-will employment status or confer any right with respect to continuation of employment by Company, nor will it interfere in any way with my right or Company's right to terminate my employment at any time, with or without cause or advance notice.

    12.6. **Waiver**. No waiver by Company of any breach of this Agreement will be a waiver of any preceding or succeeding breach. No waiver by Company of any right under this Agreement will be construed as a waiver of any other right. Company will not be required to give notice to enforce strict adherence to all terms of this Agreement.

    12.7. **Export**. I agree not to export, reexport, or transfer, directly or indirectly, any U.S. technical data acquired from Company or any products utilizing such data, in violation of the United States export laws or regulations.

12.8. **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

12.9. **Advice of Counsel**. I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT WILL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION OF THIS AGREEMENT.

12.10. **Entire Agreement**. The obligations pursuant to Sections 1 and 2 of this Agreement will apply to any time during which I was previously engaged, or am in the future engaged, by Company as a consultant if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter of this Agreement and supersedes and merges all prior discussions between us. No modification of or amendment to this Agreement will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

This Agreement is effective as of the date of Employee's signature.

**COMPANY**

Signature: *Robert Ochoa*

Name: Robert Ochoa

Title: Human Resources

**EMPLOYEE**

Signature: *Xuechen Li* (DocuSigned by: 3760BBD30E30414)

Name: Xuechen Li

Date: 2/26/2024

## EXHIBIT A

### EXCLUDED INVENTIONS

1. Excluded Inventions Disclosure. Except as listed in Section 2 below, the following is a complete list of all Excluded Inventions:

```
The complete list of prior inventions attached in the next pages.
```

2. Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to the Excluded Inventions generally listed below, the intellectual property rights and duty of confidentiality with respect to which I owe to the following party(ies):

Excluded Invention:

_____

_____

Party(ies):

_____

_____

Relationship:

_____

_____

# List of Prior Inventions

1. **A Simulation Framework for Methods that Learn from Human Feedback**
   a. publications/research articles:
      i. Dubois, Yann, Chen Xuechen Li, Rohan Taori, Tianyi Zhang, Ishaan Gulrajani, Jimmy Ba, Carlos Guestrin, Percy S. Liang, and Tatsunori B. Hashimoto. "Alpacafarm: A simulation framework for methods that learn from human feedback." *Advances in Neural Information Processing Systems* 36 (2024).
      ii. Alpaca: A Strong, Replicable Instruction-Following Model. Rohan Taori* and Ishaan Gulrajani* and Tianyi Zhang* and Yann Dubois* and Xuechen Li* and Carlos Guestrin and Percy Liang and Tatsunori B. Hashimoto.
   b. code: https://github.com/tatsu-lab/alpaca_farm
   c. abstract: A simulator for research and development for learning from feedback at a low cost. The simulator mimics human feedback with large language models, analyzes the performance of methods, and provides a fast and cheap automated evaluation that reflects human judgement.

2. **Methods, Software Implementations, and Applications for Differentially Private Machine Learning**
   a. publications:
      i. He, Jiyan, Xuechen Li, Da Yu, Huishuai Zhang, Janardhan Kulkarni, Yin Tat Lee, Arturs Backurs, Nenghai Yu, and Jiang Bian. "Exploring the limits of differentially private deep learning with group-wise clipping." The Eleventh International Conference on Learning Representations.
      ii. Li, Xuechen, Florian Tramer, Percy Liang, and Tatsunori Hashimoto. "Large language models can be strong differentially private learners." The Tenth International Conference on Learning Representations.
      iii. Yue, Xiang, Huseyin A. Inan, Xuechen Li, Girish Kumar, Julia McAnallen, Hoda Shajari, Huan Sun, David Levitan, and Robert Sim. "Synthetic text generation with differential privacy: A simple and practical recipe." The 61st Annual Meeting of the Association for Computational Linguistics.
   b. code: https://github.com/lxuechen/private-transformers
   c. abstract: Methods for improving the run time and memory efficiency of differentially private machine learning. Software implementation techniques for scaling the technical approaches to very large neural

      network models. Applications to generate synthetic data to preserve privacy.

3. **Methods and software implementation for scalable training of neural network models with differential equations**
    a. publications:
        i. Li, Xuechen, Ting-Kam Leonard Wong, Ricky TQ Chen, and David Duvenaud. "Scalable gradients for stochastic differential equations." In *International Conference on Artificial Intelligence and Statistics*, pp. 3870-3882. PMLR, 2020.
        ii. Kidger, Patrick, James Foster, Xuechen Li, and Terry J. Lyons. "Neural sdes as infinite-dimensional gans." In *International conference on machine learning*, pp. 5453-5463. PMLR, 2021.
        iii. Xu, Winnie, Ricky TQ Chen, Xuechen Li, and David Duvenaud. "Infinitely deep bayesian neural networks with stochastic differential equations." In *International Conference on Artificial Intelligence and Statistics*, pp. 721-738. PMLR, 2022.
        iv. Kidger, Patrick, James Foster, Xuechen Chen Li, and Terry Lyons. "Efficient and accurate gradients for neural sdes." Advances in Neural Information Processing Systems 34 (2021): 18747-18761.
    b. code: https://github.com/google-research/torchsde
    c. abstract: Methods and software implementation for scalable gradient estimation through stochastic differential equations.

4. **Methods and evaluation protocols for unsupervised training of neural generative models with disentangled latent factors**
    a. publication: Chen, Ricky TQ, Xuechen Li, Roger B. Grosse, and David K. Duvenaud. "Isolating sources of disentanglement in variational autoencoders." *Advances in neural information processing systems* 31 (2018).
    b. abstract: Methods for training variational autoencoders with disentangled latent factors and novel evaluation metrics for the performance of approaches for disentangling.