UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X.AI CORP., et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>OPENAI, INC., et al.,<br><br>        Defendants. | Case No. 25-cv-08133-RFL<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**<br><br>Re: Dkt. No. 59 |

      To advance past the initial stage of a lawsuit and unlock the doors of discovery, a plaintiff must allege facts that, if true, would indicate that the defendant has committed the wrongful act in question.  The sole defendant in this lawsuit is OpenAI, whom xAI accuses of misappropriating its trade secrets.  But xAI does not point to any misconduct by OpenAI.  Instead, it points to eight former xAI employees who left for OpenAI at around the same time.  According to xAI, two of these former employees stole its source code during their departure at a time when they were communicating with an OpenAI recruiter (though there is no allegation that the recruiter told them to do so).  xAI also alleges that:  two other former employees retained work chats on their devices after leaving xAI; another refused xAI's demands to provide various certifications about confidential information after his departure; the sixth unsuccessfully tried to access xAI information about hiring and datacenter optimization after he started working at OpenAI; and the last two simply left xAI for OpenAI.  Notably absent are allegations about the conduct of OpenAI itself.  xAI does not allege any facts indicating that OpenAI induced xAI's former employees to steal xAI's trade secrets or that these former xAI employees used any stolen trade secrets once employed by OpenAI.  While xAI may state misappropriation claims against a couple of its former employees, it does not state a plausible misappropriation claim against OpenAI, which is the sole defendant in this case.  Accordingly, and for the reasons set forth below, OpenAI's motion to dismiss is **GRANTED WITH LEAVE TO AMEND**.

I.      **ALLEGATIONS OF FIRST AMENDED COMPLAINT**

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the allegations of a complaint are assumed to be true. *See Boquist v. Courtney*, 32 F.4th 764, 772 (9th Cir. 2022). xAI and OpenAI offer competing generative AI products. In the summer of 2025, eight xAI employees left to pursue opportunities with OpenAI. In the First Amended Complaint (the "FAC"), xAI alleges the following concerning their departures. (*See* Dkt. No. 44.)

A.      **Xuechen Li**

"Li joined xAI on or about February 26, 2024, and . . . was among the company's first 20 engineers . . . ." (*Id.* ¶ 46.) His contact with OpenAI began in July 2025. (*See id.* ¶ 54.) On July 13, he "made a presentation to OpenAI for an interview" that, on information and belief, "contain[ed] xAI's Confidential Information." (*See id.* ¶ 55.) xAI does not allege what specific information Li disclosed in the presentation or that OpenAI was aware that this unspecified information constituted xAI's confidential information or trade secrets. Ten days after Li's presentation, "OpenAI Research Talent Advisor Tifa Chen sent [him] a message request" on Signal, an "encrypted messaging application." (*See id.* ¶ 58.) The next day, she sent him a link to "a cloud storage location." (*See id.*) xAI does not allege why Chen did so or the intended purpose of the cloud storage location. On the following day, July 25, "Li uploaded the entire xAI source code base to a personal cloud account" that he had connected to ChatGPT, OpenAI's "generative AI chatbot product." (*See id.* ¶¶ 29, 59 (emphasis omitted), 83.) xAI does not allege that this was the same cloud storage location that Chen provided Li. "Li then deleted his browser history and system logs . . . ." (*Id.* ¶ 59.) That same day, Li also downloaded xAI's source code from the cloud to his personal computer. (*See id.* ¶ 60.)

This download occurred during the same time frame when Li was finalizing his move to OpenAI and continuing to communicate with Chen. On July 25, about four hours after Li downloaded xAI's source code onto his personal computer, Chen sent him a message on Signal reading "nw!" which xAI alleges meant "no way!"[1] (*See id.* ¶ 61; Dkt. No. 64 at 7.) xAI does

---

[1] In the FAC, xAI alleges that Chen sent Li a message "that equated to 'no way!'" (*See* FAC ¶

not allege what prompted Chen to send Li this message. "Two minutes later, . . . Chen had a virtual meeting with Li." (FAC ¶ 62.) Two days after that, on July 27, "Li again downloaded xAI Confidential Information to his personal laptop." (*See id.* ¶ 63.) On July 28, OpenAI offered him a job worth "multiple millions of dollars," and by August 1, he had accepted. (*See id.* ¶¶ 64-65.)

