# Exhibit D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X.AI LLC,<br><br>        Plaintiff,<br><br>v.<br><br>OPENAI, INC., et al.,<br><br>        Defendants. | Case No. 25-mc-80299-JCS<br><br>**ORDER DENYING APPLICATION PURSUANT TO 28 U.S.C. § 1782 TO TAKE DISCOVERY FOR USE IN A FOREIGN PROCEEDING**<br><br>Re: Dkt. No. 1 |

## I. INTRODUCTION

X.AI LLC ("xAI") brings an application pursuant to 28 U.S.C. § 1732 ("Application") seeking discovery from Respondents OpenAI, Inc., OpenAI Global, LLC, and OpenAI OpCo, LLC (collectively, "OpenAI") in support of litigation xAI has initiated in the United Kingdom against former xAI employee Jimmy Fraiture (the "UK Litigation"). The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the Application is DENIED.

## II. BACKGROUND

### A. Freiture and Li

xAI and OpenAI are competitors in the field of artificial intelligence. Case No. 25-cv-8133 RFL, N.D. Cal., dkt. no. 1 ("8133 Compl.") ¶ 7. According to xAI, OpenAI has poached multiple xAI employees to obtain its proprietary source code, including Jimmy Fraiture and Xuechen Li, who are software engineers formerly employed by xAI who left xAI to work for OpenAI. *Id.* ¶¶ 40-101. Fraiture's employment with xAI ended on September 1, 2025. Declaration of Bruce Applin in Support of x.AI LLC's Application for an Order Pursuant to 28 U.S.C. § 1782 to Take Discovery for Use in a Foreign Proceeding, dkt. no. 1-2 ("Applin Decl.") ¶

3. Fraiture began his employment with OpenAI on September 2, 2025 and now resides in London, England. 8133 Comp. ¶ 91; Declaration of Carson Swope in Support of x.AI LLC's Application for an Order Pursuant to 28 U.S.C. § 1782 to Take Discovery for Use in a Foreign Proceeding ("Swope Application Decl."), Ex. 12 (Claim Form filed in U.K. Proceeding on September 10, 2025, in the High Court of Justice, King's Bench Division) ("U.K. Claim").

xAI alleges that on July 31, 2025, while still employed by xAI and having already accepted an offer of employment from OpenAI, "Fraiture AirDropped (*i.e.,* copied via an Apple product feature that transfers files between Apple devices) to his personal Apple device significant, high-value parts of xAI's highly confidential codebase, together with a video recording of a confidential internal meeting that had taken place on July 30, 2025 in which Mr. Musk detailed xAI's future strategic and development plans."  Applin Decl. ¶ 4.

Fraiture does not dispute that he copied these materials but according to his solicitor in the U.K. Proceeding, Lucy Chaize, he deleted them from his devices on August 29, 2025, before his employment with OpenAI had commenced, in the "virtual presence" of the xAI Insider Threat Team. Swope Application Decl., Ex. 14 (Sept. 9, 2025 Chaize letter to Lewis Silkin LLP) ("Sept. 9 Letter").  In particular, Chaize provided the following account to xAI's U.K. counsel in a letter dated September 9, 2025:

> 2. Our client resigned from his employment with your client on 1 August 2025. The same day, your client placed our client on garden leave for the remainder of his notice period (your client then sent a letter to our client on 5 August 2025 which stated that our client was being placed on garden leave "with immediate effect"). Our client's notice period ended on 1 September 2025, being the date on which his employment with your client terminated.
>
> 3. Our client had decided to resign from your client's employment to take up a role that had been offered to him at OpenAI. As our client prepared to provide his notice to your client, our client considered that one possible reaction to him giving such notice could be that, immediately upon resigning, our client would have his work laptop and general system access revoked, without having had an opportunity to obtain important documents belonging to him (e.g. his payslips and other employment paperwork). Having decided to provide his resignation at an internal meeting which had been arranged by his line manager for 1 August 2025, on 31 July 2025 our client copied a number of these personal documents to his personal laptop.
>
> 4. At the same time, our client also copied certain files belonging to

2

your client, including a portion of the xAI monorepo (containing, amongst other code, code that he personally created during his tenure at xAI). Our client did not do this with the intention of providing the xAI code to his new employer, or indeed any other third party. Rather, he made a hasty and regrettable decision in the moment; he was proud of the code that he worked so hard on, and he did not want to forget it in the future.

