LEELLE B. SLIFER (*pro hac vice*)
lslifer@kslaw.com
JONATHAN HUNG (*pro hac vice*)
jhung@kslaw.com
**KING & SPALDING LLP**
2601 Olive Street, Suite 2300
Dallas, TX 75201
Telephone: (214) 764-4600

KOSTA S. STOJILKOVIC (*pro hac vice* pending)
kstojilkovic@wilkinsonstekloff.com
JOLEE PORTER (*pro hac vice* pending)
jporter@wilkinsonstekloff.com
JENNA P. SWARBRICK (*pro hac vice* pending)
jpswarbrick@wilkinsonstekloff.com
**WILKINSON STEKLOFF LLP**
2001 M Street NW, Floor 10
Washington, D.C. 20036
Telephone: (202) 847-4000

MARK ZAMBARDA (State Bar No. 314808)
mzambarda@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (720) 535-2315

*Attorneys for Plaintiffs X.AI CORP. and X.AI LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X.AI CORP. and X.AI LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> OPENAI, INC., OPENAI GLOBAL, LLC, and OPENAI OPCO, LLC, <br><br> Defendants. | **Case No. 3:25-cv-08133-RFL** <br><br> **XAI'S RESPONSE TO OPENAI'S MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> Judge: Hon. Rita F. Lin <br> Date: May 12, 2026 <br> Time: 10:00 a.m. |

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................................1

FACTS ...............................................................................................................................................2

LEGAL STANDARD........................................................................................................................4

ARGUMENT .....................................................................................................................................4

I.    xAI Plausibly Alleged That OpenAI Misappropriated Its Trade Secrets. ..........................4

A.    xAI Plausibly Alleged That OpenAI Indirectly Misappropriated Its Trade Secrets.........................................................................................................5

1.    xAI plausibly alleged that OpenAI knew or should have known that Li was disclosing xAI's trade secrets. ..........................5

2.    xAI plausibly alleged that OpenAI knew or should have known that Li's disclosures were improper. ...................................8

B.    xAI Plausibly Alleged That OpenAI Induced Li To Divulge xAI's Trade Secrets.........................................................................................................9

II.   OpenAI's Motion To Strike Is Meritless. .........................................................................13

III.  Any Dismissal Should Be Without Prejudice....................................................................15

CONCLUSION................................................................................................................................15

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                           **Page(s)**

*ABC Acquisition Co., LLC v. AIP Prods. Corp.*,
   2020 WL 4607247 (N.D. Ill. 2020) ............................................................................................... 11

*Attia v. Google LLC*,
   983 F.3d 420 (9th Cir. 2020) ......................................................................................................... 4

*Austin v. Univ. of Oregon*,
   925 F.3d 1133 (9th Cir. 2019) ....................................................................................................... 4

*Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*,
   2016 WL 11523446 (C.D. Cal. 2016) ............................................................................................ 8

*Bus. Solutions. LLC v. Ganatra*,
   2020 WL 1279209 (C.D. Cal. 2020) ............................................................................................ 11

*Cisco Sys., Inc., v. Chung*,
   462 F. Supp. 3d 1024 (N.D. Cal. 2020) .................................................................................... 8, 10

*Citcon USA, LLC v. RiverPay Inc.*,
   2019 WL 917056 (N.D. Cal. 2019) ............................................................................................... 9

*Colgate-Palmolive Co. v. Carter Prods., Inc.*,
   230 F.2d 855 (4th Cir. 1956) ....................................................................................................... 12

*Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*,
   911 F.2d 242 (9th Cir. 1990) ......................................................................................................... 7

*Doe 1 v. Univ. of San Francisco*,
   685 F. Supp. 3d 882 (N.D. Cal. 2023) ........................................................................................ 14

*Elko, Inc. v. WTH Com. Servs., LLC*,
   2023 WL 6141623 n.5 (D. Nev. 2023) .......................................................................................... 8

*Genentech, Inc. v. JHL Biotech, Inc.*,
   2019 WL 1045911 (N.D. Cal. 2019) .................................................................................. 6, 7, 8, 13

*Guilbert Tex., Inc. v. U.S. Fed Grp. Consortium Syndicate*,
   2021 WL 1557752 (C.D. Cal. 2021) ............................................................................................. 9

*In re Hernandez*,
   2011 WL 3300927 (B.A.P. 9th Cir. 2011) .................................................................................. 11

*JustMed, Inc. v. Bryce*,
   600 F.3d 1118 (9th Cir. 2010) ..................................................................................................... 11

*LiButti v. United States*,
178 F.3d 114 (2d Cir. 1999)..................................................................................................7

*Missouri ex rel. Koster v. Harris*,
847 F.3d 646 (9th Cir. 2017) ..............................................................................................15

*ML Prods. Inc. v. Ninestar Tech. Co.*,
2023 WL 12171006 (C.D. Cal. 2023)....................................................................................4

*Navigation Holdings, LLC v. Molavi*,
445 F. Supp. 3d 69 (N.D. Cal. 2020) ....................................................................................5

*Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017) ..............................................................................................13

*Pinnacle Ventures LLC v. Bertelsmann Educ. Servs. LLC*,
2019 WL 4040070 (N.D. Cal. 2019) ....................................................................................15

*Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*,
149 F.4th 1081 (9th Cir. 2025) ..........................................................................................14

*Silvaco Data Sys. v. Intel Corp.*,
109 Cal. Rptr. 3d 27 (Ct. App. 2010) .............................................................................11, 12

*Source Prod. & Equip. Co. v. Schehr*,
2017 WL 3721543 (E.D. La. 2017) ....................................................................................12

