UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| X.AI CORP., et al.,<br><br>              Plaintiffs,<br><br>        v.<br><br>OPENAI, INC., et al.,<br><br>              Defendants. | Case No.  25-cv-08133-RFL<br><br>**ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND**<br><br>Re: Dkt. No. 91 |

xAI accuses OpenAI of misappropriating its trade secrets through xAI's former employees.  On OpenAI's original motion to dismiss, xAI's claim under the Defend Trade Secrets Act (the "DTSA") was dismissed because xAI failed to sufficiently allege a connection between OpenAI and the alleged misappropriation of xAI's former employees.  (*See* Dkt. No. 73 (the "Prior Order").)  xAI has now filed an amended complaint, and OpenAI again moves to dismiss.  (*See* Dkt. Nos. 91 (the "Motion"), 92-1 (Second Amended Complaint (the "SAC")).)[1] For the reasons set forth below, the Motion is **GRANTED WITHOUT LEAVE TO AMEND**. This order does not recount the factual background of the case, which was discussed at length in the Prior Order, and assumes that the reader is familiar with the facts of the case, the applicable legal standards, and the parties' arguments.[2]

**A.    Analysis**

OpenAI moves to dismiss on the basis that xAI insufficiently alleges misappropriation. xAI counters that it has plausibly pled two theories of misappropriation:  (1) OpenAI induced xAI's then-employee Li to misappropriate xAI's trade secrets; and (2) Li disclosed xAI's trade secrets to OpenAI in a presentation that he delivered during the recruitment process.

---

[1] In the SAC, xAI no longer brings a claim under California's Unfair Competition Law.

[2] All citations to page numbers in filings on the docket refer to ECF page numbers.

1

## 1.    Inducement

xAI insufficiently pled inducement in the prior complaint because it offered no non-conclusory allegations allowing a reasonable inference "that OpenAI told or encouraged" xAI's former employees to exfiltrate its confidential information.  (*See* Prior Order at 7-9.)  To address that deficiency, xAI now focuses on the alleged interview presentation delivered by Li during his recruitment process and points to several new allegations:  (1) OpenAI specifically targeted Li for recruitment because of his role as "a senior engineer responsible for the reinforcement learning and post training techniques for Grok 4," which were "areas in which OpenAI was lagging"; (2) OpenAI typically "asks candidates to deliver a presentation about a prior project" which, for engineers like Li, "typically addresses technical aspects of the project"; (3) "OpenAI knew or should have known that asking [Li] to present on his prior work was tantamount to asking Li to discuss xAI's reinforcement learning and post training techniques"; (4) Li met with OpenAI's head of research to understand Li's professional interests to determine his "best fit" at OpenAI, and during that conversation, "Li described his work on post-training and reinforcement learning at xAI"; and (5) as part of the recruiting process, "OpenAI scheduled Li to meet with key leaders of its post-training and reinforcement learning teams."  (*See* SAC ¶¶ 63-64, 66-67, 69-70.)

These allegations do not suffice.  In essence, xAI equates asking a candidate about their prior work experience with encouraging the candidate to divulge trade secrets obtained during that prior work experience.  Without more, however, merely asking Li to discuss his previous work—a routine part of the hiring process—does not allow a plausible inference that OpenAI induced Li to reveal anything confidential or secret about that work.  To hold otherwise would potentially expose employers to liability any time they inquire about a candidate's past work.

xAI distinguishes between "asking a candidate to deliver a technical presentation about the proprietary methods used by a competitor" and "asking a candidate about prior work experience."  (*See* Dkt. No. 100 at 15.)  Yet it alleges only that OpenAI asked Li to present on "technical aspects" of a project he worked on at xAI, and OpenAI knew or should have known

that Li would have accordingly discussed reinforcement learning and post training techniques in his presentation.  (*See* SAC ¶¶ 66-67.)  xAI does not identify any facts supporting an inference that presenting on these topics would necessitate the disclosure of trade secrets, and nothing in the SAC supports xAI's speculation that OpenAI's presentation request to Li included a request that his presentation cover xAI's "proprietary methods."

