CAROLYN HOECKER LUEDTKE (SBN 207976)
carolyn.luedtke@mto.com
DANE P. SHIKMAN (SBN 313656)
dane.shikman@mto.com
GABRIEL M. BRONSHTEYN (SBN 338011)
gabriel.bronshteyn@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-3089
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

JOSEPH N. GLYNN (SBN 337652)
joseph.glynn@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for Defendants OpenAI, Inc., OpenAI
Global, LLC, and OpenAI OpCo, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| X.AI CORP. and X.AI LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>OPENAI, INC., OPENAI GLOBAL, LLC, and OPENAI OPCO, LLC<br><br>Defendants. | Case No. 3:25-cv-08133-RFL<br><br>**DECLARATION OF CAROLYN HOECKER LUEDTKE IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEY'S FEES** |

Case No. 3:25-cv-08133-RFL

DECLARATION OF CAROLYN HOECKER LUEDTKE

## DECLARATION OF CAROLYN HOECKER LUEDTKE

I, Carolyn Hoecker Luedtke, hereby declare:

1. I am admitted to practice before this Court. I am a partner at the law firm of Munger, Tolles & Olson LLP ("MTO") and counsel for Defendants OpenAI, Inc., OpenAI Global, LLC, and OpenAI OpCo, LLC ("OpenAI"). I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, I could and would testify competently to the matters set forth herein.

2. I have served as lead counsel for OpenAI in this matter and have been responsible for overseeing the team of MTO attorneys and professionals working on this matter.

3. I submit this declaration in support of OpenAI's Motion for Attorney's Fees ("Motion"). OpenAI seeks $1,041,859.90 in attorney's fees previously incurred in this matter. OpenAI will also seek any additional attorney's fees incurred in conjunction with this Motion, any reply in support of the Motion, and any related hearings.

## BACKGROUND TO THIS LITIGATION

### xAI Initiates Legal Action Against Xuechen Li

4. xAI brought legal action against Xuechen Li in this Court on August 28, 2025. *See* Complaint, *X.AI Corp. et al. v. Li*, No. 3:25-cv-07292-RFL (N.D. Cal. Aug. 28, 2025), Dkt. No. 1 ("*Li*").

5. On September 2, 2025, this Court issued a TRO, which required Mr. Li to temporarily surrender control and access to any devices and accounts accessible to him or in his possession, custody, or control. *Li* Dkt. No. 20 ¶ 1.

6. On January 14, 2026, xAI and Mr. Li stipulated to a preliminary injunction which recognized that, pursuant to the TRO and "requests made by xAI," Li had "provided certain devices and accounts to xAI" and xAI was able to "conduct[] forensic examinations on certain devices and accounts provided." *Li* Dkt. No. 90.

### xAI Initiates Legal Action Against Jimmy Fraiture

7. On September 10, 2025, xAI initiated litigation against Jimmy Fraiture in the U.K. *See* Order Denying Application Pursuant to 28 U.S.C. § 1782 to Take Discovery for Use in a

Foreign Proceeding at 4, No. 3:25-mc-80299-JCS (N.D. Cal. Nov. 11, 2025), Dkt. No. 24 ("1782 Action").

8. On September 15, 2025, a Consent Order was entered in the U.K. litigation, under which Mr. Fraiture agreed to provide relevant devices and accounts to an independent forensics vendor for imaging, provide a witness statement setting forth his account of what occurred, and deliver any remaining xAI confidential information to xAI's counsel. *See* Declaration of Lucy Chaize in Support of Respondents' Opposition to Application for an Order Pursuant to 28 U.S.C. § 1782 to Take Discovery for Use in a Foreign Proceeding, 1782 Action, Dkt. No. 16-1 ¶¶ 5-6 & Ex. 1.

<u>xAI Threatens Legal Action Against Departing Employees</u>

9. In July and August 2025, xAI's counsel sent a series of letters to former xAI employees.

10. On July 27, 2025, xAI's outside counsel, Alex Spiro of Quinn Emmanuel Urquhart & Sullivan, LLP, emailed the individual identified in this litigation as the senior finance executive. The email stated that xAI had "learned of several breaches by you of xAI's confidentiality obligations," but the email did not specify any particular breaches. The email proceeded to threaten legal action for the unspecified breaches.

11. On August 30, 2025, Lily Lim, who identified herself as xAI's Head of Legal Affairs, emailed letters dated August 29, 2025 to former xAI employees Mike Dalton, Ethan Knight, Hieu Pham, and Uday Ruddarraju. Those letters expressed "grave concerns about whether you understand and are in compliance with your legal obligations," demanded that the recipients "come clean" about breaching their confidentiality agreements, and said xAI would "vigorously pursue all available legal remedies without hesitation," including "substantial monetary damages." Attached as Exhibits 1 through 4 are true and correct copies of those four letters. None of those letters specified any particular breaches of confidentiality that those employees had committed.

12. I outline further information about the individuals' responses starting at paragraph 38 below.

DECLARATION OF CAROLYN HOECKER LUEDTKE

Communications With xAI About Xuechen Li

13. On September 5, 2025, xAI's U.S. litigation counsel, Kathi Vidal of Winston & Strawn LLP, wrote a letter addressed to OpenAI's General Counsel providing notice of the *Li* action. As part of that letter, xAI conveyed its "understand[ing]" that "on or about July 13, 2025, Li had a meeting with representatives of OpenAI, Inc." and "at that meeting, Li presented a slide deck that may have included xAI's proprietary information." The letter proceeded to demand that OpenAI "cease any use of and return any xAI Confidential Information that Li provided" and to ask OpenAI a variety of questions, requesting a response within five business days. Attached as Exhibit 5 is a true and correct copy of that letter.