Over the next few weeks, and before beginning any employment at OpenAI, Li accessed his cloud account, downloaded xAI's confidential information, changed his cloud account password, and accessed his trash folder ("where a user must go to permanently delete files"). (*See id.* ¶¶ 69-77.) At some unspecified time, he also obtained a slide deck "specifically pertaining to xAI's highly sensitive and confidential AI model training and tuning methods." (*See id.* ¶ 56.)

xAI eventually discovered Li's exfiltration of its confidential information and subsequently obtained a temporary restraining order from this Court, which prohibited Li "from having any role or responsibility at OpenAI . . . until xAI has confirmed that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted." (*See id.* ¶¶ 79-80.) OpenAI then revoked Li's job offer. (*See id.* ¶ 80.)

### B. Jimmy Fraiture

"Fraiture joined xAI on or about April 22, 2024[,] [and] . . . was the second engineering hire in xAI's London operation . . . ." (*Id.* ¶ 87.) Like Li, he had been in contact with OpenAI "since early July" 2025. (*See id.* ¶ 93.) He communicated via Signal with Chen, "the very same recruiter who was in regular contact with Li," around July 17, visited OpenAI around July 24, received an offer of employment on July 29, and accepted the offer by July 30. (*See id.* ¶¶ 94-

---

61.) It clarified in its opposition brief and at oral argument that Chen's message actually read "nw!" OpenAI insists that "nw" means "no worries." (*See* Dkt. No. 66 at 10 n.3.) Drawing inferences in xAI's favor, as required on a motion to dismiss, this Order assumes "nw" meant "no way."

In this Order, all citations to page numbers in filings on the docket refer to ECF page numbers.

97.)

On July 31, about a day after he accepted OpenAI's offer, Fraiture copied xAI's source code and other trade secrets from his work laptop onto his "personal device." (*See id.* ¶ 98.) Among the files taken was a "video recording of a lengthy internal, xAI 'All-Hands' meeting, in which xAI founder Elon Musk conveyed significant confidential nonpublic information in relation to xAI's future plans and immediate targets, product roadmap, commercial contract terms, and other confidential and sensitive information[,] . . . includ[ing] information relating to xAI's strategic priorities and confidential business practices." (*See id.* ¶ 102.)

xAI eventually discovered Fraiture's exfiltration of its confidential information, and its "Insider Threat team" met with him in late August. (*See id.* ¶ 103.) At that meeting, Fraiture told xAI that he had never transferred xAI's source code to his personal device, but he "later admitted that this statement was untrue and that he had in fact copied xAI source code to his personal computer," which he kept there for a few weeks before, according to him, he deleted it. (*See id.*) He maintained the source code on his personal device "until at least August 28." (*See id.* ¶ 98.) His employment with OpenAI began on September 2. (*See id.* ¶ 97.)

xAI does not allege any facts indicating that Fraiture used xAI's confidential information once he began working at OpenAI. Likewise, other than the bare fact that Fraiture had been recruited by Chen, who had also recruited Li, xAI does not allege any facts indicating that OpenAI had encouraged Fraiture to take xAI's confidential information in the first place.

C.     **Unnamed Finance Executive**

An unnamed finance executive who had joined xAI around April 2025 quit a few months later to begin working for OpenAI "in a lesser role." (*See id.* ¶¶ 112, 115.) His position at OpenAI involved "working on spending strategy for data centers." (*See id.* ¶ 115.) That work overlapped with confidential information that the executive had obtained while employed at xAI. (*See id.* ¶ 113.) In fact, at one point, the executive had opined: "The secret sauce of xAI? The data center team. Their speed and precision blew me away. I would NEVER want to compete against them." (*See id.* ¶ 114.) On two occasions after the executive left xAI, the company

4

reached out to him to address "confidentiality concerns," as contemplated by a confidentiality agreement that he had signed when he joined the company. (*See id.* ¶¶ 112, 118-19.) On both occasions, he refused to cooperate, telling xAI's counsel and human resources employee: "Suck my dick"; and "Leave me the fuck alone." (*See id.* ¶¶ 118-19.)