5. As part of the above transfer, our client inadvertently also included a copy of the recording of an xAI All Hands virtual meeting. This file had been sent to his work device contemporaneously by a colleague for him to watch, as he did not attend the original meeting. To be clear, and with reference to paragraph 5(d)(ii) of the First 8 September Letter, our client did not "take a recording of the xAI All Hands meeting", if your suggestion is that our client made the recording itself. He did not.

6. Soon after our client was placed on garden leave, he remembered that he had copied these files. He realised that he had made a significant mistake in doing so and deleted what he thought at the time was the total sum of the files belonging to xAI.

7. On 28 August 2025, our client received an email from your client's Insider Threat security team, requesting a meeting to discuss "an Airdrop event of a 3GB file containing material that is proprietary xAI company information". Our client promptly met virtually with a representative of the Insider Threat team on 29 August 2025, and again on 4 September 2025, as referred to in the First 8 September Letter. Our client realised, upon receiving the 28 August 2025 email from the Insider Threat team, that the compressed version of the xAI monorepo remained on his personal device, despite him believing it had been deleted with the rest of the xAI files. He therefore deleted the compressed version without further delay.

8. During the 29 August 2025 meeting, our client confirmed that he had not yet started work at OpenAI, as his last day of employment with xAI was 1 September 2025. He realised, during this meeting, that he had neglected to delete a recording of the xAI All Hands meeting that had come over at the same time as copying the xAI monorepo. He had missed this document as it was located solely in his downloads folder. He deleted this document in the virtual presence of the Insider Threat team, and pursuant to their instruction; the file was never opened by our client. This was the last of the xAI files to be deleted from our client's personal device.

9. During the 4 September 2025 meeting, our client explained that he was not forthcoming in the 29 August 2025 meeting about the circumstances in which he had copied the xAI file to his personal device. He initially said that he attempted to copy the xAI monorepo without success, such that the file was never transferred to his personal device; this was not correct. Rather, he attempted to copy the xAI monorepo initially, after which it was successfully transferred (and then subsequently deleted). He provided incorrect information to the Insider Threat team during the 29 August meeting, but his intention was not to mislead or to deceive. This was an error of judgment on his part, which he accepts.

3

> 10. In the course of preparing this response, it has come to our client's attention that there remains on his personal phone the history of a group chat on the X messaging function used by xAI employees. Use of the X messaging function is, as you will be aware, not confined to xAI employees, however it is used (and was used by our client) by xAI employees in the course of their ordinary work. Our client was removed from this group upon resigning from your client, and he understands that in due course he will need assistance from your client's IT team to permanently delete the history from his personal phone (but for the avoidance of doubt will take no steps to do so for the time being). Our client confirms he has not opened the chat history since resigning from your client, and has not (and will not) attempt to disclose any of its contents to OpenAI or any third party. *Id.*

Swope Decl., Ex. 14.

### B. The U.K. Litigation

xAI filed a claim against Fraiture in the High Court of Justice, King's Bench Division on September 10, 2025. Swope Application Decl., Ex. 12 (U.K. Claim). The U.K. Claim alleges that Fraiture copied xAI's source code in violation of employment and confidentiality agreements with xAI that Fraiture signed on March 4, 2025. *Id.* The Claim does not include any allegations against OpenAI or name OpenAI as a defendant. *Id.*

According to Fraiture's solicitor, xAI and Fraiture agreed to a Consent Order in the U.K. Proceeding, which was entered on September 15, 2025. Declaration of Lucy Chaize in Support of Respondents' Opposition to Application for an Order Pursuant To 28 U.S.C. § 1782 to Take Discovery for Use in a Foreign Proceeding, dkt. no. 16-1 ("Chaize Decl.") ¶ 5 & Ex. 1 (Consent Order). Chaize states that "[u]nder the Consent Order, Mr. Fraiture gave several 'undertakings' to the Court, which are legally enforceable commitments with equivalent force and effect to an interim injunction (including the risk of imprisonment in the event of breach). These undertakings included providing relevant devices[1] and electronic accounts to an Independent IT Expert for forensic imaging, serving a witness statement setting forth Mr. Fraiture's account of what occurred, and delivering any xAI confidential information in his possession to xAI's counsel." *Id.* ¶ 6. She further states that Fraiture "has cooperated fully with his obligations under the Consent

---

[1] The Consent Order defines "relevant devices" as "any Device in the possession, custody or control of the Defendant which has at any time contained or may contain any Confidential Information or has been used to access the same." Chaize Decl., Ex. 1 (Consent Order), Section 3.3.