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ..............................................................................................4

*United States v. Sing*,
2016 WL 54906 (C.D. Cal. 2016)........................................................................................12

*Whittlestone, Inc. v. Handi-Craft Co.*,
618 F.3d 970 (9th Cir. 2010) ..............................................................................................14

*Wireless Advance Vehicle Electrification, LLC v. WiTricity Corp.*,
2025 WL 895322 (D. Utah 2025) ........................................................................................14

*Wisk Aero LLC v. Archer Aviation Inc.*,
2021 WL 8820180 (N.D. Cal. 2021) ....................................................................................13

**Statutes**

18 U.S.C. § 1839(5) ...............................................................................................................4

18 U.S.C. § 1839(5)(A)........................................................................................................5, 11

18 U.S.C. § 1839(6)(A)............................................................................................................9

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................................ 13, 15

Fed. R. Civ. P. 12(f) ........................................................................................................................ 13

Fed. R. Civ. P. 56(a) ....................................................................................................................... 15

**Other Authorities**

Roger M. Milgrim, *Trade Secrets* § 18.02 (2005) ............................................................................ 10

**INTRODUCTION**

OpenAI concedes that xAI has plausibly alleged that OpenAI "recei[ved] . . . xAI information" from Xuechen Li during the interview process. Mot. to Dismiss ("MTD") at 1, ECF No. 91. And there is no question that at the exact same time, Li stole the entire Grok source code and deleted evidence of his theft. Yet despite knowing Li had improperly disclosed xAI information, OpenAI offered him a multi-million-dollar employment contract. OpenAI now seeks to minimize its wrongdoing, discounting the spate of thefts by Li and other former xAI employees and recasting Li's disclosure of trade secrets during his interviews as "simply asking a candidate about prior work experience." *Id*.

xAI's allegations tell a very different story. When xAI released Grok 4 in July 2025, it became the clear frontrunner in critical reasoning. This success was attributed to xAI's advances in post training. The previous year, xAI showed it could build data centers in a fraction of the time it took competitors— giving Grok 4 an even bigger advantage with xAI's unprecedented computing power. Realizing that it was falling behind on multiple fronts, OpenAI began targeting xAI employees, including Li, one of the engineers most familiar with the proprietary methods used to train Grok 4. As part of the recruiting process, Li delivered a presentation that discussed those methods to members of OpenAI's post-training team—individuals tasked with refining OpenAI's post-training processes so that it could close the gap with Grok 4. These OpenAI employees would have readily known from the presentation's substance (including express references to Grok 4) that Li was divulging xAI's trade secrets. Rather than stop Li's presentation, dissuade him from further breaching his confidentiality obligations, or inform xAI of Li's disclosures, OpenAI recognized an opportunity to steal from its competitor. OpenAI continued to recruit Li, offering him a job only after he had stolen the entire Grok source code. And OpenAI would have allowed Li to begin work had xAI not obtained a temporary restraining order.

These allegations establish indirect misappropriation by OpenAI because its engineers knew or had reason to know that Li was improperly divulging xAI trade secrets during his interviews. And these allegations further show that OpenAI induced Li (and likely others) to divulge xAI trade secrets and to later steal the Grok source code as a condition of his lucrative offer. Moreover, the additional details in xAI's Second Amended Complaint ("SAC") cast xAI's existing allegations in a new light, strengthening

xAI's Response to Motion to Dismiss                     1                     Case No. 3:25-cv-08133-RFL

the reasonable inference that OpenAI is responsible for the multiple trade secret thefts committed over just a few weeks last summer by multiple xAI employees poached by OpenAI.

The Court should thus deny OpenAI's Motion to Dismiss.

**FACTS**

In July 2025, xAI released Grok 4, the latest version of its flagship large language model. *See* Second Am. Compl. ("SAC") ¶ 63, ECF No. 92-1. At the time of its launch, Grok 4 outperformed every competitor on benchmarks for complex reasoning, including OpenAI's existing ChatGPT-4 and its subsequent model ChatGPT-5. *Id.* Industry commentators attributed Grok 4's success to reinforcement-learning-related innovations—specifically, xAI's ability to scale reinforcement learning and invest more in post-training techniques, areas in which OpenAI was lagging. *Id.* And Grok 4's success was further accelerated by xAI's unmatched speed in building data centers to generate the necessary supercomputing power to run that model. *Id.* ¶ 8.

Shortly after Grok 4's launch, OpenAI reached out to Li, a senior xAI engineer. *Id.* ¶ 64. Li had significant experience developing and training Grok. *Id.* ¶ 56. Notably, Li was responsible for the reinforcement-learning and post-training techniques that drove Grok 4's success—techniques directly relevant to OpenAI's efforts to improve ChatGPT's performance in complex reasoning. *Id.* ¶¶ 64; 71(b). Li's interview process with OpenAI began as early as July 11, 2025, and involved senior leadership like OpenAI's cofounder and CEO, Sam Altman, *id.* ¶ 65, and key members of OpenAI's post-training and reinforcement-learning teams, *id.* ¶ 70.