xAI also argues that OpenAI induced Li to steal xAI's trade secrets by showing continued interest in his candidacy even after he revealed xAI trade secrets in his presentation, which "should have been a red flag against hiring him."  (*See* Dkt. No. 100 at 15.)  Showing continued interest could potentially demonstrate inducement only if OpenAI knew or should have known that Li had disclosed xAI's trade secrets in his presentation.  In the prior complaint, "xAI allege[d] no facts that permit[ted] a reasonable inference that OpenAI knew that the information [disclosed in the presentation] was a trade secret, that Li had improperly acquired the information, or that Li was improperly or mistakenly disclosing the information."  (Prior Order at 9.)  To address that deficiency, xAI points to the following new allegations about Li's slide deck and interview presentation:  (1) OpenAI engineers "who were focused on post-training and/or reinforcement learning" interviewed Li during his presentation; (2) the presentation "focused specifically on xAI's reinforcement learning techniques" and Grok 4, and given that Grok 4's "strong performance [had been] widely publicized," the "interviewers would have known the value of the information that [Li] was communicating"; (3) the first page of the slide deck was marked "confidential material"; (4) because confidentiality agreements are "prevalen[t]" in the AI industry, listening to Li's presentation should have notified the interviewers (who themselves, on information and belief, had signed similar agreements) that Li "was violating his contractual confidentiality duties to xAI"; (5) the slide deck included "details of xAI's training recipes and checkpoints (slide 2), the sources of problems in post-training AI models (slide 3), xAI's experience with different training recipes and which methods provided the best results (slides 5-7), details of xAI's experience with different training methods including specific characteristics of xAI's internal training (slides 8-10), details of xAI's training for model behavior (slide 13),

and details of problems identified in xAI's model training (slide 14)"; and (6) "[a]n xAI engineer confirmed that th[e] slide deck . . . disclosed multiple xAI trade secrets relating to xAI's reinforcement learning approach vis-à-vis Grok 4."  (*See* SAC ¶¶ 68, 71.)

These allegations are insufficient to support a reasonable inference that OpenAI knew or should have known that Li disclosed xAI trade secrets during his presentation.  It is not clear at what level of detail Li discussed xAI's reinforcement learning techniques.  Similarly, while xAI refrains from alleging that Li actually displayed the slide deck during his presentation (*see id.* ¶ 68), even assuming that he did so, the level of detail included in the slide deck is unclear.[3] Accordingly, the allegations are not sufficient to plausibly infer that it was obvious to OpenAI engineers that the information disclosed was an xAI trade secret.  That an *xAI* engineer "confirmed" that the slides disclosed xAI trade secrets does not supply the inference that an *OpenAI* engineer, based on their industry experience, would know that the slides disclosed xAI trade secrets.

Nor is the "confidential" label on the first page of the slide deck a sufficient basis to draw such an inference.  xAI's argument relies on a multi-step inferential chain.  First, xAI asks the Court to infer that, although it is unknown whether Li used the slides "visually or by verbally sharing [its] contents" (*id.*), Li would have either displayed the first page or read the confidentiality label aloud.  Then, xAI proposes a further inference that it would have been obvious to OpenAI engineers that the word "confidential" referred to "xAI confidential" material, rather than Li's promise to OpenAI to keep the recruitment process confidential pursuant to his nondisclosure agreement with OpenAI.  (*See id.* ¶ 86 (Li "believed it would violate a nondisclosure agreement to reveal the name of his future employer," *i.e.*, OpenAI).) Finally, xAI seeks yet a further inference that it would have been apparent to the OpenAI engineers interviewing Li that the xAI "confidential" information at issue rose to the level of a trade secret and was not simply sensitive or internal corporate information.  Each of these steps

---

[3] xAI did not file a copy of the slide deck with the SAC.

involves rejecting an obvious alternative explanation:  that the slide deck was used as notes for a verbal presentation in which the confidentiality label was not read aloud; that the OpenAI engineers could reasonably have understood any "confidential" label to refer to the nondisclosure agreement between Li and OpenAI; and that the OpenAI engineers could reasonably have lacked sufficient information to deduce that any xAI information labeled as "confidential" was a trade secret as opposed to merely sensitive.  "When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation.  Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true . . . ."  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (citations and quotation marks omitted).  The SAC fails that requirement because xAI alleges no facts excluding the obvious alternative explanation at each inferential step.

*Genentech, Inc. v. JHL Biotech, Inc.*, No. 18-cv-06582-WHA, 2019 WL 1045911 (N.D. Cal. Mar. 5, 2019), on which xAI relies, presents a useful contrast.  There, the defendant "allegedly received a confidential Genentech Technical Report that was clearly labeled as 'GENENTECH Pharm R & D Technical Report – CONFIDENTIAL' and clearly marked 'Confidential' and 'Internal Only' at the bottom of the cover page" and "was told not to show the document to others."  *See id.* at *12 (quotation marks omitted); *see also Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*, No. 13-cv-01880-JLS, 2016 WL 11523446, at *1, *3 (C.D. Cal. Oct. 17, 2016) (defendant company allegedly received "drawings and other technical works papers" from prospective customers with "legend[s] identifying the material as proprietary to" plaintiff company).  Here, however, xAI does not allege that the confidentiality marking on the slide deck identified the slide deck as belonging to xAI or that Li told his interviewers not to share the contents of the presentation with others.  That the slide deck referred to xAI and Grok "in several places" does not compel a different outcome (*see* Dkt. No. 100 at 13-14) because OpenAI allegedly asked Li, who at the time was employed by xAI, to present on a work project.