14. I emailed Ms. Vidal two business days later to introduce myself as counsel for OpenAI, to let her know that Xuechen Li did not join OpenAI, and to say we were working on responding to her letter.

15. On September 12, 2025, I called Ms. Vidal to provide an update, but went to voicemail. I then sent her an email to check in and let her know we were working on a response to her letter and would respond soon. Ms. Vidal did not call me back.

16. On September 18, 2025, Ms. Vidal wrote to me again regarding xAI's allegations concerning Mr. Li. In that email, xAI's counsel complained that "OpenAI has continued to recruit and hire additional xAI employees" and accused OpenAI of hiring those employees because of "their access to xAI's Confidential Information." Ms. Vidal proceeded to allege that "OpenAI is knowingly and systematically inducing breaches of confidentiality obligations owed to xAI, engaging in or enabling trade secret misappropriation, tortiously interfering with valid and enforceable agreements between xAI and its employees, and disregarding its obligations under applicable law." Attached as Exhibit 6 is a true and correct copy of Ms. Vidal's email.

17. On September 19, 2025, I sent several responses to Ms. Vidal about the concerns outlined in her various communications to OpenAI. In a letter to Ms. Vidal about Mr. Li, a true and correct copy of which is attached here as Exhibit 7, I set forth answers to the questions and demands in her September 5 letter. I explained that OpenAI had taken "immediate steps" to "diligently and thoroughly investigate[] xAI's allegations." I conveyed that "OpenAI has not

DECLARATION OF CAROLYN HOECKER LUEDTKE

solicited" any xAI confidential information from Li, that OpenAI "ha[s] not been able to locate" the slide deck referenced in counsel's September 5 letter, and that OpenAI had not "identified any meeting where Mr. Li showed a slide deck to OpenAI personnel." I said that we considered the matter closed "unless you learn of and inform us of any details related to Mr. Li that suggests he did transmit confidential or trade secret xAI information to OpenAI," and I said if they do find such evidence to "provide us with specific information to facilitate further investigation" by OpenAI.

18. No counsel for xAI responded to this September 19 letter. Instead, xAI filed their lawsuit as discussed below.

Communications With xAI About Jimmy Fraiture

19. On September 5, 2025, xAI's U.K. litigation counsel, Lewis Silkin LLP, wrote to OpenAI's General Counsel, forwarding a letter Lewis Silkin LLP had sent to Mr. Fraiture regarding allegations against him. The letter to OpenAI expressed "serious concerns" about "whether any of the xAI information taken by Mr. Fraiture has been passed to or used for the benefit of OpenAI."

20. On September 8, 2025, Lewis Silkin LLP wrote another letter to OpenAI, noting "serious concern" that Mr. Fraiture had "already commenced work at OpenAI."

21. On September 11, 2025, I wrote a letter to Lewis Silkin LLP responding to their prior letters. I explained that "[w]e have looked into the allegations in your September 5 letter" and "have also spoken to Mr. Fraiture." I noted that Mr. Fraiture's counsel had "offered to allow a third party forensics expert to work with xAI's counsel to double check that all confidential xAI information indeed has been deleted" and would "give a statement under oath that he did not disclose or use confidential xAI information at OpenAI." I pointed out that "OpenAI has also conducted its own investigation of this matter and has found no evidence that Mr. Fraiture disclosed or used confidential xAI information in his short time at OpenAI." In closing, I requested that "[i]f you have other information about an ongoing problem or new threat to your client's confidential information, please let us know right away and provide specifics so that we

DECLARATION OF CAROLYN HOECKER LUEDTKE

can look into your concerns." Attached as Exhibit 8 is a true and correct copy of the previously described letter.

22. On September 14, 2025, Lewis Silkin LLP wrote a responsive letter that OpenAI's employment of Mr. Fraiture "raises significant questions about the seriousness of OpenAI's investigation." Attached as Exhibit 9 is a true and correct copy of the previously described letter.

23. On September 16, 2025, I reiterated to Lewis Silkin LLP that "OpenAI has seen no evidence that Mr. Fraiture did anything to disclose or use xAI confidential information." I also offered to investigate further if xAI could provide any further information or "more specific substantive description of what information you believe [Mr. Fraiture] misappropriated." Attached as Exhibit 10 is a true and correct copy of my response.

24. On September 26, 2025, Lewis Silkin LLP responded. xAI's counsel took issue with "OpenAI's recruitment of employees" who had previously worked at xAI and accused OpenAI of hiring them because their "value is directly tied to their access to xAI's confidential information" and of "knowingly inducing breaches of confidentiality obligations, and engaging in or enabling trade secret misappropriation." Attached as Exhibit 11 is a true and correct copy of Lewis Silkin's letter.

25. I have not received any correspondence from Lewis Silkin LLP or anyone else representing xAI providing any response to my correspondence asking for detail or specific concerns about Mr. Fraiture's disclosure or use of confidential xAI information at OpenAI.

<u>Communications With xAI About the Senior Finance Executive</u>

26. On September 16, 2025, Ms. Vidal wrote a letter addressed to OpenAI's General Counsel concerning the individual identified in xAI's pleadings as a senior finance executive. Ms. Vidal contended that the senior finance executive had access to confidential xAI information while he was an xAI employee and expressed "serious concerns" because the senior finance executive had used coarse language to respond to xAI's harassing correspondence. xAI demanded that OpenAI "[i]mmediately cease any use of and return any xAI Confidential Information that" the senior finance executive "provided to" OpenAI or its representatives. xAI also expressed concerns about "OpenAI's recent pattern of hiring or seeking to hire xAI employees who have violated their

DECLARATION OF CAROLYN HOECKER LUEDTKE

own confidentiality agreement with xAI and misappropriated xAI Confidential Information, including source code, such as Xuechen Li and Jimmy Fraiture."