        **D.    Uday Ruddarraju, Hieu Pham, and Ethan Knight**

Ruddarraju, Pham, and Knight each worked at xAI for over a year (in unspecified positions), "where they acquired detailed knowledge about xAI's operations and technology, including its Confidential Information and trade secrets." (*See id.* ¶ 123.) "Ruddarraju and Knight left xAI in July 2025[,] Pham left xAI in August 2025, and all [three] began working for OpenAI by August." (*Id.* ¶ 126.) "Since their departure, Knight and Pham have admitted to keeping copies of xAI related work chats and information on their personal devices," but they have refused to cooperate with xAI in identifying the information taken or turning over their devices. (*See id.* ¶ 127.) Moreover, the two "have shared copies of their xAI information with" a third party. (*See id.* ¶ 128.) xAI does not allege why Pham and Knight shared its information with this third party or whether they did so in connection with their employment at OpenAI or to benefit OpenAI. OpenAI asserts that this third party was a forensics vendor. (*See* Dkt. No. 59 at 8.) xAI does not allege who the third party was. As for Ruddarraju, in September 2025, he attempted to access an internal xAI document containing confidential information about "datacenter optimization," potential hires, and compensation for potential hires. (*See id.* ¶ 130.) xAI does not allege that Ruddarraju successfully accessed the document, and it confirmed in its opposition brief that it "successfully blocked Ruddarraju's attempt" to access the document. (*See* Dkt. No. 64 at 12.)

        **E.    Sreekanth Pothanis and Mike Dalton**

Pothanis and Dalton left xAI to work for OpenAI at around the same time as the other former xAI employees identified in the FAC. (*See id.* ¶ 121.) Their work at xAI involved "xAI data center solutions or the development of Grok 4," xAI's "conversational generative AI" product that competes with OpenAI's ChatGPT. (*See id.* ¶¶ 33-34, 121.) xAI does not allege

5

that they took any of its confidential information.

* * *

Believing OpenAI "poached" these "eight xAI employees as part of a deliberate, unlawful, and unfair scheme to gain access to specific xAI Confidential Information," xAI commenced this action on the basis that OpenAI unlawfully misappropriated xAI's trade secrets. (*See id.* ¶ 132.)

## II.     LEGAL STANDARD

A complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). Failure to satisfy this requirement may result in dismissal. *See id.* 12(b)(6). To survive a Rule 12(b)(6) challenge, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim

> has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Boquist*, 32 F.4th at 773 (citation omitted).

In ruling on a motion to dismiss, a court may consider only "the complaint, materials incorporated into the complaint by reference, and matters [subject to] judicial notice. *See UFCW Loc. 1500 Pension Fund v. Mayer*, 895 F.3d 695, 698 (9th Cir. 2018) (citation omitted). "All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *McShannock v. JP Morgan Chase Bank NA*, 976 F.3d 881, 886-87 (9th Cir. 2020) (citation omitted). However, a court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See Khoja v. Orexigen*

*Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted).

## III.   DISCUSSION

xAI brings claims under the federal Defend Trade Secrets Act (the "DTSA") and California's Unfair Competition Law (the "UCL"). Neither claim survives scrutiny under Rule 12(b)(6).

### A.   The DTSA

"To succeed on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020) (citation omitted). OpenAI argues that xAI insufficiently alleges misappropriation. "The [DTSA] provides the following three definitions of misappropriation: (1) the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; (2) the disclosure of a trade secret without the owner's consent; and (3) the use of a trade secret without the owner's consent." *Attia v. Google LLC*, 983 F.3d 420, 424 (9th Cir. 2020) (citations and quotation marks omitted). Courts consider both direct and vicarious liability in evaluating claims of trade secret misappropriation. *See, e.g.*, *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1056 (N.D. Cal. 2020).

#### 1.   Direct Liability

"Courts distinguish between direct trade secret misappropriation claims and indirect trade secret misappropriation claims, depending on whether a plaintiff alleges that a defendant obtained the trade secrets directly from the plaintiff or indirectly from someone other than plaintiff." *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 78 (N.D. Cal. 2020) (citation and quotation marks omitted).