4

1 Order [and that] xAI has never contended that Mr. Fraiture has breached any undertaking under
2 the Consent Order." *Id.* ¶ 7.

### C. Cases in this District

On August 28, 2025, xAI brought an action for trade secret misappropriation against Xuechen Li in this Court. Case No. 25-cv-7292 RFL, N.D. Cal. ("the 7292 case"). On September 2, 2025, the Court entered a Temporary Restraining Order in that case requiring that Li turn over any personal electronic devices in his possession, custody and control for forensic examination "to identify, remediate, and/or delete Confidential Information belonging to xAI"; prohibiting Li from "having any role or responsibility at OpenAI or any other competitor of xAI pertaining to generative AI . . . until xAI has confirmed that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted[;]" and permitting xAI to propound expedited discovery immediately in aid of preliminary injunction proceedings, including propounding a set of interrogatories and a set of requests for production and deposing Li. 7292 Case, dkt. no. 20. The Court modified the TRO on September 9, 2025 in response to objections asserted by Li under the Fifth Amendment due to an ongoing criminal investigation involving the same subject matter. *See id.*, dkt. no. 34. Briefing relating to xAI's request for a preliminary injunction in the 7292 case is ongoing.

On September 24, 2025, xAI brought another trade secret misappropriation case in this Court, naming OpenAI as a defendant. *See generally* 8133 Comp. In that case, xAI levels sweeping accusations against OpenAI concerning its alleged "strategic campaign to undermine xAI and gain unlawful advantage in the race to build the best artificial intelligence models." *Id.* ¶ 2. In particular, xAI alleges that OpenAI has been "specifically targeting xAI employees and using them to steal xAI Confidential Information and trade secrets." *Id.* ¶ 8. The complaint in the 8133 case includes lengthy allegations related to the alleged poaching of Fraiture and Li. *Id.* ¶¶ 42-101. It also alleges that OpenAI "in just a few months, . . . poached no fewer than eight xAI employees as part of a deliberate scheme to gain access to specific xAI Confidential Information that OpenAI needed to harm xAI and benefit itself." *Id.* ¶ 115.

On September 26, 2025, the 8133 Case was related to the 7292 Case. On October 27,

2025, xAI filed an amended complaint in the 8133 Case. 8133 Case, dkt. no. 44. As in the original complaint, xAI alleges that OpenAI has engaged in a strategy of targeting for hire xAI employees, including Fraiture and Li, in order to obtain xAI's confidential information. *See generally id.* An initial case management conference in the 8133 case is scheduled for January 14, 2026.

### D. The Application and Subpoena

On September 26, 2025, xAI initiated the instant action, filing an application under 28 U.S.C. § 1792 seeking discovery from OpenAI for use in the U.K. Proceeding. On September 30, 2025, Judge Lin declined to relate this case to the 8133 case. The subpoena xAI seeks to serve on OpenAI in this case contains fourteen requests for production. Swope Decl., Ex. 1 ("Subpoena"). Because OpenAI challenges the breadth of the Subpoena, the Court reproduces here the specific requests that are the focus of OpenAI's challenge:

> REQUEST FOR PRODUCTION NO.4:
> All DOCUMENTS and COMMUNICATIONS related to Your internal review and decisionmaking process about whether to hire Fraiture, including without limitation internal memoranda, recruitment notes, Fraiture's job application, notes or correspondence regarding a review of Fraiture's background and/or concerns, risks, or questions related to hiring Fraiture.
>
> REQUEST FOR PRODUCTION NO.5:
> All DOCUMENTS and COMMUNICATIONS related to Your onboarding, orientation, and/or intended or actual training of Fraiture.
>
> . . .
>
> REQUEST FOR PRODUCTION NO.7:
> All DOCUMENTS and COMMUNICATIONS related to Fraiture soliciting, inducing, or encouraging any xAI employee, consultant, or independent contractor to terminate his or her relationship with xAI or to consider joining OpenAI.
>
> . . .
>
> REQUEST FOR PRODUCTION NO.12:
> All DOCUMENTS and COMMUNICATIONS related to xAI Confidential Information.

*Id.* xAI argues that it satisfies the statutory requirements for obtaining discovery under 28 U.S.C. § 1728 and that the discretionary factors set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) also support its Application.