As part of the recruiting process, OpenAI directed Li to deliver a presentation about technical aspects of a prior project. *Id.* ¶ 66. Li then created a slide deck, which he later presented during his OpenAI interviews. *Id.* ¶ 68. The slides reveal that Li divulged confidential trade secrets about model training, including details of xAI's training recipes, sources of problems in post-training AI models, xAI's experience with different training methods, and details of xAI's training for model behavior. *Id.* ¶ 71(a). The OpenAI engineers who interviewed Li—specialists in post-training techniques—had the background necessary to recognize that this information was both confidential and valuable. *Id.*

After realizing Li would readily breach his confidentiality obligations to xAI, OpenAI induced him to misappropriate additional xAI trade secrets, communicating with him via ephemeral Signal communications and extending an offer only after Li had downloaded the entire Grok source code and an additional slide deck on xAI's reinforcement-learning techniques. *Id*. ¶¶ 74–75. That deck was a primer for xAI coders on the software architecture supporting the same xAI reinforcement-learning techniques that Li discussed during his interview. *Id*. ¶ 77. After accepting OpenAI's offer, Li attempted to conceal his thefts by deleting files and messages (including the presentation he gave to OpenAI), emptying his Trash folder, and changing key account passwords. *Id*. ¶¶ 88–94.

Upon discovering Li's thefts, xAI acted quickly to protect its confidential trade secrets. On August 28, 2025, xAI filed a federal lawsuit against Li for trade secret misappropriation. *See x.AI Corp. et al. v. Li*, Case No. 3:25-cv-07292. xAI obtained an order against Li that prevented him from starting work at OpenAI. *See* Order Granting TRO, *x.AI Corp. et al. v. Li*, No. 3:25-cv-07292 (N.D. Cal. Sept. 2, 2025), ECF No. 20 at 4. Only after the TRO was entered did OpenAI rescind its offer of employment to Li. SAC ¶ 99. xAI's suit against Li is ongoing. Notably, in discovery, Li pleaded the Fifth Amendment when asked whether he shared xAI's trade secrets with OpenAI. *Id*. ¶ 100.

xAI's further investigation revealed that Li's actions were not isolated. On the contrary, at the same time OpenAI was courting Li, OpenAI also poached at least seven other xAI employees with expertise related to xAI's generative AI technology and its data centers. *Id*. ¶ 155. One of those employees, Jimmy Fraiture, stole the most valuable and sensitive portions of xAI's infrastructure and training code, including code related to Grok 4, around the same time as Li's thefts. *Id*. ¶¶ 118, 120. Fraiture also engaged in secret Signal communications with the same OpenAI employee as Li, and now works at OpenAI. *Id*. ¶¶ 115, 127. A former finance executive was hired by OpenAI specifically for his experience with xAI's data centers, and has since shared highly confidential information with OpenAI. *Id*. ¶¶ 131, 136–37, 142. At least one other employee involved with xAI's data centers tried to access xAI confidential information while working at OpenAI. *Id*. ¶ 153. Others retained xAI confidential information after leaving for OpenAI. *Id*. ¶ 150. And all of this happened within weeks. *Id*. ¶ 155.

This alarming pattern reveals that OpenAI was not an unknowing recipient of xAI's valuable trade secrets; instead, it knowingly sought to obtain xAI's valuable trade secrets through former xAI employees.  xAI thus sued OpenAI for trade secret misappropriation in violation of the DTSA.

## LEGAL STANDARD

The court must accept xAI's factual allegations as true and draw all reasonable inferences in xAI's favor. *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1137 (9th Cir. 2019).  As the Ninth Circuit has explained, this standard requires "liberal treatment of a plaintiff's complaint." *Id*.  "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss . . . ." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  OpenAI selectively quotes caselaw to argue that xAI must "*exclude* an 'innocent explanation.'" *See* MTD at 8, 11, 14.  That is not the law:  "There is no requirement, at the pleading stage, that a plaintiff disprove any alternate or 'innocent' explanation where the plaintiff's allegations are plausible." *ML Prods. Inc. v. Ninestar Tech. Co.*, 2023 WL 12171006, at *8 (C.D. Cal. 2023).

## ARGUMENT

xAI's allegations show that OpenAI violated the DTSA.  *First*, xAI has stated a plausible claim against OpenAI for indirect misappropriation because it is reasonable to infer that OpenAI knew that Li divulged xAI trade secrets during his interview and was doing so in violation of his confidentiality obligations.  *Second*, xAI has also stated a plausible claim for direct misappropriation because it is reasonable to infer that OpenAI induced Li to disclose (and later steal) xAI's trade secrets.  *Finally*, xAI's new allegations regarding Li strengthen the reasonable inference that OpenAI is likewise responsible for the other instances of trade secrets theft by former xAI employees that OpenAI recruited in the same short window of time.  OpenAI's Motion to Dismiss should be denied.

## I. xAI Plausibly Alleged That OpenAI Misappropriated Its Trade Secrets.

Under the DTSA, "misappropriation" includes the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *See* 18 U.S.C. § 1839(5); Order Granting Mot. to Dismiss ("MTD Order") at 7, ECF No. 73 (quoting *Attia*

*v. Google LLC*, 983 F.3d 420, 424 (9th Cir. 2020)). Courts have recognized that misappropriation can be direct or indirect. *See Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 78 (N.D. Cal. 2020). xAI plausibly alleged both.

### A.   xAI plausibly alleged that OpenAI indirectly misappropriated its trade secrets.

With respect to indirect misappropriation, this Court's order concluded that "Li allegedly disclosed xAI's confidential information in a presentation to OpenAI," but that xAI failed to allege "that OpenAI knew that the information was a trade secret, that Li had improperly acquired the information, or that Li was improperly or mistakenly disclosing the information." MTD Order at 9. xAI's amended allegations address this concern, explaining why it would have been obvious that Li was disclosing xAI trade secrets based on the substance of Li's presentation and his interviewers' backgrounds. The Court can reasonably infer that OpenAI would have known both that Li was disclosing xAI's trade secrets and that he was doing so improperly. *See* 18 U.S.C. § 1839(5)(A) (authorizing liability for acquisition where defendant knows or should know that its acquisition occurred through improper means).