Finally, xAI argues that the Court may reach an adverse inference from Li's invocation of his Fifth Amendment privilege in refusing to answer in a separate litigation whether he shared any xAI trade secrets with OpenAI. (*See* SAC ¶ 100.) Any adverse inference that Li did share xAI trade secrets with OpenAI, however, is an insufficient basis to draw a plausible inference of OpenAI's knowledge.

### 2. Disclosure by Li

Disclosure of xAI's trade secrets to OpenAI by Li could constitute misappropriation only if OpenAI allegedly knew or had reason to know: "(1) before the use or disclosure that the information was a trade secret and . . . that [Li] had acquired it through improper means or was breaching a duty of confidentiality by disclosing it; or (2) that the information was a trade secret and that the disclosure was a mistake." (*See* Prior Order at 9 (citations and quotation marks omitted).) As discussed above, xAI does not sufficiently allege that OpenAI knew or should have known that Li disclosed xAI's trade secrets in his presentation.

Even if xAI sufficiently alleged OpenAI's knowledge, disclosure by Li would still not be enough to state a misappropriation claim because xAI alleges only passive receipt of trade secrets by OpenAI. Under the DTSA, misappropriation includes acquisition, disclosure, or use. (*See id.* at 7.) At most, disclosure by Li could constitute only acquisition by OpenAI and not disclosure or use. Courts interpret acquisition under the DTSA to require active conduct. The mere passive receipt of trade secrets is not enough. *See, e.g.*, *Bus. Sols. LLC v. Ganatra*, No. 18-cv-01426-DOC, 2020 WL 1279209, at *6 (C.D. Cal. Jan. 22, 2020); *see also Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 223 (2010) (interpreting same statutory language in California's trade secret act) ("One does not ordinarily 'acquire' a thing inadvertently; the term implies conduct directed to that objective. The choice of that term over 'receive' suggests that inadvertently coming into possession of a trade secret will not constitute acquisition."). Indeed, were passive receipt enough, that would run dangerously close to imposing liability for the mere possession of trade secrets. Yet "mere possession of trade secrets is not sufficient to constitute misappropriation." (Prior Order at 11 (citations and quotation marks omitted).) *JustMed, Inc. v.*

6

*Byce*, 600 F.3d 1118 (9th Cir. 2010), on which xAI relies, does not require a different result. There, in interpreting acquisition under Idaho's trade secret act, the Ninth Circuit relied on the following dictionary definition: "to come into possession, control, or power of disposal of." *Id.* at 1129 (citation omitted).  That definition does not address or foreclose the passive-active distinction that applies under the DTSA.

**B.    Leave to Amend**

xAI has failed to cure the deficiencies identified in the Prior Order.  Allowing further amendment would be futile.  In moving for a six-month stay of this action to allow time to obtain discovery in other litigation, xAI argued that it would suffer prejudice in the absence of a stay because that discovery would allow it to address the deficiencies identified in the Prior Order, so "xAI should have the opportunity to incorporate such information into its amended complaint." (*See* Dkt. No. 74 at 8.)  "But xAI was required to have completed [its] investigation [of its claims] *before* filing suit, *not after*, and if it lacked the requisite information to allege [its] claims in the manner required . . . when [it] filed suit, [it] should not have sued [OpenAI] in the first instance."  (Dkt. No. 79 at 2 (citation and quotation marks omitted) (emphasis in original).)  xAI has already been provided multiple opportunities to state a valid claim.  Accordingly, dismissal is without leave to amend.  *See, e.g.*, *Snapkeys, Ltd. v. Google LLC*, No. 19-cv-02658-LHK, 2020 WL 6381354, at *7 (N.D. Cal. Oct. 30, 2020).

**C.    Conclusion**

For the foregoing reasons, the Motion is **GRANTED WITHOUT LEAVE TO AMEND**.

**IT IS SO ORDERED.**

Dated: June 15, 2026

_____
RITA F. LIN
United States District Judge