27. On September 19, 2025, I responded to Ms. Vidal. I noted that "OpenAI has no reason to believe that it has received confidential xAI information" from the senior finance executive. I conveyed that Ms. Vidal's correspondence was "unclear on whether you believe" the senior finance executive "has transferred confidential information to OpenAI." I reiterated my prior request that xAI provide further information, including "specific file names or descriptions of specific information that you believe[] had been disclosed" so that OpenAI could investigate further. Attached as Exhibit 12 is a true and correct copy of my September 19 letter.

28. xAI's counsel never provided our firm with any specific information on the senior finance executive in response to my September 19 letter or at any time thereafter to facilitate OpenAI's investigation.

Communications With xAI About Allegations Against OpenAI

29. On September 19, 2025, I sent a separate email to Ms. Vidal to address Ms. Vidal's September 18 email described above "as well as xAI's crescendo of oppressive and harassing behavior toward its former employees." I first reiterated that OpenAI would "address any additional information you can provide." I noted that xAI had "cite[d] no evidence of any action by OpenAI other than hiring people who worked at xAI, which is not unlawful or an inducement of any breach." I confirmed that OpenAI had neither "sought" nor "received" any xAI confidential information from current or former xAI employees. And I asked that "xAI cease its harassment of employees leaving for or who have joined OpenAI." Attached as Exhibit 13 is a true and correct copy of that email chain.

30. No xAI counsel responded to my September 19 email.

xAI Brings this Action Against OpenAI

31. Instead, on the evening of September 24, 2025, xAI filed this action against OpenAI.

32. Counsel from xAI did not provide our firm with a copy of the Complaint when it was filed. On September 25, 2025, xAI filed a motion in its separate case against Xuechen Li to

DECLARATION OF CAROLYN HOECKER LUEDTKE

relate that case to the newly filed OpenAI case, but xAI's counsel did not inform me or anyone at our firm of that motion or the new litigation. *See Li* Dkt. No. 55. In a September 25 declaration supporting that motion, xAI's counsel told the Court: "No counsel has yet appeared for the defendants in the OpenAI Litigation. As such, their position on whether the cases should be related is unknown." *Li* Dkt. 55-1 ¶ 3. As of the time of the declaration, xAI's counsel had not informed our firm, with whom they had been dealing on the pre-litigation correspondence, of the lawsuit having been filed or of the motion.

33. xAI did not serve OpenAI until September 29, 2025, and it did that through OpenAI's agent for service of process, not through notice to our firm.

34. On October 3, 2025, I wrote a letter to Ms. Vidal addressing the allegations in xAI's Complaint against OpenAI. A true and correct copy of my October 3 letter is attached as Exhibit 14. I referred xAI to OpenAI's Answer filed the prior day, "which outlines in specific detail why these allegations are wrong." My letter then addressed the allegations of the Complaint individually. I requested that xAI's counsel "withdraw your Complaint immediately" because "[a]ny reasonable pre-suit inquiry would have confirmed that these allegations are factually unfounded." OpenAI "reserve[d] all rights to seek any and all appropriate relief, including sanctions as appropriate and attorneys' fees for prosecuting a bad-faith misappropriation claim."

35. xAI did not respond to my October 3 letter until October 17, when LeElle Slifer, then also of Winston & Strawn LLP, wrote to me. In her message, Ms. Slifer wrote that "[w]e need not waste time on a letter writing campaign." Ms. Slifer did not respond to any of OpenAI's requests for the factual information underlying its allegations. Attached as Exhibit 15 is a true and correct copy of the previously described correspondence.

36. On October 2, 2025, OpenAI filed a motion to dismiss the Complaint. Dkt. No. 30. Rather than oppose that motion, xAI amended the complaint on October 27, 2025. Dkt. No. 44 ("FAC").

37. The Court granted OpenAI's motion to dismiss the FAC on February 24, 2026. Dkt. No. 73. xAI sought to stay the OpenAI litigation for six months and that motion was denied

on March 9, 2026.  Dkt. No. 79.  The Court granted OpenAI's motion to dismiss the Second Amended Complaint on June 15, 2026.  Dkt. No. 110.

### Communications About Other xAI Departing Employees

38.    As noted above, xAI's Head of Legal Affairs, Lily Lim, sent correspondence dated August 29 to Mr. Dalton, Mr. Knight, Mr. Pham, and Mr. Ruddarraju on August 30, 2025.  Those letters made a series of demands, including that the former employees provide a "detailed written description" by September 2 of any xAI information they stored on their personal accounts and devices.

### Uday Ruddarraju

39.    On September 2, Mr. Ruddarraju, responded to Ms. Lim's letter.  Mr. Ruddarraju acknowledged his confidentiality obligations to xAI and his commitment to honoring those obligations.  Mr. Ruddarraju pointed out that xAI did not issue company phones or messaging accounts to xAI employees at the time of their departures from xAI in July 2025, and that xAI employees were expected to use personal devices and accounts for work purposes.  Mr. Ruddarraju also specified that he had reviewed personal devices and accounts and deleted work-related communications prior to his departure from xAI.  Finally, Mr. Ruddarraju stated that he had not made any unauthorized disclosure or use of xAI's confidential information.  Attached as Exhibit 16 is a true and correct copy of Mr. Ruddarraju's email.

40.    xAI identified Mr. Ruddarraju by name in its original Complaint as an employee who was purportedly "poached" by OpenAI "as part of a deliberate scheme to gain access to specific xAI Confidential Information that OpenAI needed to harm xAI and benefit itself." Complaint ¶¶ 114-15.