##### a.   Direct Misappropriation

xAI does not offer any nonconclusory allegations that OpenAI itself acquired, disclosed, or used xAI's trade secrets. Instead, its allegations of direct misappropriation appear to proceed

entirely on a theory that OpenAI induced xAI's former employees to misappropriate its trade secrets. But xAI offers no nonconclusory allegations that permit a reasonable inference of inducement. For example, while Li and Fraiture transferred xAI's source code onto their personal devices, there is no indication that OpenAI told or encouraged them to do so. *See, e.g.*, *Arthur J. Gallagher & Co. v. Tarantino*, 498 F. Supp. 3d 1155, 1173 (N.D. Cal. Nov. 2, 2020). xAI counters that it permissibly pleads inducement "on information and belief." (*See, e.g.*, FAC ¶¶ 84, 97, 116.) To be sure, Rule 12(b)(6) "does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." See *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (citations omitted). Even so, conclusory allegations remain insufficient. *See, e.g.*, *Reaper v. ACE Am. Ins. Co.*, No. 23-15178, 2024 WL 810697, at *1 (9th Cir. Feb. 27, 2024); *see also Cloudera, Inc. v. Databricks, Inc.*, No. 21-cv-01217-HSG, 2021 WL 3856697, at *6 (N.D. Cal. Aug. 30, 2021) ("Although courts may consider whether facts are peculiarly within the possession and control of the defendant, such latitude does not mean that conclusory allegations are permitted." (citation and quotation marks omitted)).

xAI also argues that, when considered as a whole, its allegations state a DTSA claim against OpenAI. The Court agrees that it must examine the entire course of conduct alleged to assess the plausibility of misappropriation by OpenAI. *See, e.g.*, *Wisk Aero LLC v. Archer Aviation Inc.*, No. 21-cv-02450-WHO, 2021 WL 8820180, at *16 (N.D. Cal. Aug. 24, 2021) (rejecting attempt "to break up the allegations" where "[t]he whole of the FAC . . . is still sufficient to plead a misappropriation claim"). But when taken together, as true, and with all reasonable inferences drawn in favor of xAI, xAI's allegations do not state a plausible claim based on inducement. Yes, several employees took its confidential information at around the same time and before leaving to work for OpenAI, and two of those employees communicated with the same OpenAI recruiter using an encrypted messaging application around the time of their exfiltration and their exploration of a move to OpenAI. Without more, though, those

allegations are insufficient to support a plausible inference that OpenAI encouraged the alleged theft.

The cases on which xAI relies illustrate what is absent from the FAC. In *Citcon USA, LLC v. RiverPay Inc.*, No. 18-cv-02585-NC, 2019 WL 917056 (N.D. Cal. Feb. 25, 2019), the defendant company allegedly encouraged misappropriation by promising co-founder status to one of the plaintiff company's former employees, and it allegedly conditioned co-founder status on that former employee "retain[ing] [a] POS device" upon leaving the plaintiff company. *See id.* at *4-5. Similarly, in *Elko, Inc. v. WTH Commercial Services, LLC*, No. 22-cv-00015-MMD, 2023 WL 6141623 (D. Nev. Sept. 20, 2023), the defendant company "entered into an agreement with [the plaintiff company's former employee] to steal confidential information" and used the stolen confidential information to "target[] [the plaintiff company's] customer base by contacting them and pressuring them to switch providers." *See id.* at *5. No similar agreements or inducements are alleged here.

Accordingly, xAI does not sufficiently allege any direct misappropriation by OpenAI.

### b. Indirect Misappropriation

Indirect trade secret misappropriation requires a defendant to know or have reason to know: (1) "before the use or disclosure that the information was a trade secret and . . . that the disclosing party had acquired it through improper means or was breaching a duty of confidentiality by disclosing it"; or (2) that the information "was a trade secret and that the disclosure was a mistake." *See Navigation Holdings*, 445 F. Supp. 3d at 78-79 (citation omitted); *see also Attia*, 983 F.3d at 424 (acquisition constitutes misappropriation where acquiring party "knows or has reason to know that the trade secret was acquired by improper means"). xAI offers insufficient allegations of OpenAI's knowledge.