1  In its Opposition, OpenAI does not dispute that the statutory requirements for discovery under Section 1782 are satisfied but argues the *Intel* factors support denying xAI's application. Among other things, it points to the early stage of the U.K. Proceedings and the fact that Fraiture has been cooperating in the U.K. discovery.  It also contends xAI's broad requests for production indicate it is engaging in a "fishing expedition" and attempting to gain an improper advantage in the 8133 case, in which discovery has not yet opened.

In its Reply, xAI rejects OpenAI's assertion that it will be able to obtain the evidence it needs in the U.K. Proceeding through discovery in that case.  According to xAI, "Fraiture admitted to repeatedly deleting evidence of his theft of xAI trade secrets and being dishonest with xAI during its investigation. And Fraiture's personal laptop and phone and his OpenAI-issued laptop and phone were seized by the FBI—a fact conspicuously omitted from OpenAI's declaration from Fraiture's UK lawyer."  Reply at 1; *see also* Declaration of Michael Anderson In Support Of X.AI LLC's Reply on Support of it Application for an Order Pursuant to 28 U.S.C. § 1782 to Take Discovery for Use in A Foreign Proceeding ("Anderson Decl."), ¶ 4 (stating that "Fraiture's personal devices were seized by the FBI on 12 September 202S, shortly after he claims to have begun his employment with OpenAI (2 September 2025). Accordingly, those devices are unavailable for forensic analysis in the UK.").

xAI further asserts in its Reply that "Fraiture's destruction of evidence . . . creates an urgency here: records relating to deleted files may be preserved only for a short time, justifying discovery from OpenAI now, even though the UK Litigation is at an early stage." *Id.* xAI rejects OpenAI's assertion that the Application is an attempt to get ahead of discovery in the 8133 case, citing the fact that Judge Lin declined to relate this case to the 8133 case as evidence that she does not seek to exercise any oversight over the discovery xAI seeks in its Application. *Id.* at 14.

**III.  ANALYSIS**

    **E.  Legal Standards**

Section 1782 provides, in relevant part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or

7

> international tribunal . . . . The order may be made . . . upon the application of any interested person . . . .

28 U.S.C. § 1782(a). Section 1782 permits district courts to authorize discovery where the following requirements are met: "(1) the person from whom the discovery is sought 'resides or is found' in the district of the district court where the application is made; (2) the discovery is 'for use in a proceeding in a foreign or international tribunal'; and (3) the application is made by a foreign or international tribunal or 'any interested person.'" *Khrapunov v. Prosyankin*, 931 F.3d 922, 925 (9th Cir. 2019) (citations omitted). OpenAI does not dispute that these requirements are met.

Even if the basic requirements of § 1782 are satisfied, however, a district court has wide discretion in deciding whether to permit discovery under § 1782. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 260-61 (2004). In exercising its discretion, a district court should consider the following factors: (1) whether the "person from whom discovery is sought is a participant in the foreign proceeding," (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal court judicial assistance," (3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States," and (4) whether the request is "unduly intrusive or burdensome." *Id.* at 264–65.

"A district court's discretion is to be exercised in view of the twin aims of § 1782: providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *In re Nat'l Ct. Admin. of the Republic of Korea*, No. C15-80069 MISC LB, 2015 WL 1064790, at *2 (N.D. Cal. Mar. 11, 2015) (citing *Schmitz v. Bernstein Libehard & Lifshitz, LLP*, 376 F.3d 79, 85 (2d Cir. 2004)). The party seeking discovery need not establish that the information sought would be discoverable under the foreign court's law or that the United States would permit the discovery in an analogous domestic proceeding. *See Intel*, 542 U.S. at 247, 261–63.

8

**F. Discretionary Factors**

**1. Whether OpenAI is a Participant in the U.K. Proceeding**

The first *Intel* factor is whether "the person from whom discovery is sought is a participant in the foreign proceeding." 542 U.S. at 264. "Courts have held that '[a]lthough the case law at times refers to whether the "person" is within the foreign tribunal's jurisdictional reach, the key issue is whether the material is obtainable through the foreign proceeding.' " *MetaLab Design Ltd. v. Zozi Int'l, Inc.*, No. 17-MC-80153-MEJ, 2018 WL 368766, at *3 (N.D. Cal. Jan. 11, 2018) (citing cases).