#### 1.   xAI plausibly alleged that OpenAI knew or should have known that Li was disclosing xAI's trade secrets.

OpenAI does not argue in its motion that xAI failed to plausibly allege that Li's presentation contained xAI's trade secrets—instead, OpenAI argues only that the OpenAI interviewers would not have *known* as much. MTD at 4, 10–12. That argument fails.

Both the context and substance of Li's presentation made clear that he was disclosing xAI's trade secrets. It is reasonable to infer that Li created this presentation for use during his interviews with OpenAI because of the file's name ("interview slides 07-13-25"), its creation date, and the fact that, as part of its standard interview process, OpenAI asks engineering candidates to deliver a presentation about the candidate's specific technical contributions to a prior project. *Id.* ¶¶ 66, 68.[1] And the presentation detailed Li's work training Grok 4 and its predecessors, describing "specific characteristics of xAI's

---

[1] OpenAI suggests that it is unreasonable to infer that these slides were prepared for use in an interview because July 13, 2025 was a Sunday. MTD at 4, 7. But there is nothing unusual about a person preparing for an upcoming interview on a weekend. And OpenAI ignores xAI's allegation that Li presented his slides during interviews on or around July 21–22, 2025. SAC ¶¶ 70–71.

internal training" of Grok 4 and referencing Grok 4 explicitly by name. *Id.* ¶¶ 68, 71. As a result, the OpenAI employees who heard Li's presentation would have recognized that they were being given insight into *xAI*'s proprietary reinforcement-learning-related processes.

The OpenAI interviewers also would have recognized that this information was valuable and confidential. To start, Li had stamped "confidential material" on the deck's first slide. *Id.* ¶ 71(c). Moreover, the presentation described "specific characteristics of xAI's internal training" of its models, identified "which methods provided the best results," and described training-related problems that AI developers should avoid. *Id.* ¶¶ 66, 68, 71(a)–(c).[2] These are not insignificant topics: AI developers spend billions of dollars refining their training methodology. xAI's proprietary methods—as well as its "negative know-how" gleaned from trial and error—would be instantly recognized as valuable by others in the field, like Li's interviewers at OpenAI. *See Genentech, Inc. v. JHL Biotech, Inc.*, 2019 WL 1045911, at *11 (N.D. Cal. 2019) (trade secrets "may come in the form of negative know-how" that enables a competitor to "avoid[] costly research pitfalls"). Even more so given that commentators were attributing Grok 4's unmatched reasoning capabilities to xAI's advances in post training.[3] SAC ¶ 63.

In addition, because Li interviewed with "key leaders of [OpenAI's] post-training and reinforcement learning teams," *id.* ¶ 70, his interviewers possessed the technical expertise necessary to appreciate the significance of the information he was sharing about xAI's post-training techniques. That shared technical expertise is precisely what the court found persuasive in *Genentech.* In that case, a JHL employee was given a hard copy of a "confidential technical report" by a coworker whose wife worked at Genentech and told not to show it to others. *Genentech*, 2019 WL 1045911, at *2–3. Judge Alsup concluded that it was reasonable to infer that the JHL employee "*had reason to know* that the information

---

[2] These allegations refute OpenAI's mistaken contention that the SAC does not address "what content allegedly was presented to OpenAI." MTD at 11. Moreover, it is reasonable to infer that Li's oral presentation went far beyond the text of his slides to disclose still more details about xAI's training methods. xAI's claim thus does not depend on the text of the slides alone. *See* SAC ¶ 72.

[3] OpenAI wrongly suggests that public commentary about Grok 4's success somehow undermines the confidentiality of the post-training techniques used to develop Grok 4. *See* MTD at 11. The fact that commentators were attributing Grok 4's success to advances in xAI's post-training techniques does not mean that those commentators were divulging (or even knew) the details of the techniques xAI used— details that xAI closely guarded as trade secrets. Li's presentation, on the other hand, was essentially a roadmap for the techniques that xAI used and lessons it learned along the way. *See, e.g.*, SAC ¶ 71(a).

was a trade secret and that he *had reason to know* that it was acquired through improper means" because of the manner in which he received the report and because the report concerned the "exact topic JHL was researching at that time." *Id*. at \*12 (emphasis added).  The same is true of Li's presentation on post-training techniques, delivered to OpenAI engineers focused on post training.  OpenAI makes much of the fact that xAI relied on one of its engineers—rather than its attorneys alone—to identify proprietary information in Li's presentation.  MTD at 4, 11.  But that is precisely xAI's point; it was OpenAI engineers with deep experience in this area who interviewed Li, not attorneys.  *See* SAC ¶ 70.[4]

Li himself recognized the value of the information he disclosed.  After xAI discovered his theft, he attempted to delete his interview slides, *id.* ¶¶ 73, 93, and pleaded the Fifth Amendment when asked whether he had shared xAI's trade secrets with OpenAI, *id.* ¶ 100.  These actions support the reasonable inference that Li understood he disclosed xAI trade secrets.  Federal courts permit adverse inferences against a party based on the invocation of the Fifth Amendment by non-party witnesses, "because silence when one would be expected to speak is a powerful persuader." *LiButti v. United States*, 178 F.3d 114, 119–20 (2d Cir. 1999).  Regardless of whether an adverse inference would be warranted at summary judgment or trial as an evidentiary matter, given that Li invoked his Fifth Amendment rights when questioned about sharing trade secrets with OpenAI and had previously concealed evidence of his wrongdoing, it is at least reasonable to infer that Li would have answered those questions adversely.