41.    xAI did not make any specific allegations regarding Mr. Ruddarraju until weeks after naming him in its Complaint.  In her October 17 letter, Ms. Slifer claimed that on September 26, Mr. Ruddarraju had "attempted to access a confidential xAI document on xAI's internal Google Drive regarding an xAI datacenter employee."

42.    I responded to Ms. Slifer by email on October 21, 2025.  I first stated that Mr. Ruddarraju had used his personal phone for work at xAI's request but that his phone was no

DECLARATION OF CAROLYN HOECKER LUEDTKE

longer connected to xAI's Google Drive. I pointed out that Mr. Ruddarraju did "not have any recollection of attempting to access or accessing any xAI document on September 26" and that he had "confirm[ed] that he did not intentionally access any such document." I requested several pieces of information from xAI "to facilitate our investigation" of the attempted connection that xAI had identified. Attached as Exhibit 17 is a true and correct copy of the previously described email exchange, which includes subsequent emails exchanged between myself and Ms. Slifer.

43. Ms. Slifer did not respond for nearly a week. I followed up multiple times in the intervening days requesting that xAI provide the information that OpenAI needed to further investigate xAI's allegations about Mr. Ruddarraju.

44. Ms. Slifer stated that she did not "intend to engage in a letter or email writing campaign and thus won't be responding further unless you want to give me a call."

45. Later that same day, I called Ms. Slifer's office number, left a voicemail, and emailed her to inform her that I had tried to call her at her direction.

46. Ms. Slifer responded by email that she would not be able to speak with me until two days later, October 29, 2025.

47. xAI filed its FAC on October 27, 2025, which included an allegation that Mr. Ruddarraju "has been caught attempting to access a confidential file relating to an xAI employee's hiring package … using his personal Gmail account" and described Mr. Ruddarraju's "access of an internal document link" as an "act[] of misappropriation." FAC ¶¶ 14, 130-31.

48. I spoke with Ms. Slifer on October 29, 2025. The only information she provided to facilitate OpenAI's investigation was that attempted access was logged in xAI's system at 1:30 a.m. I asked a variety of other questions to try to facilitate OpenAI's investigation, but Ms. Slifer did not have more information to share.

49. On November 3, 2025, Ms. Slifer stated in an email to me that she was "still working on an update to our call last week."

50. On November 18, 2025, I sent an email asking if Ms. Slifer had an update regarding my request for further information to facilitate OpenAI's investigation of the alleged attempted access by Mr. Ruddarraju. xAI did not provide additional information in response.

DECLARATION OF CAROLYN HOECKER LUEDTKE

51.    xAI maintained virtually identical allegations regarding Mr. Ruddarraju in its Second Amended Complaint.  *See* Dkt. No. 92-1 ("SAC") ¶ 153.

<u>Ethan Knight and Hieu Pham</u>

52.    I was retained by Mr. Knight and Mr. Pham to represent them including in connection with responding to xAI's August 30 letter dated August 29.

53.    On September 2, Mr. Knight, and Mr. Pham each responded separately to the letters Ms. Lim had sent to each of them.  Both responses acknowledged their confidentiality obligations to xAI and their commitment to honoring those obligations.  Their responses also pointed out that xAI did not issue company phones or messaging accounts to xAI employees at the time of their departures from xAI in July 2025, and that xAI employees were expected to use personal devices and accounts for work purposes.  Mr. Pham and Mr. Knight pointed out that they had not been instructed to review personal devices and accounts for xAI information prior to departing from xAI and described messages, screenshots, and incidental notes that they maintained on their personal devices and accounts as part of their employment for xAI which still remained on their personal devices and accounts.  Mr. Pham and Mr. Knight also requested instruction as to whether they should delete all remaining xAI information from their devices and accounts.  Finally, each response stated that they had not made any unauthorized disclosure or use of xAI's confidential information.  Attached as Exhibits 18 and 19 are email records containing Mr. Pham and Mr. Knight's September 2 emails.

54.    On September 8, in response to emails from Mr. Knight and Mr. Pham, Ms. Lim requested that Mr. Knight and Mr. Pham specifically "list out any communications means, including X chat, Signal, WeChat, or others, that included xAI communications of xAI Confidential Information after your last date at xAI, and *list out the subject of the communications therein.*" (Emphasis added.)

55.    On September 9, Mr. Pham responded to Ms. Lim, reiterated he wanted to honor his confidentiality obligation, asked for clarification on whether he could delete the xAI-related communications on his personal accounts, and for the description of xAI communications on his phone, he told her he did not have any after he left xAI.  Ms. Lim responded on September 9, "To

DECLARATION OF CAROLYN HOECKER LUEDTKE

clarify, if after your last day at xAI, you kept any xAI Confidential Information in any form including on any personal devices or account that existed in your possession, custody, or control, then both 3 and 4 apply." "3" seemed to apply to her request for a description of the subject matter of the xAI communications.

56.    On September 12, 2025, I emailed Ms. Lim in my capacity as counsel for Mr. Knight and Mr. Pham as individuals. I pointed out that Ms. Lim's responses were confusing. I expressed concern that describing the information, as she requested, would expose Mr. Knight and Mr. Pham to the substance of those xAI communications while they were working for OpenAI. I requested instructions on how to handle the xAI information in Mr. Knight's and Mr. Pham's possession, specifically sought Ms. Lim's approval to delete the xAI information, and requested that X-Chat messages be deleted from the relevant X accounts by X if feasible.