Li allegedly disclosed xAI's confidential information in a presentation to OpenAI, but xAI alleges no facts that permit a reasonable inference that OpenAI knew that the information was a trade secret, that Li had improperly acquired the information, or that Li was improperly or mistakenly disclosing the information. For the same reason, the connection between Li's cloud

9

account (which contained xAI's source code) and ChatGPT, and the implication that Li directly sent xAI's source code to OpenAI through a link sent by Chen, do not suffice. None of the other former employees allegedly shared with or disclosed to OpenAI any xAI trade secrets.

Accordingly, xAI does not sufficiently allege any indirect misappropriation by OpenAI.

### 2. Vicarious Liability

xAI contends that OpenAI is vicariously liable under a theory of *respondeat superior*.[2] In general, under the doctrine of *respondeat superior*, an employer

> will be vicariously liable . . . if its employee's acts were committed within the course and scope of her employment. Within the course and scope of employment means: (1) the conduct occurred substantially within the time and space limits authorized by the employment; (2) the employee was motivated, at least in part, by a purpose to serve the employer; and (3) the act was of a kind that the employee was hired to perform.

*See Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n*, 298 F.3d 768, 775-76 (9th Cir. 2002) (citations and footnotes omitted). In applying the doctrine to alleged misappropriation of trade secrets intended to benefit a *future* employer, courts also require allegations that "the future employer subsequently used the trade secrets or the wrongdoer used the trade secrets once he actually became employed." *See Alert Ent., Inc. v. Rana*, No. 22-cv-06646-JSC, 2023 WL 2541353, at *3 (N.D. Cal. Mar. 16, 2023); *accord Flexport, Inc. v. Freightmate AI, Inc.*, No. 25-cv-02500-RFL, 2025 WL 2399666, at *4 (N.D. Cal. July 10, 2025).

Scrutinized under the lens of these standards, xAI's allegations fall short:

---

[2] It does not appear that the Ninth Circuit has squarely addressed whether traditional principles of vicarious liability apply to DTSA claims. However, the parties do not dispute that *respondeat superior* applies to xAI's misappropriation claim against OpenAI. When a federal "statute itself is silent as to vicarious liability," as are the civil provisions of the DTSA, courts "assume that Congress intended to incorporate ordinary tort-related vicarious liability rules." *See Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 877 (9th Cir. 2014) (citation and quotation marks omitted); 18 U.S.C. § 1831 *et seq.* Trade secret misappropriation is a tort (*see Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1070 (9th Cir. 2016)), and under the doctrine of *respondeat superior*, employers may be held vicariously liable for the torts of their employees. *See* Restatement (Third) of Agency § 2.04 (A.L.I. 2006). Accordingly, a defendant may be held vicariously liable under *respondeat superior* for trade secret misappropriation under the DTSA.

- Li never worked at OpenAI, and xAI does not allege that OpenAI ever used any trade secrets transferred to it by Li.
- Fraiture did eventually begin working for OpenAI, but xAI does not allege that he ever used any of its trade secrets in his new job.  True, he allegedly exfiltrated xAI's source code and an internal video recording about a month before beginning his employment with OpenAI (presumably in a role similar to his position at xAI).  But that is not enough to allow a reasonable inference that Fraiture actually used those trade secrets at OpenAI.  To hold otherwise would automatically subject future employers to potential trade secret misappropriation liability every time they hired someone who, without their knowledge beforehand or ratification afterwards, had improperly taken confidential information from their former employer on the way out the door, even if there is no indication that the information was actually used in the subsequent job.  Such an approach would also undercut the well-established principle that "mere possession of trade secrets is not sufficient to" constitute misappropriation.  *See Acculmage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 951 n.5 (N.D. Cal. 2003) (citation omitted); *see also Attia*, 983 F.3d at 424 (definition of misappropriation under DTSA does not include mere possession).
- Like Fraiture, the unnamed finance executive merely possessed xAI trade secrets about data centers, and xAI does not allege that he used that information once he started working at OpenAI.  His hostility when xAI reached out about its confidentiality concerns also does not support a plausible inference of use.  Hostility toward one's former employer during departure does not, without more, indicate use of trade secrets in a subsequent job.  Nor does the executive's lack of experience with AI data centers before his time at xAI, without more, support a plausible inference that he used xAI's trade secrets at OpenAI.  For example, xAI does not allege that, after Fraiture started working at OpenAI, OpenAI adopted a new approach to data centers mirroring xAI's or otherwise adopted aspects of xAI's data center operations that OpenAI could not have

11

known about absent misappropriation.