" 'Although § 1782 does not have an 'exhaustion' requirement, the Court is permitted, in deciding how to exercise its discretion, to consider whether the applicant has availed itself of discovery procedures in the foreign forum.' " *In re Quadre Invs., L.P.*, No. 24-MC-1341-MMP, 2025 WL 502054, at *9 (S.D. Cal. Feb. 14, 2025) (quoting *In re Ex Parte LG Elecs. Deutschland GmbH*, No. 12-cv-1197-LAB-MDD, 2012 WL 1836283, at *2 (S.D. Cal. May 21, 2012) (internal citation omitted)). Thus, for example, in *In re Quadre Investments, L.P.*, the court found that this factor favored denial of the applicant's Section 1782 application because the applicant had not yet availed itself of the discovery procedures available in the foreign proceeding when it filed the application; therefore the applicant was not in a position to know what could or could not be obtained in the foreign proceeding. *Id.* at *10 ("Without availing themselves of the discovery procedures expressly contemplated by the Cayman Court, this Court cannot conclude the discovery sought under § 1782 is 'unobtainable absent § 1782 aid.'") (quoting *Intel*, 542 U.S. at 264).

Here, it is too soon to tell whether the discovery xAI seeks for use in the U.K Proceeding is "unobtainable absent § 1782(a) aid." *Intel*, 542 U.S. at 264. First, the U.K Proceeding was initiated only sixteen days before xAI filed the Application, and the Consent Order establishing a procedure for obtaining discovery from Fraiture was entered only eleven days before the Application was filed. It is too soon for xAI to know *what* information it will be able to obtain from Fraiture directly, which also makes it impossible to narrowly tailor its subpoena to seek discovery only of the information xAI will be unable to obtain in the U.K. Proceeding. Further,

1    while xAI cites concerns related to Fraiture's "destruction of evidence", there is no evidence in the
2    record that establishes the Fraiture has destroyed any evidence that he had an obligation to
3    preserve.  There *is* evidence in the record that Fraiture destroyed xAI source code that was in his
4    possession, but he appears to have done so in order to comply with his obligations to xAI under
5    his employment and confidentiality agreements.  Indeed, xAI's Insider Threat Team appears to
6    have supervised the deletions on August 29, 2025.
7           Furthermore, the Court is not persuaded by xAI's assertion that "records relating to deleted
8    files may be preserved only for a short time, justifying discovery from OpenAI now." Reply at 1.
9    The Subpoena seeks discovery from OpenAI rather than Fraiture.  As OpenAI is a defendant in the
10   8133 case, which encompasses all of the allegations in the U.K. Proceeding, it has an obligation to
11   preserve any evidence that is relevant to those claims. *See Elko, Inc. v. Peters*, No. 3-22-CV 00015
12   MMD CLB, 2022 WL 256975, at *7 (D. Nev. Jan. 27, 2022) ("Defendants have an inherent
13   obligation to preserve evidence, particularly when they have been notified of the litigation, and
14   [Plaintiff] failed to show that Defendants have breached this duty").  xAI has not offered any
15   evidence suggesting that OpenAI will not abide by its obligation to preserve relevant evidence or
16   that any concerns xAI may have on that score cannot be alleviated by entering into a protocol in
17   the 8133 case that addresses the preservation of digital information.
18          Finally, because of the overlap between xAI's claim against Fraiture in the U.K.
19   Proceeding and the more broad-ranging claims asserted against OpenAI in the 8133 case, it is
20   likely that at least some of the discovery that xAI seeks in this proceeding can be obtained once
21   discovery in that case opens, which is likely to occur in a matter of a few months.  Regardless of
22   whether or not this case has been formally related to the 8133 Case, the possibility that xAI may
23   soon be able to obtain at least some of the discovery it seeks in that proceeding may be considered
24   by this Court in addressing the first *Intel* factor.  *See Intel*, 542 U.S. at 266 n.19 (observing that in
25   determining whether 1782 assistance should be afforded, the court "might also consider" whether
26   permitting such discovery would frustrate a protective order entered by another district court
27   related to the same material).
28          The Court therefore concludes that this factor supports denial of the Application.