That is more than enough to plausibly allege both that Li in fact presented the slides to OpenAI employees,[5] and that those employees should have known that Li was divulging xAI trade secrets.

---

[4] OpenAI's assertion that this argument is inconsistent with xAI's position in its motion to compel misses the mark.  MTD at 11.  xAI never said that Li "attempted to mask" xAI trade secrets from OpenAI engineers. *Id*. at 2, 4, 11.  In fact, xAI said precisely the opposite: "Someone with a technical background in the AI space—*such as the engineers Li met with at OpenAI*—would recognize [the information in Li's presentation] as relating to xAI's model training frameworks." MTD Ex. A at 16 (emphasis added).  The point xAI was only that OpenAI's *lawyers* could not be relied upon to identify what constitutes xAI information.  *See id.*

[5] OpenAI contests whether Li delivered the presentation during his interviews.  *See* MTD at 1 n.1.  But that is a dispute of fact, and "questions of fact cannot be resolved or determined on a motion to dismiss . . . ." *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990).  The relevant question at this stage is whether it is reasonable to infer that Li's presentation to OpenAI revealed xAI's trade secrets.  As this Court already acknowledged, it is. *See* MTD Order at 9.

### 2. xAI plausibly alleged that OpenAI knew or should have known that Li's disclosures were improper.

xAI's allegations also show that the OpenAI interviewers knew or should have known that Li was *improperly* disclosing xAI information. OpenAI barely addresses this question in its motion—for good reason. The OpenAI interviewers must have known that xAI employees sign confidentiality agreements, and that Li was violating his agreement through his disclosures.

AI is a competitive industry in which technological advances are closely guarded; confidentiality agreements are thus standard practice. SAC ¶¶ 12, 71(d). The OpenAI employees who interviewed Li must have been familiar with that practice. They likewise must have recognized that the information Li conveyed—xAI's training techniques for Grok 4—is exactly the type of sensitive information covered by such agreements. *See Elko, Inc. v. WTH Com. Servs., LLC*, 2023 WL 6141623, at *6 n.5 (D. Nev. 2023) (defendant had "reason to know" former employee was breaching his confidentiality policy where such policies are "relatively standard" and he was divulging "the type of information that [his former employer] would not voluntarily disclose"); *see also Cisco Sys., Inc., v. Chung*, 462 F. Supp. 3d 1024, 1056 (N.D. Cal. 2020) (defendant's employee who himself had previously signed a confidentiality agreement "should have known" that plaintiff's employee had "a like agreement").

That is particularly true here, given that Li labeled his presentation "confidential" on the very first slide. SAC ¶ 71(c). A confidentiality label signals to the viewer—here, OpenAI—that the document contains protected information. Accordingly, once OpenAI interviewers saw the "confidential" label, they realized or should have realized that the slide deck contained confidential, valuable information. *See Genentech*, 2019 WL 1045911, at *12 (defendant had reason to know that information he received was acquired through improper means because the report was "clearly marked" "Confidential"); *Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*, 2016 WL 11523446, at *3 (C.D. Cal. 2016) (reasonable to infer defendant's knowledge from its receipt of schematics stamped "Proprietary").

OpenAI attempts to distinguish *Genentech* on the grounds that the report in that case had multiple confidentiality labels, one of which said, "GENENTECH Pharm R&D Technical Report – Confidential." *See* MTD at 11. But Li's presentation elsewhere disclosed that the information contained therein related

to xAI, referring to "Grok" and "xAI" in several places. SAC ¶¶ 12, 68, 71(a)–(c). So, the fact that the confidentiality label did not itself mention xAI is of no import. OpenAI separately posits that the interviewers may have understood the slides' confidentiality label to relate to Li's yet-to-be-offered "future employment relationship" with OpenAI. MTD at 12. But that is not how confidentiality labels are commonly understood, and thus OpenAI's proposed inference is unreasonable. In any event, "competing inferences . . . must be drawn in [the plaintiff's] favor on a motion to dismiss." *Guilbert Tex., Inc. v. U.S. Fed Grp. Consortium Syndicate*, 2021 WL 1557752, at *3 (C.D. Cal. 2021). xAI thus plausibly alleged that OpenAI knew or should have known that Li's disclosures breached his confidentiality agreement with xAI.

Because this Court can reasonably infer from the SAC that OpenAI knew both that Li's presentation disclosed xAI's trade secrets and that Li was improperly disclosing that information, xAI has stated a plausible claim of indirect misappropriation against OpenAI.

**B.    xAI plausibly alleged that OpenAI induced Li to divulge xAI's trade secrets.**

Although xAI's allegations of indirect misappropriation suffice to defeat OpenAI's Motion to Dismiss, xAI has also plausibly alleged direct misappropriation. Under the DTSA, direct misappropriation includes "inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6)(A); *see Citcon USA, LLC v. RiverPay Inc.*, 2019 WL 917056, at *4–5 (N.D. Cal. 2019) (denying motion to dismiss where plaintiff alleged that "[defendant corporation] directed [plaintiff's] former employee], and encouraged him with a promise of 'co-founder' status, to misappropriate [plaintiff's] trade secrets"). Here, xAI plausibly alleged that OpenAI induced Li to divulge trade secrets during his interviews and later to steal source code as a condition of his multi-million-dollar job offer.