57.    On October 8, 2025, I had not received a response so I sent a follow-up email to Ms. Lim stating that since no response had been received, "we will go ahead and work with a forensic vendor to make a preservation copy of this material to be kept securely outside of Mr. Pham's possession and have the vendor delete the material from his personal devices and accounts." I also again requested that X remotely delete any X-Chat messages from Mr. Knight's and Mr. Pham's X-Chat accounts.

58.    After another week passed without any response from xAI, I instructed Lighthouse, a reputable forensics vendor that our firm retained in connection with our individual representation of Mr. Knight and Mr. Pham, to preserve and then remediate Mr. Knight's and Mr. Pham's devices and accounts as described to xAI.

59.    It was not until October 20, 2025—a week before xAI's deadline to respond to OpenAI's Motion to Dismiss or to amend its complaint—that xAI objected to OpenAI's proposal regarding Mr. Knight's and Mr. Pham's devices and accounts. Ms. Vidal wrote in an email to me that the proposal was "inappropriate" and accused Mr. Knight and Mr. Pham of violating their confidentiality obligations by not returning xAI information, despite Mr. Knight and Mr. Pham attempting for weeks through counsel to obtain guidance on how to handle the xAI information in

DECLARATION OF CAROLYN HOECKER LUEDTKE

their possession.  Attached as Exhibits 20 and 21 are true and correct copies of email chains containing the previously described correspondence.

60.     On October 21, 2025, I spoke with Matt McCullough of Winston & Strawn LLP regarding xAI's objections, and I sent a follow-up letter to Winston & Strawn LLP on October 22, 2025.  In that letter, I recounted the history of correspondence concerning Mr. Knight and Mr. Pham, including xAI's prolonged silence after Mr. Knight and Mr. Pham earnestly sought xAI's guidance on how to remediate xAI information.  I also confirmed that Lighthouse had remediated information in the locations identified by Mr. Knight and Mr. Pham, and that nobody outside of Lighthouse had accessed the remediated files.  I offered to share Lighthouse's preservation copy of the remediated information if xAI agreed to certain conditions, including that "my firm may review the information before it is provided to you, so that we can ensure that the imaging process did not inadvertently capture sensitive information unrelated to xAI."  Attached as Exhibit 22 is a true and correct copy of my October 22 letter.

61.     On October 23, 2025, Mr. McCullough wrote a letter in response.  Mr. McCullough stated that xAI would not agree to allow MTO to review the remediated information before it was returned to xAI.  Attached as Exhibit 23 is a true and correct copy of Mr. McCullough's letter.

62.     On October 27, 2025, I responded by letter to Mr. McCullough's October 23 letter. I again recounted the history of communications and requested that xAI provide any factual basis for disagreeing with my characterization of that history.  I also pointed out that xAI had "not explained what you believe [Mr. Knight and Mr. Pham] should have done differently in light of the difficult situation that xAI put them in by (1) telling them to use their personal phones and personal accounts for work; (2) providing them with no guidance about how to handle xAI confidential information on their personal phones and personal accounts at the time of their separation; (3) seemingly not deleting the X-chats from within X; and (4) refusing to respond to their repeated requests for such guidance after they received your August 30 letter."  I also described in detail Lighthouse's instructions from my firm and the secure conditions under which the preservation copies of the remediated information were maintained.  Finally, to explain why I requested that MTO review the remediated information before its transfer to xAI, I described how

-12-

(for Mr. Knight only) personal communications had been collected alongside xAI-related communications when Lighthouse conducted its remediation in an effort to be conservative, and that further review was required to remove those purely personal communications.

63. xAI filed its FAC on October 27, 2025, which included allegations related to Mr. Knight and Mr. Pham. xAI alleged that Mr. Knight and Mr. Pham "refused requests to identify the specific information they kept," "refused to turn over their devices to xAI," "shared copies of their xAI information with a third-party not authorized by xAI under unknown security conditions," and "refused to provide access to their devices to confirm that all xAI information has been deleted, and Knight, through OpenAI's counsel, continues to refuse to provide access to all xAI information they already shared with a third party unless xAI agrees to let him further share that information with OpenAI's counsel first." FAC ¶¶ 127-28.

64. On November 12, 2025, pursuant to continuing negotiations between my firm and Mr. McCullough, Lighthouse transferred the remediated information from Mr. Pham and certain categories of information from Mr. Knight (with the exception of information for which the parties were continuing to discuss a protocol to disaggregate purely personnel information) to xAI's designated forensics vendor.

65. On November 20, 2025, I made a proposal to Mr. McCullough for facilitating the review and return of the remaining categories of remediated information from Mr. Knight. I never received a response to this counter-proposal.

66. On December 23, 2025, my colleague, Gabriel Bronshteyn, emailed Mr. McCullough a proposed protocol for reviewing the remaining categories of information remediated from Mr. Knight. Mr. McCullough never responded to this proposal.

67. On November 12, 2025, after Lighthouse delivered the images of Mr. Knight and Mr. Pham's information, my firm provided xAI's counsel a comprehensive list of the remediated files and asked xAI's counsel to confirm that the drive with the images worked for their forensics vendor so that Lighthouse could delete their preservation copy and thus complete the return. MTO followed up on December 23, 2025 again requesting permission to direct Lighthouse to

DECLARATION OF CAROLYN HOECKER LUEDTKE

delete the remediated information. Nobody for xAI ever responded to give Lighthouse permission to delete their preservation copy so it remains stored with Lighthouse.

68. xAI continued to assert in its SAC allegations regarding Mr. Knight and Mr. Pham that were essentially identical to the allegations asserted in the FAC, deleting only allegations that OpenAI continued to refuse to provide access to the remediated information. *See* SAC ¶¶ 150-52.