- Ruddarraju unsuccessfully attempted to access xAI's information while at OpenAI. Because he could not access the information, there is no basis to infer that he used it while employed at OpenAI.

- Pham and Knight allegedly misappropriated confidential information, but nothing in the FAC allows a reasonable inference that the confidential information included trade secrets.[3] Even if the allegedly misappropriated confidential information constituted trade secrets, the sole use alleged is Pham and Knight's sharing the information with an unidentified third party for unknown reasons, and nothing in the FAC allows a reasonable inference that they shared the information to "serve" OpenAI or that doing so was "a kind [of act] that [they were] hired to perform." *Oki Semiconductor*, 298 F.3d at 776.

- xAI offers no allegations about Pothanis or Dalton beyond identifying what they did at xAI and the fact that they left for OpenAI around the same time as xAI's other former employees. Nothing about those allegations allows a reasonable inference of misappropriation.

xAI argues that "the covert nature of trade secret misappropriation" allows it to "rely on circumstantial allegations of [OpenAI's employees'] misappropriation" because "it would be unreasonable to require [xAI] to demonstrate the precise ways in which [OpenAI's employees] may have used [xAI's] trade secrets" in the absence of discovery, "given that [OpenAI and its employees are] the only ones who possess such information." (*See* Dkt. No. 64 at 16 (citations

---

[3] In *Tri Tool, Inc. v. Hales*, No. 22-cv-01515-DAD, 2023 WL 7130610 (E.D. Cal. Oct. 30, 2023), in contrast, while the plaintiff agreed that it "remain[ed] unknown" whether the information allegedly stolen by its former employees constituted trade secrets, its allegations supported a reasonable inference that its trade secrets were used by the former employees once they joined the defendant company. *See id.* at *1-2, *6. The plaintiff company's trade secrets concerned information that allowed "it to bid competitively to customers in its field of service" and about "projects in the pipeline" that presented "viable sources of future revenue." *See id.* at *1. One of the plaintiff company's employees allegedly "sabotaged at least one job on which he worked [] so that he could reclaim the same job while working for" the defendant company, and after resigning from the plaintiff company, the same employee contacted one of the plaintiff company's customers in an attempt to get their business. *See id.* at *6.

12

omitted); *see also id.* at 11, 14.) Certainly, an inference of use may be based on circumstantial evidence. But Rule 12(b)(6) does not impose a lower standard in trade secret cases, and xAI does not provide the circumstantial evidence necessary to draw a plausible inference that its former employees used its trade secrets at OpenAI.

The cases relied upon by xAI illustrate how its allegations fall short. In *Applied Biological Laboratories, Inc. v. Diomics Corporation*, No. 20-cv-02500-AJB, 2021 WL 4060531 (S.D. Cal. Sept. 7, 2021), the defendant company "had no prior experience" in the relevant industry before it allegedly procured the plaintiff company's misappropriated trade secrets and released a competing product. *See id.* at *4-5. In *Autodesk, Inc. v. ZWCAD Software Co., Ltd.*, No. 14-cv-01409-EJD, 2015 WL 2265479 (N.D. Cal. May 13, 2015), the defendant company released software sharing "the same interfaces and commands as [the plaintiff company's software and which] also perform[ed] identically to prior versions of [the plaintiff company's] software in unmistakable ways." *See id.* at *1. In *Yeiser Research & Development LLC v. Teknor Apex Company*, 281 F. Supp. 3d 1021 (S.D. Cal. 2017), the defendant company "did not know how to build a compact hose and was not in the business of compact hoses" before it received confidential information on the subject from the plaintiff company, "indicated it wanted to commercialize" a hose, and subsequently released a hose that "incorporate[d] attributes of [the plaintiff company's] concept." *See id.* at 1048. In *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198 (E.D. Cal. 2020), evidence demonstrated that the defendant company's employees had "deployed a sales method claimed by [the plaintiff company] as a trade secret." *See id.* at 1207-08. In *3D Systems, Inc. v. Wynne*, No. 21-cv-01141-LAB, 2022 WL 21697345 (S.D. Cal. Mar. 9, 2022), the defendant company's "patents and one patent application contain[ed] trade secrets which the [plaintiff company's former employees] could only have acquired during their employment at" the plaintiff company. *See id.* at *4. And in *Flexport*, the defendant company "rapid[ly] launch[ed] [] a competing product containing functionality similar to the allegedly stolen source code." *See* 2025 WL 2399666, at *4. xAI offers no similar allegations suggesting use of misappropriated information.