### 2. Whether U.K. Tribunal is Receptive to Discovery xAI Seeks

*Intel*'s second discretionary factor "focuses on whether the foreign tribunal is willing to consider the information sought." *In re Varian Med. Sys.*, 2016 WL 1161568, at *4. Where there is no evidence suggesting that foreign courts would be unreceptive to the requested discovery, the second discretionary factor weighs in favor of the application. *See In re Med. Corp. H&S*, No. 19-mc-80107-SVK, 2019 WL 2299953, at *3 (N.D. Cal. May 30, 2019) (holding that the second factor weighs in favor of an application when there is an absence of evidence that a foreign tribunal is unreceptive to this type of discovery or the information sought). Here, OpenAI has not pointed to any evidence that the U.K. tribunal will not be receptive to the discovery xAI seeks. Accordingly, this factor points in favor of granting the application.

### 3. Whether Application Seeks to Circumvent Discovery Rules

The third factor in *Intel* considers whether the application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. Where there is a "perception that an applicant has side-stepped less-than-favorable discovery rules by resorting immediately to § 1782" this factor may weigh against the application. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C07-5944-SC, 2013 WL 183944, at *3 (N.D. Cal. Jan. 17, 2013). But absence of evidence of attempted circumvention weighs in favor of an application. *See*, *e.g.*, *In re Google, Inc.*, No. 14-mc-80333-DMR, 2014 WL 7146994, at *2 (N.D. Cal. Dec. 15, 2014); *In re Eurasian Nat. Res. Corp. Ltd.*, No. 18-mc-80041-LB, 2018 WL 1557167, at *3 (N.D. Cal. Mar. 30, 2018); *In re Honda*, No. 21-mc-80167-VKD, 2021 WL 3173210, at *4 (N.D. Cal. July 27, 2021).

Here, xAI appears to be seeking to "side-step" discovery rules in *both* the U.K. Proceeding and the 8133 case. In particular, xAI does not dispute that under U.K. law, requests for "relevant documents from third parties 'must be supported by evidence,' U.K. CPR § 31.17(2)[;]" that "the disclosure must be not merely relevant but 'necessary in order to dispose fairly of the claim or to save costs,' *id*. § 31.17(3)[;] and [that] any disclosure order must 'specify the documents or the classes of documents which the respondent must disclose,' *id*. § 31.17(4)." Opposition at 10. Nor does it dispute that "[a]s a procedural matter, such applications are generally made at a later stage

11

1    of U.K. litigation, once the pleading stage is complete." *Id.* at 10-11 (citing Chaize Decl. ¶ 16).
2    Given the broad nature of the discovery requested in the Subpoena and the narrow allegations
3    against Fraiture in the U.K. Proceeding, it appear xAI is using Section 1782 to obtain discovery as
4    to which it might have difficulty meeting the burdens imposed under U.K. discovery rules.
5    Furthermore, the timing of the Application suggests that xAI is seeking to make an end run around
6    rules in both the U.K. and in this Court that render xAI's discovery requests premature.

### 4.  Whether Discovery Imposes Undue Burden

*Intel*'s fourth and final factor considers whether the requested discovery is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265.  Requests are unduly burdensome when they are "not narrowly tailored, request confidential information and appear to be a broad 'fishing expedition' for irrelevant information." *In re Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016).  The "proper scope" of requests under section 1782 is "generally determined by the Federal Rules of Civil Procedure." *In re Varian Med. Sys.*, 2016 WL 1161568, at *5.  Parties "may obtain discovery that is relevant to any parties claim or defense," Fed. R. Civ. P. 26(b)(1), but "unduly intrusive or burdensome requests may be rejected or trimmed." *Intel*, 542 U.S. at 246.

This factor strongly favors OpenAI's position.  The discovery requests in the Subpoena are extremely broad, as discussed above, and appear to be a "fishing expedition" aimed at gaining an unfair advantage in both the U.K. Proceeding and the 8133 Case (and possibly in other pending or future litigation xAI is contemplating bringing against OpenAI and/or former xAI employees).  They are likely to require production of OpenAI's confidential information, some of which will be highly sensitive. This will require the Court to adopt protocols for production that will almost certainly duplicate (or possibly impede) the efforts of the Court in the 8133 Case in supervising discovery in that case.  Furthermore, the broad discovery requests in the Subpoena are likely to duplicate discovery in the 8133 case.  Such duplication of discovery imposes an undue burden on OpenAI and the Court.

In sum, the Court finds that on balance, the *Intel* factors favor denial of the Application.

## IV. CONCLUSION

For the reasons stated above, the Application is DENIED.

**IT IS SO ORDERED.**

Dated: November 11, 2025

_____
JOSEPH C. SPERO
United States Magistrate Judge