OpenAI reached out to recruit Li just weeks after Grok 4's release and weeks before OpenAI announced a $300 billion partnership with Oracle to build data centers. SAC ¶¶ 63, 65, 149. OpenAI targeted Li because he worked on the reinforcement-learning techniques that supercharged Grok's reasoning capabilities. *Id*. ¶ 64. Li created his interview presentation only after OpenAI initiated the recruitment process. *Id.* ¶¶ 65, 68. It is reasonable to infer that OpenAI requested that Li deliver a presentation on a significant technical project from his time at xAI—both because job candidates do not

typically create slides without prompting and because such presentations are standard in OpenAI's interview process. *Id.* ¶ 66. In addition, given that Li focused on post-training techniques at xAI and was scheduled to meet with OpenAI employees who worked in post training, it is reasonable to infer that OpenAI would have expected his presentation to address those same topics. *Id.* ¶¶ 67, 70. It is also reasonable to infer that the interviewers asked substantive follow-up questions, particularly because they were working on the same problems, further inducing Li to divulge xAI's trade secrets. *See id.* ¶ 72.

Taken together, these allegations support the reasonable inference that OpenAI induced Li's disclosure of xAI trade secrets during his interview presentation. After all, asking a candidate to deliver a technical presentation about the proprietary methods used by a competitor is a long way from "asking a candidate about prior work experience." MTD at 1; *cf.* 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 18.02 (2005) (advising that hiring employers should "not inquire into the particulars" of a potential hire's prior technical work to avoid disclosure of her prior employer's confidential information).

Moreover, OpenAI took no steps to discourage Li when he disclosed xAI's trade secrets during his interviews. Li's presentation should have been a red flag against hiring him—he had demonstrated he cannot be trusted with trade secrets. Instead, OpenAI continued to interview him, engaged in secret Signal communications with him (most of which xAI's forensics team was unable to recover), and then hired him. SAC ¶¶ 74–84, 115; *cf. Cisco Sys.*, 462 F. Supp. 3d at 1057 (denying motion to dismiss where "executives did not reprimand [former plaintiff employee] for (or otherwise caution him against) making such disclosures" during an interview). It is reasonable to infer that Li interpreted OpenAI's continued interest as contingent on his implementing the trade secrets he had disclosed, and his theft of Grok's source code all but guaranteed that implementation. Likewise, it is reasonable to infer that OpenAI, recognizing Li's willingness to breach his confidentiality obligations, induced him to steal additional xAI trade secrets. *Id.* ¶ 74. Indeed, when Li left xAI, he took not only the entirety of xAI's source code but also an internal xAI presentation on the same techniques discussed in his presentation. *Id.* ¶¶ 76–77.

OpenAI responds that xAI has at most alleged "passive receipt," which it says is not enough to show direct misappropriation.[6]  MTD at 9.  But that argument misreads the text of the DTSA, relevant caselaw, and xAI's allegations.  To start, neither the DTSA nor caselaw support the "passive receipt" carveout that OpenAI proposes.  The DTSA defines "misappropriation" to include "acquisition of a trade secret."   18 U.S.C. § 1839(5)(A).  As a matter of plain text, acquisition means "[t]he gaining of possession or control over something." *Acquisition*, Black's Law Dictionary (10th ed. 2014).  The Ninth Circuit has adopted the same broad definition: "[a]cquire means to come into possession, control, or power of disposal of." *JustMed, Inc. v. Bryce*, 600 F.3d 1118, 1129 (9th Cir. 2010) (quoting Webster's International Dictionary 18 (3d ed. 1993)) (citation modified).  When Li disclosed xAI's trade secrets to his OpenAI interviewers, OpenAI knowingly came into possession of trade secrets—that is enough to show acquisition.

The cases OpenAI cites do not compel a different conclusion.  At most, the cases stand for the idea that a competitor does not "acquire" a trade secret when it "inadvertently com[es] into possession of a trade secret." *Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27, 40 (Ct. App. 2010); *see also Genentech*, 2019 WL 1045911, at *11 (limiting *Silvaco* to instances of purely "inadvertent[]" receipt (citation modified)).[7]  The facts of *Silvaco* illustrate what this means.  There, the plaintiff alleged that Intel acquired its trade secrets by merely purchasing third-party software because the software had plaintiff's trade secrets embedded in the source code. *Silvaco*, 109 Cal. Rptr. 3d at 35.  The plaintiff did not even argue that "Intel acquired the trade secrets at issue but only that . . . it *could* have done so without itself having 'knowledge' of them." *Id.* at 40.  The court suggested in dicta that "inadvertently coming into possession of a trade secret" in this manner would not qualify as "acquisition." *Id.*  But it

---

[6] OpenAI only argues that its "passive receipt" rule applies to xAI's direct misappropriation theory, *see* MTD at 7–10; not that a similar rule applies to xAI's indirect misappropriation theory, *id.* at 10–13.

[7] The other cases OpenAI invokes reference "passive receipt" only in passing dicta. *See In re Hernandez*, 2011 WL 3300927, at *5 (B.A.P. 9th Cir. 2011) (mentioning passive receipt in the context of describing the standard for willful injury that had been applied in a separate proceeding); *Bus. Solutions. LLC v. Ganatra*, 2020 WL 1279209, at *6 (C.D. Cal. 2020) (holding that there was a dispute of fact over the defendant's use (rather than acquisition) of trade secrets); *ABC Acquisition Co., LLC v. AIP Prods. Corp.*, 2020 WL 4607247, at *11 (N.D. Ill. 2020) (granting summary judgment because defendant had no reason to know information was improperly disclosed).

XAI'S RESPONSE TO MOTION TO DISMISS                    11                    CASE NO. 3:25-CV-08133-RFL

declined to "decide the outer limits of acquisition" because there was "no suggestion . . . of acquisition even in the broadest sense, i.e., that Intel ever came into possession of the source code constituting the claimed trade secrets." *Id*. That is a far cry from what happened here.