### Mike Dalton

69. On September 1, 2025, Mr. Dalton responded to Ms. Lim's letter confirming that he had deleted all xAI confidential information on his personal devices, accounts, or other media, "except for any X posts or direct messages that I could not delete due to technical limitations, which I authorized xAI to delete on my behalf."

### ATTORNEY'S FEES

### Background Regarding MTO

70. MTO maintains active practices in litigation matters, and the firm's clients include many of the largest corporations in California and the nation, as well as other law firms and international corporations. MTO has earned a reputation for handling particularly important litigation matters. For example, in the last several years, MTO was ranked number one on the *American Lawyer's* "A-List," a ranking of the top 20 of the nation's most elite law firms. MTO also has a well-reputed trade secret and employee mobility practice. For the past two years, Chambers and Partners has ranked MTO in the "Nationwide: Trade Secrets" category.

71. MTO prefers to staff matters as leanly as possible based on ongoing consultation with the client and as warranted by the circumstances of the case. Staffing decisions in this matter were based on my assessments regarding the anticipated demands of the litigation. In addition, two members of the MTO team in this case (Dane Shikman and Gabriel Bronshteyn) took parental leave in early 2026, and Mr. Shikman was in trial upon returning from his parental leave, which resulted in a need for additional attorneys during their absences. We did not charge OpenAI for time spent bringing new attorneys up to speed to replace attorneys going on leave so that transition cost is not part of the submitted fee proposal.

DECLARATION OF CAROLYN HOECKER LUEDTKE

<u>MTO's Team of Lawyers and Staff</u>

72.    OpenAI seeks compensation for work done on this matter by myself, my partner Dane P. Shikman (who began as an associate on the case), three MTO associates, and one MTO paralegal.  There were other timekeepers who worked on the matter, but to simplify the motion for the Court, we are only seeking fees for these timekeepers.

73.    I, **Carolyn Luedtke**, am a Partner in MTO's litigation practice, where I have more than twenty years of experience representing clients in complex commercial litigation matters including trade secret and employee mobility matters.  I have been named by the *Daily Journal* as one of California's top trade secret lawyers most years since 2019.  I have been ranked by Chambers and Partners in the Intellectual Property: Trade Secrets (Nationwide) ranking, as well as the Intellectual Property: Trade Secrets (Global) ranking.  I co-lead the firm's Trade Secret and Employee Mobility practice group.  I have been practicing at MTO for 26 years, having started at the firm in 2000 after my clerkship on this Court for Judge William Schwarzer.

74.    **Dane P. Shikman** is a Partner in MTO's litigation practice, having been promoted to partner in January 2026.  Mr. Shikman is an experienced litigator with extensive experience handling high-stakes cases, including trade secret matters.  Mr. Shikman has been practicing at MTO since 2017.  Prior to joining the firm, he served as a law clerk on the U.S. Court of Appeals for the Tenth Circuit.

75.    **Samuel H. Allen** is a litigation Associate at MTO.  Mr. Allen has more than nine years of experience in private practice, including time at MTO as well as time at a different large law firm.  Mr. Allen served as a law clerk on the Massachusetts Supreme Judicial Court.

76.    **Gabriel P. Bronshteyn** is a litigation Associate at MTO.  Mr. Bronshteyn has been practicing at MTO since 2021.  Prior to joining the firm, he served as a law clerk on the U.S. Court of Appeals for the Ninth Circuit.

77.    **Joseph N. Glynn** is a litigation Associate at MTO.  Mr. Glynn has been practicing at MTO since 2022.  Prior to joining the firm, he served as a law clerk on both the U.S. Court of Appeals for the Ninth Circuit as well as the U.S. District Court for the Central District of California.

-15-    Case No. 3:25-cv-08133-RFL

DECLARATION OF CAROLYN HOECKER LUEDTKE

78.    **Amanda Hudson** is an experienced paralegal at MTO and has significant experience supporting MTO litigation teams.

MTO Billing Practices in this Matter

79.    OpenAI agreed at the beginning of the representation that it would pay MTO for the services of its attorneys and staff on an hourly basis.  That agreement has remained in place throughout the representation.

80.    The MTO attorneys and staff who worked on this matter were instructed to, and to the best of my knowledge and belief did, follow MTO's timekeeping and billing policies.  As a Partner at MTO, I am familiar with those policies.  Those policies require every timekeeper at the firm to keep careful records of the time spent working on matters, including this matter.  Specifically, the policies require each timekeeper to maintain a log of time entries containing a description of the task performed, the amount of time worked by task (in six-minute increments), and in this matter, the "task code" applicable to the task performed.

81.    In addition to a matter used for recording time spent defending OpenAI in this case, MTO has also used separate billing matter numbers to track time spent advising OpenAI in connection with the case captioned *Li* litigation; advising OpenAI in connection with litigation involving Mr. Fraiture mentioned above including the 1782 Action; and advising OpenAI on matters relating to the other individuals mentioned above.  The fee calculation for this motion does not include any of those other matters; it just includes fees from the work defending OpenAI in *this litigation*.

82.    I personally review each MTO invoice before sending it to OpenAI to confirm that each entry reflects time properly charged to OpenAI.  In addition, I personally review each invoice to ensure that time entries are recorded to the appropriate MTO matter number.  I edit and adjust both the time entries and the descriptions where I think that would be appropriate based on my knowledge of work on the matter.  I sometimes reduce time entries based on my judgment.

83.    MTO has submitted monthly invoices to OpenAI for work in this matter, which are then reviewed by OpenAI prior to OpenAI rendering payment.  OpenAI has consistently paid MTO's invoices following the completion of this standard review cycle.