13

xAI also argues, as discussed above, that Rule 12(b)(6) requires evaluation of all of its allegations as an amalgamated whole. Thus, rather than confining the vicarious liability analysis to employee-by-employee consideration, the analysis should instead, in xAI's words, consider the "gestalt" of its allegations. As before, however, even when taken together, as true, and with all reasonable inferences drawn in favor of xAI, the allegations do not support a plausible inference that xAI's former employees used its trade secrets in their work at OpenAI. The unnamed finance executive, Ruddarraju, Pham, and Knight did not misappropriate any trade secrets, and Pothanis and Dalton did nothing except leave xAI for OpenAI. That leaves Li and Fraiture. While xAI alleges significant acts of misappropriation by those two when they left the company, that is not enough to infer that either of them *used* the misappropriated information at OpenAI. Indeed, as noted above, Li never even worked at OpenAI.

B.      The UCL

The UCL "prohibits business acts or practices that are 'unlawful,' 'unfair,' or 'fraudulent.' Each of these three prongs constitutes a separate and independent cause of action." *See Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 554 (9th Cir. 2010) (citations omitted). xAI brings claims under the unlawful and unfair prongs. "[U]nder the unlawful prong, the UCL borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1196 (2013) (citation and quotation marks omitted). xAI bases its unlawful prong claim on OpenAI's alleged DTSA violation. As for the unfair prong, in the context of allegedly unfair practices among competitors, "the word 'unfair' in [the UCL] means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *See Nationwide Biweekly Admin., Inc. v. Superior Ct.*, 9 Cal. 5th 279, 302 (2020) (citation and emphasis omitted). xAI bases its unfair prong claim on OpenAI's alleged attempt "to destroy legitimate competition in the AI industry by neutralizing xAI's innovations" and "forc[ing] [xAI] to unfairly compete against its own trade secrets." (*See*

14

FAC ¶¶ 166-68.)

xAI's claims under both prongs are preempted by the California Uniform Trade Secrets Act (the "CUTSA"). The CUTSA "provides the exclusive civil remedy for conduct falling within its terms and supersedes other civil remedies based upon misappropriation of a trade secret." *See Mattson Tech., Inc. v. Applied Materials, Inc.*, No. 23-cv-06071-SVK, 2024 WL 3558849, at *6 (N.D. Cal. July 25, 2024) (citations and emphasis omitted). xAI's unlawful prong claim is necessarily based on misappropriation of a trade secret, as it derives from its DTSA claim. The unfair prong claim is also based on misappropriation of a trade secret, as xAI describes anticompetitive harm flowing from OpenAI's alleged misappropriation of xAI's trade secrets. xAI argues that the anticompetitive harm also derives from OpenAI's poaching of its employees. But its poaching allegations all focus on poaching in service of acquiring xAI's trade secrets, and it does not identify any other reason why the hiring of those employees resulted in anticompetitive harm. (*See, e.g.*, FAC ¶ 44.) In fact, in detailing why OpenAI's conduct qualifies as unfair under the UCL in the FAC, xAI relies solely on misappropriation of xAI's confidential information as the source of the alleged anticompetitive harm. (*See id.* ¶¶ 166-68.)

### IV.   CONCLUSION

For the foregoing reasons, OpenAI's motion to dismiss is **GRANTED WITH LEAVE TO AMEND**. If xAI wishes to file an amended complaint correcting the deficiencies identified in this Order, it shall do so by **March 17, 2026**. The amended complaint may not add new claims or parties, or otherwise change the allegations except to correct the identified deficiencies, absent leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.

**IT IS SO ORDERED.**

Dated: February 24, 2026

_____
RITA F. LIN
United States District Judge