OpenAI was more than an inadvertent recipient. As discussed above, it is reasonable to infer that OpenAI both asked Li to give a presentation and expected he would discuss reinforcement learning—the exact work OpenAI knew Li was doing at xAI. That inference is bolstered by the fact that OpenAI scheduled Li's interviews with members of its reinforcement-learning team. OpenAI thus actively took steps to create a situation in which Li was likely to disclose xAI's trade secrets, and from which OpenAI could learn whether Li would disclose more if offered employment. Moreover, it would have been obvious to the interviewers—many of whom were post-training specialists—that Li was divulging xAI trade secrets. Li's presentation gave detailed insight into xAI's training methods and described problems that xAI engineers encountered when training Grok 4. But rather than stop the interview, inform xAI about Li's disclosures, and decline to hire him, OpenAI continued meeting with Li (even scheduling him to interview with OpenAI's CEO) and then made him a multi-million-dollar job offer. That is not inadvertent receipt. *See Source Prod. & Equip. Co. v. Schehr*, 2017 WL 3721543, at *4 (E.D. La. 2017) (denying motion to dismiss where defendant "accepted these [trade] secrets" despite having reason to know they were "improperly conveyed"); *cf. United States v. Sing*, 2016 WL 54906, at *12–13 (C.D. Cal. 2016) (describing a company that, after receiving a competitor's trade secrets, deleted them and informed the competitor). Indeed, the only reason Li did not start work at OpenAI is because xAI discovered his wrongdoing and obtained a TRO. OpenAI is thus not a mere passive recipient. *See Colgate-Palmolive Co. v. Carter Prods., Inc.*, 230 F.2d 855, 864 (4th Cir. 1956) (holding defendant "was obligated to do more than it did towards ascertaining the extent to which [plaintiff's former employee] was, in fact, restricted in what he might disclose").

Because this Court can reasonably infer from the SAC that OpenAI induced Li's disclosure of xAI trade secrets during his interviews and subsequent thefts of additional xAI trade secrets, xAI has stated a plausible claim of direct misappropriation against OpenAI.

## II.    OpenAI's Motion to Strike Is Meritless.

OpenAI alternatively asks the Court to strike all remaining allegations related to employees other than Li.  MTD at 15.  But that request improperly seeks to "isolate each allegation in a vacuum." *Genentech*, 2019 WL 1045911, at \*11.  And regardless, neither Rule 12(f) nor Rule 12(b)(6) authorize the Court to dismember xAI's claim in the manner that OpenAI suggests.

xAI has brought a single claim of trade secret misappropriation under the DTSA.  Specifically, xAI alleges that over the span of just over a month, OpenAI acquired xAI's trade secrets from multiple different xAI employees.  SAC ¶¶ 7–21.  When analyzing a misappropriation claim, "the inquiry focuses on all of the threads of its allegations woven together—the whole gestalt, of the complaint or evidence— not each in isolation."  *Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180, at \*11 (N.D. Cal. 2021) (citation modified); *see also Park v. Thompson*, 851 F.3d 910, 928 n.22 (9th Cir. 2017) ("[W]hen the entire sequence of events in the complaint is considered in context, what might otherwise appear to have been coincidental parallel conduct on its own becomes suggestive of illegal conduct . . . ." (citation modified)).  Here, the "whole gestalt" of xAI's claim is that following the release of Grok 4 and xAI's success in data center construction, OpenAI systematically poached xAI employees who specialized in xAI's post-training techniques and data-center strategy to acquire xAI trade secrets on both.

OpenAI suggests that this Court peel off xAI's allegations related to Li and then assess xAI's remaining allegations about other employees standing alone.  But that inverts the necessary inquiry: The Court must instead consider xAI's allegations related to the other employees "refracted through the lens of other circumstantial evidence," including allegations about Li.  *Wisk*, 2021 WL 8820180, at \*16.  And xAI's additional allegations connecting OpenAI to Li's thefts make it more likely that OpenAI was also involved in the thefts committed by other xAI employees OpenAI poached at the same time.  Those former xAI employees were also involved in key aspects of xAI's training of Grok 4 and the data center strategy that powered the model, were recruited during the same few week period, and also stole xAI trade secrets while being recruited to OpenAI, just like Li.  Consider, for example, the striking parallels in xAI's allegations regarding Li and Fraiture:  At the same time Li was divulging xAI's proprietary post-training techniques to OpenAI during his interviews and stealing the entire Grok source code,

Fraiture was *also* stealing large swaths of xAI code. *Id.* ¶ 120–21. Meanwhile, the same OpenAI employee was recruiting both Li and Fraiture by using ephemeral Signal messaging. *Id.* ¶ 115. Fraiture's story differs from Li's only in that he succeeded in joining OpenAI after his thefts and still works there today. *Id.* ¶¶ 124, 127. As with Li, it is thus reasonable to infer that OpenAI likewise acquired xAI trade secrets from Fraiture and others in its race to close the gap with xAI. *See Wireless Advance Vehicle Electrification, LLC v. WiTricity Corp.*, 2025 WL 895322, at \*7 (D. Utah 2025) (denying motion to dismiss where plaintiff alleged "campaign to recruit" employees to steal trade secrets).

Thus, if this Court agrees that xAI has plausibly alleged that OpenAI misappropriated xAI's trade secrets through Li, that strengthens the inference that OpenAI also misappropriated xAI's trade secrets through the other xAI employees too. Indeed, the Ninth Circuit has cautioned against prematurely pruning allegations in trade secret cases, given the unique challenges inherent to the "factual development of a trade-secret claim" and necessarily "iterative process" that can only play out in discovery. *See Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1088 (9th Cir. 2025).