<u>Reasonableness of MTO's Hourly Rates</u>

84.    MTO sets hourly rates for its timekeepers based on, among other considerations, information concerning the prevailing market rates for similar services offered by lawyers of reasonably comparable skill and experience who practice in other large law firms with national practices.  Rates also reflect the complexity and difficulty of the matters MTO is retained to handle.

85.    MTO's rates for this matter are as follows:

| Timekeeper | 2025 Billing Rate | 2026 Billing Rate |
|---|---|---|
| Carolyn Luedtke | $1,488 | $1,573 |
| Dane Shikman | $1,156 | $1,227 |
| Samuel Allen | N/A | $1,178 |
| Gabriel Bronshteyn | $1,040 | $1,118 |
| Joseph Glynn | $1,040 | $1,118 |
| Amanda Hudson | $512 | $514 |

86.    MTO's rates for this matter, described further below, are justified based on each attorney's background, experience, and seniority, as well as our firm's significant experience in complex commercial litigation and trade secret matters.

87.    Importantly, the rates MTO has charged and will charge OpenAI for the work relevant to this Motion are negotiated rates and are not reflective of the rates MTO generally charged in 2025 or is charging in 2026.  MTO's standard rates are higher than those charged for OpenAI.

88.    Based on my knowledge and experience, and looking at some public benchmarks outlined below, I believe that the rates MTO charges OpenAI in this matter are reasonable and on par with prevailing market rates for attorneys at comparable law firms.

89.    For example, in *Li v. ArcSoft*, Judge White approved 2024 rates billed by O'Melveny & Meyers of up to $1,384.50 for a senior lawyer and $941 for counsel with about seven years of experience in private practice, which is the equivalent to about $1,500 and $1,022

DECLARATION OF CAROLYN HOECKER LUEDTKE

per hour, respectively, when adjusted for inflation. *Li v. ArcSoft, Inc.*, 2024 WL 4800753, at *1 (N.D. Cal. Oct. 8, 2024). Similarly, a Special Master in *Yuga Labs, Inc. v. Ripps*, 2024 WL 489248 (C.D. Cal. Jan. 11, 2024), found reasonable Fenwick & West's 2024 hourly rates of $1,240 to $1,410 for partners, $640 to $1,185 for associates, and $450 to $500 for paralegals. *Id.* at *5.

90.    MTO's requested rates are also comparable to rates that have been charged by the law firms representing xAI. *See Biden v. Ziegler*, 2024 WL 4452492, at *3 (C.D. Cal. Sept. 9, 2024) (approving 2024 hourly rates of $1,480 for a Partner and $1,135 for an Of Counsel at Winston & Strawn LLP); Interim Appl. for Compensation, *In re Bestwall LLC*, No. 3:17-31795 (July 25, 2024 Bankr. W.D.N.C.), Dkt. No. 3470 (submission seeking fees for work by attorneys at King & Spalding requesting hourly rates of up to $1,510 for Partners and $1,075 for Associates).

Reasonableness of Time Spent and Incurred

91.    In order to identify the lodestar amount for the Motion, I worked with my attorney team and MTO's Billing Department to analyze the time and fee entries in this matter from contemporaneous records in the bills that have been, or will be, sent to OpenAI.

92.    Our team excluded from the analysis several categories of time entries. To cite some examples, we excluded time charges that related to MTO's factual investigation of xAI's allegations prior to xAI's original Complaint, as well as work relating to threats by xAI against other OpenAI employees as outlined above. So, for instance, we excluded time working with Mr. Knight, Mr. Pham, and Lighthouse on the remediation of their personal phones and accounts. We also excluded time spent on third party issues related to the separate *Li* or *Fraiture* litigation. And we excluded time charges for some timekeepers altogether in an effort to simplify this motion for purposes of the Court's review.

93.    Based on these approaches, I believe that we have taken a conservative approach in calculating the total amount of fees sought by way of this Motion. Indeed, the $1,041,859.90 in attorneys' fees that OpenAI seeks via this Motion reflects a reduction of approximately 30% as compared to MTO's total fees incurred during the relevant time period.

94.    Attached hereto as Exhibit 24 is a spreadsheet that MTO's Billing Department produced, at my team's direction, summarizing the hours and rates that we included in tallying OpenAI's requested fees for purposes of this Motion.  An overview of these sums is shown below:

| Attorney | Total Hours | Effective Hourly Rate | Amount Sought |
| --- | --- | --- | --- |
| Carolyn H. Luedtke | 213.1 | $1,536 | $327,428.80 |
| Dane M. Shikman | 127.9 | $1,179 | $150,742.10 |
| Gabriel P. Bronshteyn | 145.8 | $1,065 | $155,298.00 |
| Joseph N. Glynn | 320.4 | $1,095 | $350,867.40 |
| Samuel H. Allen | 38.2 | $1,178 | $44,999.60 |
| Amanda Hudson | 24.4 | $513 | $12,524.00 |

95.    Exhibit 24 provides detail regarding the number of hours being sought for each MTO team member during three different phases of the matter (Phase 1, Phase 2, and Phase 3). The MTO team's work during these three phases is described in detail below.

a.    **Phase 1 (September 24 to October 26, 2025)** – This phase covers the date of xAI's filing of its initial complaint against OpenAI to the day before xAI filed its First Amended Complaint.  MTO's work during this time period included analysis of the claims set out in xAI's original Complaint, factual investigation of claims in the Complaint, and preparation of OpenAI's initial disclosures.  MTO's work during this timeframe also included legal research and drafting of OpenAI's first Motion to Dismiss (Dkt. 30), and fact gathering and drafting efforts for OpenAI's Answers and Affirmative Defenses (Dkt. 31).  MTO also engaged in correspondence with xAI during this phase to request that xAI withdraw its complaint.  In addition, MTO engaged in work efforts during this period relating to document preservation, document collection, and planning for potential discovery.