OpenAI argues the Court should strike allegations related to employees other than Li under Rule 12(f). MTD at 15. But Rule 12(f) is "neither an authorized nor a proper way to procure the dismissal of all or a part of a complaint." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) (citation modified). Moreover, motions to strike are "regarded with disfavor" and "infrequently granted." *Doe 1 v. Univ. of San Francisco*, 685 F. Supp. 3d 882, 894 (N.D. Cal. 2023) (citation modified). OpenAI's conclusory assertion that the non-Li allegations are "impertinent, immaterial, and scandalous" does not justify "such a drastic remedy." *See id.* (citation modified) And those allegations are not "scandalous" just because they reflect poorly on OpenAI—there is no dispute that Fraiture also stole xAI's source code and confidential documents, lied about his theft, and yet continues to work at OpenAI today, SAC ¶¶ 118–27, or that another former employee tried to access documents containing

xAI's confidential hiring strategies months after he began working at OpenAI, *id.* ¶¶ 17, 153. These allegations are relevant to xAI's misappropriation claim and therefore should not be struck.[8]

Nor does OpenAI's request fare any better under Rule 12(b)(6). Courts have consistently held that litigants may not use Rule 12(b)(6) to dismiss only *part* of a claim. *E.g.*, *Pinnacle Ventures LLC v. Bertelsmann Educ. Servs. LLC*, 2019 WL 4040070, at *3 (N.D. Cal. 2019) ("[S]everal district courts within the Ninth Circuit have found that by its own terms, there does not appear to be any way to grant partial dismissal of a claim under Fed. R. Civ. P. 12(b)(6)." (citation modified)). Thus, if this Court concludes that xAI has alleged a plausible theory of misappropriation by OpenAI with respect to Li, xAI's entire DTSA claim (including its allegations relating to other employees) survives.[9]

### III. Any Dismissal Should Be Without Prejudice.

If the Court dismisses xAI's SAC, it should do so without prejudice. xAI's amended allegations redress the deficiencies identified in the Court's prior order. But to the extent any deficiency remains, OpenAI is wrong that "leave to amend would be futile." MTD at 14. To establish futility, OpenAI must show that "no set of facts" could cure any deficiency. *See Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) (citation modified). OpenAI has not made that showing—particularly given ongoing discovery in the related civil cases that could produce facts corroborating OpenAI's misappropriation of xAI's trade secrets.[10] *See, e.g.*, MTD Ex. A (xAI's Motion to Compel).

### CONCLUSION

The Court should deny OpenAI's Motion to Dismiss.

---

[8] For similar reasons, this Court should not strike xAI's amended allegations about the finance executive, which respond directly to the Court's conclusion in its prior order that xAI had failed to allege that the executive "used [confidential xAI] information once he started working at OpenAI." MTD Order at 11. xAI's additional allegations about the executive's disclosure to OpenAI of xAI's financial practices respond to this point; if the executive was willing to share xAI's confidential financial information with OpenAI, that makes it more likely that he also shared xAI's trade secrets about data center practices.

[9] If OpenAI wishes to trim allegations relating to other employees from xAI's claim, the proper vehicle to do so is a motion for summary judgment. *Compare* Fed. R. Civ. P. 56(a) (authorizing summary judgment on "part of [a] claim"), *with id.* 12(b)(6) (authorizing dismissal only of a "claim").

[10] OpenAI attempts to frame xAI's motion to stay as a concession that xAI cannot survive dismissal. *See* MTD at 1, 15. Not so. xAI moved to stay because factual developments in the related cases might streamline the issues here—not because it "needed more discovery" as OpenAI contends. *Id.* at 15.

Dated: April 14, 2026

Respectfully submitted,

*/s/  LeElle B. Slifer*

LEELLE B. SLIFER (*pro hac vice*)
lslifer@kslaw.com
JONATHAN HUNG (*pro hac vice*)
jhung@kslaw.com
**KING & SPALDING LLP**
2601 Olive Street, Suite 2300
Dallas, TX 75201
Telephone: (214) 764-4600
Facsimile: (214) 764-4601

KOSTA S. STOJILKOVIC (*pro hac vice* pending)
kstojilkovic@wilkinsonstekloff.com
JOLEE PORTER (*pro hac vice* pending)
jporter@wilkinsonstekloff.com
JENNA P. SWARBRICK (*pro hac vice* pending)
jpswarbrick@wilkinsonstekloff.com
**WILKINSON STEKLOFF LLP**
2001 M Street NW, Floor 10
Washington, D.C. 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005

MARK ZAMBARDA (SBN# 314808)
mzambarda@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (720) 535-2315
Facsimile: (720) 535-2400

ANGELA TARASI (*pro hac vice pending*)
atarasi@kslaw.com
**KING & SPALDING LLP**
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Telephone: (720) 535-2300
Facsimile: (720) 535-2400

LAUREN MYERS (*pro hac vice*)
lmyers@kslaw.com
**KING & SPALDING LLP**

633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

MATTHEW R. MCCULLOUGH (SBN# 301330)
mrmccullough@winston.com
**WINSTON & STRAWN LLP**
255 Shoreline Drive, Suite 520
Redwood City, CA 94065
Telephone: (650) 858-6500
Facsimile: (650) 858-6550

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2026 I electronically transmitted the forgoing document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to all counsel in this matter, all counsel being registered to receive Electronic Filing.


/s/  *LeElle B. Slifer*
LeElle B. Slifer