b.    **Phase 2 (October 27, 2025 to February 24, 2026)** – This phase covers the date of xAI's filing of its First Amended Complaint (Dkt. No. 44) to the date when the Court granted OpenAI's Motion to Dismiss the FAC with Leave to Amend (Dkt. No. 73).  MTO's work during this time period included analysis of the claims set out in the FAC, legal research and

drafting work for OpenAI's second Motion to Dismiss, and preparation and participation in argument on the second Motion to Dismiss held February 3, 2025.  In addition to the Motion to Dismiss, MTO filed a successful Motion to Stay discovery pending resolution of the pleadings (after xAI refused to agree to stay discovery).  Dkt. Nos. 57, 65.  MTO also spent time researching legal issues that factored into the Joint Case Management Statement filed January 7, 2026 (Dkt. No. 61), including the ramifications of the Ninth Circuit's recent decision in *Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081 (9th Cir. 2025) on trade secret identification procedures.  MTO prepared for and appeared at a Case Management Conference. MTO also engaged in further planning, analysis, and drafting work to be ready for  discovery relating to xAI's claims in the FAC should OpenAI's Motion to Stay and/or Motion to Dismiss be denied, and engaged in planning efforts relating to potential expert testimony to refute xAI's claims.  We had asked xAI to agree to stay discovery pending resolution of the pleadings and they did not agree, requiring the preparation for potential discovery and the preparation and filing of the motion to stay.

        c.      **Phase 3 (February 25 to April 28, 2026)** – This phase covers the time period from the Court's decision granting OpenAI's Motion to Dismiss the FAC without prejudice to the date when the Court issued a docket notice stating that oral argument on OpenAI's third Motion to Dismiss was being taken off calendar.  (Dkt. No. 105.)  MTO's work during this timeframe included research and drafting to oppose the Motion to Stay that xAI filed on February 27 (Dkt. 74).  MTO's work during this phase also included analysis of the Second Amended Complaint and research and drafting relating to the third Motion to Dismiss (Dkt. No. 91).

96.      Based on my personal knowledge and review of billing records, the contributions of MTO attorneys and professionals whose time is included in Exhibit 24, include the following services.

97.      *Time billed by myself, Carolyn Luedtke.*  I have served as OpenAI's lead counsel in this matter.  I oversaw all MTO work on the matter including the drafting of all three Motions to Dismiss; drafting of the Answer and Affirmative Defenses; drafting of the opposition to xAI's Motion to Stay, and all discovery planning and expert-related work.  As explained above, I

DECLARATION OF CAROLYN HOECKER LUEDTKE

engaged in meet and confer efforts with xAI's counsel at the outset of the matter.  I also closely reviewed and revised all of OpenAI's briefs in this case, appeared on behalf of OpenAI at the Case Management Conference held January 14, and argued on behalf of OpenAI at the Motion to Dismiss hearing held February 3.

98.    *Time billed by Mr. Shikman.* Mr. Shikman played a leading role in the drafting of OpenAI's Motions to Dismiss as well as OpenAI's Answer and Affirmative Defenses.  Mr. Shikman also supervised OpenAI's investigation of xAI's allegations and discovery planning work, and played a leading role in drafting OpenAI's successful Motion to Stay Discovery filed in December 2025.  Mr. Shikman spent less time working on this matter in latter phases due to the timing of a parental leave and trial in a different case.

99.    *Time billed by Mr. Bronshteyn.*  Mr. Bronshteyn played a leading role in legal research and drafting work in support of OpenAI's first and second Motions to Dismiss, as well as OpenAI's Answer and Affirmative Defenses.  Mr. Bronshteyn also led factual investigation efforts relating to allegations contained in xAI's complaint.  Mr. Bronshteyn took a parental leave in early 2026, and therefore spent less time working on the matter in more recent periods.

100.    *Time billed by Mr. Glynn.*  Mr. Glynn played a leading role in legal research and drafting work in support of all three of OpenAI's Motions to Dismiss.  Mr. Glynn also led research and drafting efforts focused on opposing the Motion to Stay that xAI filed following the Court's Order granting OpenAI's Motion to Dismiss the FAC.  Mr. Glynn also worked on drafting affirmative discovery requests in preparation for discovery.

101.    *Time billed by Mr. Allen.*  Mr. Allen joined the MTO team in 2026.  Mr. Allen's work included assisting with fact investigation and expert-related work, and assisting with research and drafting on the third Motion to Dismiss.  As shown in Exhibit 24, all of Mr. Allen's time for which OpenAI seeks recovery took place in Phase 3.

102.    *Time billed by Ms. Hudson.*  Ms. Hudson supported the MTO litigation team from the outset of the matter and her tasks included assisting with preparation of filings and reviewing and revising drafts of the Motions to Dismiss.

DECLARATION OF CAROLYN HOECKER LUEDTKE

103.    In my opinion, the number of hours spent by MTO attorneys as set forth in Exhibit 24 is reasonable in light of the importance of this litigation and the seriousness of the claims against OpenAI; the positions taken by xAI; the breadth of the allegations against numerous individuals without specificity to guide the investigations; and the three rounds of Motion to Dismiss briefing.

Efforts to Meet and Confer

In accordance with Northern District of California Civil Local Rule 54-5(a), MTO met and conferred with counsel for xAI regarding this fee request, including via conference held June 24, 2026.  The parties were unable to reach an agreement.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 13, 2026, at San Francisco, California.


By:    _s/ Carolyn Hoecker Luedtke_
      CAROLYN HOECKER LUEDTKE

DECLARATION OF CAROLYN HOECKER LUEDTKE