# Exhibit 5



**WINSTON & STRAWN LLP**

NORTH AMERICA    SOUTH AMERICA    EUROPE    ASIA

255 Shoreline Drive, Suite 520
Redwood City, CA 94065
+1 650-858-6500
+1 650-858-6550

**KATHI VIDAL**
Partner
+1 202-282-5099
KVidal@winston.com

September 5, 2025

Che Chang
General Counsel
OpenAI, Inc.

█████████████

Re:    *X.AI Corp, et al. v. Xuechen Li*, Case No. 3:25-cv-07292-RFL (N.D. Cal.)

Dear Chang:

On behalf of our clients X.AI Corp. and X.AI LLC (collectively, "xAI"), we write to notify you that, on August 28, 2025, xAI filed suit against its former employee Xuechen Li ("Li") in the Northern District of California, Case No. 3:25-cv-07292-RFL, asserting claims for (1) breach of his employment agreements with xAI, including the Employee Confidential Information and Invention Assignment Agreement (the "Agreement," Exhibit A to the Complaint); (2) misappropriation of trade secrets (18 U.S.C. § 1836 *et seq.*); (3) violation of the Computer Data and Access Fraud Act (Cal. Penal Code § 502); and (4) fraud. The complaint, which is attached hereto (with Exhibits A–B) as **Attachment 1**, alleges that Li willfully and maliciously misappropriated xAI's confidential information and trade secrets, breached his employment and confidentiality agreements (which are attached to the complaint), violated California's Computer Data and Access Fraud Act, and committed fraud in the process. The complaint seeks injunctive relief, damages, and punitive measures under federal and state law, including the Defend Trade Secrets Act.

It has come to xAI's attention that at least as early as on or about July 13, 2025, Li had a meeting with representatives of OpenAI, Inc. ("OpenAI") during which Li was interviewed for potential employment with OpenAI. xAI understands that, at that meeting, Li presented a slide deck that may have included xAI's proprietary information. xAI is concerned that before, during, and/or after such presentation, Li may have revealed to OpenAI xAI's Confidential Information as defined in the Agreement,[1] such as any and all materials Li downloaded from xAI and kept upon leaving xAI's employment.

---

[1] The Agreement defines "Confidential Information" to mean "any and all confidential knowledge, data or information" belonging to xAI, including as relevant here: (a) trade secrets, proprietary technology, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques, and any other work product of any nature and all Intellectual Property Rights (as defined in the Agreement) therein (collectively, "Inventions"), including all Company Inventions (as defined in the Agreement); [and] (g) any other non-public information that a competitor of Company could use to Company's competitive disadvantage.



We expect that OpenAI appreciates the seriousness of Li's conduct, and the potential irreparable damage it may cause xAI. We are also certain that OpenAI is aware that participating in or allowing Li to engage in the misappropriation of xAI's Confidential Information exposes OpenAI to civil and criminal liability for, among other things, misappropriating xAI's trade secrets and for tortiously interfering with the valid and enforceable agreements between xAI and Li.

Furthermore, the Court in the above-captioned suit ordered on Tuesday, September 2, a temporary restraining order, which is attached hereto as **Attachment 2**, that, among other things, (1) enjoins Li and anyone acting in concert with him from (1) possessing, using, copying, reproducing, disclosing, transferring (including to a third party), disseminating, or otherwise exploiting, any of xAI's Confidential Information (Attachment 2 2(b)), and (2) enjoins Li from having any (a) role or responsibility at OpenAI (*id.* 3), and/or (b) communication on the subject of generative AI with any officer, director, employee, agent, supplier, consultant, or customer of OpenAI, until xAI has confirmed that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted (*id.* ¶ 4).

In light of the ongoing matter and of OpenAI's potential liability, I write to formally request the following actions:

*Acknowledge Terms of Li's Employment Contracts.* Confirm that OpenAI has received a copy of Li's employment contracts with xAI, as set forth in the complaint and exhibits thereto, and confirm that OpenAI will not engage in any conduct that interferes with Li's performance of his obligations (or induces his breach of his obligations) thereunder.

*Prevent Communications with Li That Would Violate His Confidentiality Obligations.* Take all necessary measures to prevent any communications between Li and any OpenAI officer, director, employee, agent, supplier, consultant, or customer that would violate Li's obligations under his employment agreement that he not use or disclose xAI's Confidential Information, including without limitation trade secrets to "solicit, induce, encourage, or participate in soliciting, inducing or encouraging any person known to [him] to be an employee, consultant, or independent contractor of [xAI] to terminate his or her relationship with [xAI], even if [he] did not initiate the discussion or seek out the contact."  Agreement ¶¶ 5, 11.1. If OpenAI is aware of any such solicitations or communications by Li, xAI requests that OpenAI immediately disclose them to xAI.

*Cease Any Use of, Return, and Destroy Confidential Information.* Immediately cease any use of and return any xAI Confidential Information that Li provided to any officer, director, employee, agent, supplier, consultant, or customer of OpenAI. After returning the materials, please proceed to destroy any remaining copies of xAI's Confidential Information and provide confirmation under oath of all such destruction. For the avoidance of doubt, this includes all copies, excerpts, summaries, or derivative uses of such information, as well as any content or other tangible or digital information Li may have provided in the above-mentioned presentation given to OpenAI.

*Refrain from Communications Regarding Generative AI with Li Pursuant to the Court's Temporary Restraining Order.* The Court's temporary restraining order enjoins Li from



communicating with any "officer, director, employee, agent, supplier, consultant, or customer of OpenAI or any other competitor of xAI until xAI has confirmed that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted."  Attachment 2, ¶ 4. Accordingly, xAI requests that OpenAI do everything within the full extent of OpenAI's corporate, employment, contractual, and other authority to prevent communications between Li and any officer, director, employee, agent, supplier, consultant, or customer of OpenAI until xAI has confirmed to OpenAI that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted and/or returned.

This request is reasonable, necessary, and not only supported by the Court's order (Attachment 2), but also supported by precedent in the Northern District of California in the decision issued in *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939, 2017 WL 2123560 (N.D. Cal. Sept. 15, 2017). There, a Waymo employee misappropriated confidential files and left his employment to form a competitor, which was then bought by Uber. On these facts, the court (i) ordered Uber to exercise its full authority to prevent the former Waymo employee and others from using or consulting the misappropriated Waymo materials and to return all such materials to Waymo; (ii) required Uber to remove the former Waymo employee from any role or responsibility related to the technology at issue and to prevent him from communicating about such technology with anyone at Uber; and (iii) required Uber to conduct a thorough investigation and provide a detailed accounting of anyone who had seen or heard any part of the misappropriated materials. xAI is therefore entitled to OpenAI's cooperation in deleting and/or returning any xAI Confidential Information here for the same reasons.

***Preservation of Evidence and Litigation Hold.*** xAI formally requests that OpenAI implement a litigation hold and preserve all documents, communications, and/or electronic data relating to Li, his interview and recruiting process, and any presentations or materials he provided to OpenAI including those regarding the Confidential Information, including OpenAI internal communications regarding the same, and any other records, whether in physical or electronic form. The litigation hold should extend to all relevant personnel at OpenAI, including recruiting, human resources, technical staff, and management involved in the interview, recruitment process, or any individual who had communications with Li regarding Li's employment or the Confidential Information. "Documents," "communications," and "electronic data" should be interpreted broadly to include any form of recorded information, whether physical, electronic, or digital. This includes, but is not limited to all forms of communication (including emails, text messages (including SMS, MMS, and messages via apps like iMessage, WhatsApp, or Signal), instant messages (e.g., via Slack, Microsoft Teams, Zoom chat, or other collaboration tools), voicemail messages, and recorded calls); applicant tracking software notes, entries, and records; interview notes, scorecards, feedback forms, resumes, cover letters; and any other written documentation (including memos, notes, reports, letters, and drafts).

xAI takes its business interests and confidential, proprietary, and trade secret information very seriously, and will take all necessary and appropriate steps to prevent any misappropriation or disclosure of its trade secrets or confidential information and any breach of its contracts, tortious interference with its business relations, or usurpation of its corporate opportunities. xAI will remain vigilant in its review of any future conduct of Li and OpenAI regarding its confidential,



September 5, 2025
Page 4

proprietary, and trade secret information. If OpenAI engages in any tortious conduct, or conduct which would otherwise constitute violation of the temporary restraining order granted in the above-captioned matter, xAI will be forced to pursue appropriate legal action and seek available remedies. **Please provide written confirmation within five (5) business days of receipt of this letter that OpenAI has conducted a thorough investigation and complied with these demands.**

\*    \*    \*

This letter is not intended as a full recitation of the facts or a complete review of applicable law. Nothing contained in or omitted from this letter is or shall be deemed to be a limitation, restriction, or waiver of any of xAI's rights or remedies, either at law or in equity, in connection with any of the matters raised herein, all of which are expressly reserved.

If you have any questions, I can be reached at (202) 282-5099.

Sincerely,

Kathi Vidal

Kathi Vidal

KV:cn

# ATTACHMENT 1

KATHI VIDAL (State Bar No. 194971)
kvidal@winston.com
CARSON SWOPE (State Bar No. 353352)
cswope@winston.com
**WINSTON & STRAWN LLP**
255 Shoreline Drive, Suite 520
Redwood City, CA 94065
Telephone: (650) 858-6500
Facsimile: (650) 858-6550

ALEXANDER H. COTE (State Bar No. 211558)
accote@winston.com
**WINSTON & STRAWN LLP**
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Attorneys for Plaintiffs X.AI Corp. and X.AI LLC

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| X.AI Corp., a Nevada corporation, and X.AI LLC, a Nevada limited liability company,<br><br>   Plaintiffs,<br><br> vs.<br><br>XUECHEN LI, an individual<br><br>   Defendant. | **Case No. 3:25-cv-07292**<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT AND TERMINATION CERTIFICATE AND AUTHORIZATION;**<br>**(2) MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1836 ET SEQ.);**<br>**(3) VIOLATION OF COMPUTER DATA AND ACCESS FRAUD ACT (CAL. PENAL CODE § 502); AND**<br>**(4) FRAUD**<br><br>**JURY TRIAL DEMANDED** |

1

**COMPLAINT**

CASE NO. _____

Plaintiffs X.AI Corp. and X.AI LLC (collectively "Plaintiff" or "xAI") for their Complaint against Defendant Xuechen Li ("Defendant") state as follows:

## NATURE OF ACTION

1.      This is an action for willful and malicious misappropriation of xAI's confidential information and trade secrets under (18 U.S.C. § 1836 et seq.) by Defendant, as well as for breach of contract, fraud, and violation of the Computer Data Access Fraud Act (Cal. Penal Code § 502).

## PARTIES

2.      X.AI Corp. is a Nevada corporation with its principal place of business located in Palo Alto, California.

3.      X.AI LLC is a Nevada limited liability company and wholly owned subsidiary of X.AI Corp., having a principal place of business in Palo Alto, California.

4.      Defendant is a Chinese national, with a passport issued by the People's Republic of China. He also purports to be a permanent resident of Canada. At all relevant times, he has been a resident of Mountain View, California.

## JURISDICTION AND VENUE

5.      Jurisdiction is proper in this district pursuant to 28 U.S.C. § 1331 because xAI asserts claims under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* This Court has supplemental jurisdiction over xAI's additional claims because they form part of the same case or controversy. 28 U.S.C. § 1367(a).

6.      This Court has personal jurisdiction over Defendant because Defendant expressly consented to personal jurisdiction in a written agreement with xAI. *See Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 458 (9th Cir. 2007).

7.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because Defendant resides in this district, a substantial part of the events or omissions giving rise to xAI's claims occurred in

2

**COMPLAINT**

CASE NO. _____

this district, and because Defendant expressly consented to venue in this district in a written agreement with xAI.

## GENERAL ALLEGATIONS

### The Ascent of Artificial Intelligence ("AI")

8.       The rise of generative AI products for public use is one of the most transformative technological shifts of the 21st century. Generative AI refers to systems that can create new content—text, images, music, code, and more—by learning patterns from massive datasets. Unlike traditional AI, which classifies or predicts, generative AI produces original outputs.

9.       The advent of modern generative AI is often credited to the rapid rise and popularization of large language models (LLMs), a class of AI systems  designed to understand and generate human-like text, images, code, and other forms of content. However, LLMs represent but one of the groundbreaking advancements in artificial intelligence. Generative AI has seen extremely rapid development in other areas in recent years, particularly in the fields of image generation, video generation, speech generation, and multimodal generation—the simultaneous generation of multiple output modalities at once.

10.       These generative AI models are built upon sophisticated neural architectures—a complex network of nodes and edges, analogous to the neurons and synapses of a human brain—which enable the models to generate content that demonstrates human-like semantic and conceptual understanding, but at speeds far exceeding human capability. Such generative AI models have become a foundational technology across industries, powering virtual assistants, educational platforms, creative tools, and enterprise automation systems. Their ability to scale across domains and adapt to user needs has made them indispensable in modern digital infrastructure.

11.       The development of such generative AI models requires extraordinary financial and technical resources. Building a state-of-the-art model involves data acquisition and processing, computational infrastructure, and expert talent. Immense capital investment is necessary to curate high-quality datasets, operate thousands of high-performance GPUs, and employ top-tier AI researchers.

3

**COMPLAINT**

CASE NO. _____

12.     Generative AI models have delivered immense value to individuals and society at large. They enhance productivity by, among other things, automating routine tasks, improving access to education through personalized tutoring, supporting healthcare professionals with diagnostic assistance, and empowering creators with tools for content generation. Their ability to operate seamlessly across languages facilitates global communication, while their scalability allows organizations to process and generate vast amounts of content with unparalleled efficiency. The societal benefits of generative AI are profound, and the next steps in advancing generative AI depend greatly on the protection of intellectual property and trade secrets that underpin their development.

13.     OpenAI took seven years to develop and finally release its first generative AI chatbot product, ChatGPT, in November 2022 which marked the beginning of widespread public access to conversational generative AI tools. ChatGPT uses versions of its generative pre-trained transformer (hence, "Chat**GPT**") models—such as GPT-3.5, GPT-4, and GPT-o3—as its underlying LLMs.

14.     Since ChatGPT's public debut in late 2022, generative AI—particularly in the form of conversational chatbots capable of back-and-forth messaging streams—has rapidly become a fixture in daily life. By August 2024, nearly 40% of U.S. adults aged 18 to 64 reported using generative AI tools, either at work or at home.[1] This widespread adoption occurred at a pace faster than that of the personal computer or the internet, making generative AI one of the most swiftly embraced technologies in modern history.

15.     During this same period, OpenAI's ChatGPT quickly rose to dominance. Today, OpenAI has over 80 percent of the generative AI chatbot market.

---

[1]   https://news.harvard.edu/gazette/story/2024/10/generative-ai-embraced-faster-than-internet-pcs/  ("As of August, nearly 40 percent of U.S. adults aged 18-64 had used generative AI …. That pickup rate is significantly faster than the public embrace of the internet (20 percent after two years) or the personal computer (20 percent after three years, the earliest researchers could measure).")

4

**COMPLAINT**

CASE NO. _____

**Plaintiff xAI and its Technology**

16.    xAI entered the market in November 2023 and in two short years, through extensive investment in human capital and technology, it has become a leading generative AI company. xAI's vision is to advance human comprehension and capabilities through its advanced AI, including xAI's generative AI model, Grok.  Grok is a preeminent frontier model, representing the cutting edge of AI research and development and pushing the boundaries of what AI can do across multiple domains. Competing alongside OpenAI's ChatGPT, Google's Gemini and China's DeepSeek, xAI's newest release—Grok 4—is one of the most, if not the most, advanced and powerful generative AI systems in the world, leading industry benchmarks in reasoning and pretraining capabilities.

17.    Grok 4 is the culmination of years of research and development, and billions of dollars in investments. These efforts have required the collaboration of highly skilled teams of engineers, scientists, and other professionals, all working to advance the state of the art in AI.

18.    Grok is a conversational generative AI developed by xAI that is capable of many functions, including (a) performing natural language processing tasks, including answering questions, retrieving information, writing creatively, and assisting with coding, (b) interpreting, editing, and generating images or videos in various styles from fanciful to photorealistic, and also (c) generating natural language audio responses in response to oral prompts from a user.

19.    xAI operates in a highly competitive landscape for AI models, with several key players developing advanced AI systems. xAI's direct domestic competitors include OpenAI's ChatGPT, Google's Gemini and Anthropic's Claude, among others.

20.    Experts predict that the market value of AI technology will exceed hundreds of billions of dollars this year, and over a trillion dollars by decade's end.[2] Moreover, advanced AI models can cost

---

[2] Statista projects the size of the artificial intelligence market to reach $244,220,000,000 in 2025, and expects the market size to show an annual growth rate of 26.6% over the course of the next six years, culminating in a market volume of $1 trillion by 2031. https://www.statista.com/outlook/tmo/ artificial-intelligence/worldwide.

**COMPLAINT**

CASE NO. _____

greater than hundreds of millions of dollars to develop.[3] As such, maintaining the utmost secrecy in the development of AI models is of critical importance.

21.    xAI's trajectory is unprecedented. It has delivered in a mere two years arguably the most advanced AI model in the world including features more innovative and imaginative than those offered by its competitors including OpenAI. xAI's innovation is protected by xAI's confidential information and trade secrets.

22.    Trade secrets protect nearly all of xAI's developments—model weights, training data, tuning methods, system prompts, know-how, and more. With xAI's daily innovative advancements, its ability to rely on trade secrets protection is critical not only to its competitive position but for its ongoing operations and protection of its investments in its technology.

**Plaintiff xAI Protects its Confidential Information and Trade Secrets**

23.    To maintain its competitive position, and protect its confidential and proprietary information, including its trade secrets, xAI has implemented a variety of industry standard—and industry leading—practices, such as: routinely conducting security awareness training for all employees; conducting background checks on employees and contractors who may access xAI data; conducting secure development and data handling training for employees with access to sensitive data, after which such employees must complete an assessment to demonstrate understanding; employing a team dedicated to information security; adopting the NIST 800-171 Rev.3 framework as a baseline for internal security standards; achieving SOC 2, Type II compliance; securing endpoints, including employee devices, with ongoing patch maintenance and full disk encryption; and maintaining a formal written information security policy, among other practices.

24.    In addition, as a condition of employment, xAI requires each employee to enter into an Employee Confidential Information and Invention Assignment Agreement ("Agreement") of the form

---

[3] Katharina Buchholz, *The Extreme Cost Of Training AI Models*, Forbes (Aug. 23, 2024), https://www.forbes.com/sites/katharinabuchholz/2024/08/23/the-extreme-cost-of-training-ai-models/.

6

**COMPLAINT**

CASE NO. _____

seen in **Exhibit A**. The Agreement imposes clear obligations on xAI employees regarding xAI's Confidential Information. The Agreement defines "Confidential Information" to mean "any and all confidential knowledge, data or information" belonging to xAI, including most relevantly here:

(a)     trade secrets, proprietary technology, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques, and any other work product of any nature and all Intellectual Property Rights (as defined below) therein (collectively, "Inventions"), including all Company Inventions (as defined below); [and]

(g)     any other non-public information that a competitor of Company could use to Company's competitive disadvantage. (**Ex. A ¶** 1.2.)

25.     Among other things, the Agreement:

a.     Requires that the employee acknowledge that the employment "creates a relationship of confidence and trust" with respect to xAI's Confidential Information, which the company "has a protectable interest therein" (**Ex. A ¶** 1.1);

b.     Requires the employee to maintain confidentiality "during and after [the employee's] employment," and prohibits disclosure, use, or publication of Confidential Information unless required for the employee's work or expressly authorized by an officer of xAI (*id*. ¶ 1.1);

c.     Requires the employee, upon termination, to return "any and all" materials containing or disclosing Confidential Information, including documents, notes, and devices, along with all copies, and "any other material containing or disclosing . . . Confidential Information." (*id*. ¶ 8);

d.     Requires the employee to provide xAI with a computer-usable copy of any Confidential Information stored on personal devices or systems and to "permanently delete and expunge" such information from those systems (*id*. ¶ 8);

7

**COMPLAINT**

CASE NO. _____

e.    Requires the employee to "agree to provide [xAI] access to [the employee's] system as reasonably requested to verify that the necessary copying and/or deletion is completed" (*id.* ¶ 8); and

f.    Requires the employee to "agree to: (a) provide [xAI] any and all information needed to access any [xAI] property or information returned or required to be returned . . . , including without limitation any login, password, and account information." (*id.* ¶ 8)

26.    By signing the Agreement, employees agree that "any threatened or actual violation" of the Agreement would "constitute immediate and irreparable injury" to xAI. (*Id.* ¶ 9.) They also agree that xAI may remedy those violations with injunctive, specific performance or equitable relief without bond. (*Id.*)

27.    By signing the Agreement, employees also agree that prior to leaving the company they will complete and sign the xAI's "termination statement if required to do so by [xAI]." (*Id.*)

28.    By signing the termination statement ("Termination Certification") of the form seen in **Exhibit B**, employees verify that they have complied with all the Agreement's terms. (**Ex. B** at 1.) The Termination Certification also requires departing employees to certify that they have undertaken a diligent search for all xAI documents and returned them to the company. (*Id.*) It provides that "if [the employee has] used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any . . . Confidential Information, [the employee] agree[s] to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems." (*Id.*)[4] To ensure compliance, the Certification requires the employee to "agree to provide [xAI] access to [the employee's] system as reasonably requested to verify that the necessary copying and/or deletion is completed." (*Id.*)

---

[4] The Termination Certificate and Agreement share a common definition of the term "Confidential Information."

**COMPLAINT**

CASE NO. _____

**Defendant's Employment With xAI**

29.     Defendant is an accomplished researcher in the AI community. He earned a Ph.D. in Computer Science from Stanford University in 2024, and has authored numerous AI-related articles published in various scholarly journals.

30.     On or about February 26, 2024, Defendant began working for xAI as a Member of the Technical Team. Defendant was among the company's initial group of approximately 20 engineers.

31.     Defendant's responsibilities included developing and training Grok, xAI's advanced AI model. In this role, Defendant had access to and responsibility for components across the entirety of xAI's technology stack.

32.     To support his job responsibilities, xAI granted Defendant restricted and controlled access to its confidential documents and proprietary information. xAI provided this access only for the purpose of enabling Defendant to perform his job duties.

33.     As a condition for his employment and access to xAI's Confidential Information and trade secrets, xAI required Defendant to sign the Agreement, which he executed on February 26, 2024. **Exhibit A**.

34.     xAI also awarded stock options and shares to Defendant as part of his compensation package.

35.     To provide liquidity to its employee-stockholders like Defendant, xAI facilitated the purchase of some of Defendant's shares, for more than $4.7 million, in June 2025. Defendant received the cash proceeds of this sale on July 23, 2025.

36.     Seeking additional liquidity, Defendant persuaded xAI to facilitate the purchase of more shares from him for an additional $2.2 million in July 2025. xAI facilitated this transaction for Defendant because xAI valued his contributions, and wanted to retain him as a productive and successful employee. Defendant received the cash proceeds of this sale on July 25, 2025.

37.     All told, Defendant sold approximately $7 million of his company stock.

9

**COMPLAINT**

CASE NO. _____

**Defendant Stole xAI's Confidential Information and Trade Secrets**

38.    On July 25, 2025–the same day he concluded his second sale of equity and had millions in cash on hand–Defendant betrayed the trust and faith xAI had placed in him by willfully and maliciously copying xAI Confidential Information (as defined in the Agreement) and trade secrets from his xAI-issued laptop to one or more non-xAI physical or online storage systems within his personal control (collectively, "Personal System").

39.    The trade secrets Defendant willfully and maliciously misappropriated include without limitation cutting-edge AI technologies with features superior to those offered by ChatGPT and other competing products.

40.    The trade secrets Defendant willfully and maliciously misappropriated could be weaponized by competitors such as OpenAI to, at a minimum, improve competing products such as ChatGPT with xAI's more innovative AI and imaginative features which make Grok one of the most, if not the most, intelligent AI models, undermine xAI's product roadmap, and disrupt its market expansion strategy.

41.    The trade secrets Defendant willfully and maliciously misappropriated could save OpenAI and other competitors billions in R&D dollars and years of engineering effort, handing any competitor a potential overwhelming edge in the race to dominate the AI landscape.

42.    Defendant took extensive measures to conceal his misconduct. He deleted his browser history and system logs, renamed files, and compressed files prior to uploading them to his Personal System.

43.    *These facts are beyond dispute, as Defendant, with his attorney present, admitted in a handwritten document he provided to xAI that he misappropriated xAI's Confidential Information and trade secrets, and again, with his attorney present, admitted verbally during in-person meetings with xAI that he engaged in such misappropriation and further admitted that he tried to hide his theft.*

10

**COMPLAINT**

CASE NO. _____

44.    These misappropriated Confidential Information and trade secrets have independent economic value in the AI market. The data could be used by xAI's competitors, such as OpenAI, and/or foreign entities to preempt xAI's product offerings and market expansions, and understand and use its current and in-development product features to strengthen their own AI models, thus giving any competitor or entities with access to the data a potentially insurmountable competitive advantage in the AI race.

45.    xAI has invested billions of dollars in developing its intellectual property, including the Confidential Information and trade secrets stolen by Defendant.

46.    Defendant had no legitimate reason to copy the company's data to his Personal System.

**Defendant's Departure From xAI**

47.    On July 28, 2025, three days after uploading xAI's data to his Personal System and selling approximately $7 million of his company stock, Defendant suddenly resigned.

48.    Prior to his resignation, Defendant had accepted an offer to join xAI's direct competitor OpenAI with a start date of August 19, 2025.

49.    As part of his offboarding process with xAI, Defendant signed a Termination Certificate on his last day of work, August 1, 2025. A true and correct copy of the Termination Certificate is attached hereto as **Exhibit B**.

50.    In the Termination Certificate, Defendant represented that he had complied with all terms of the Agreement, which necessarily included his obligations to preserve the confidentiality and security of xAI's Confidential Information, and his obligation to return any xAI Confidential Information in his possession, and his obligation to destroy any xAI Confidential Information he had uploaded or copied to another storage service. (**Ex. B** at 1.)

51.    Defendant also represented in the Termination Certificate that he had returned all xAI documents, "including but not limited to Company files, notes, drawings, records, plans, forecasts, reports, studies, analyses, proposals, agreements, financial information, research and development information,

11
**COMPLAINT**
CASE NO. _____

sales and marketing information, customer lists, prospect information, pipeline reports, sales reports, operational and personnel information, specifications, code, software, databases [and] computer-recorded information." (**Ex. B** at 1.)

52.    He also represented that he had "made a diligent search to locate any such documents, property and information" and reiterated his false promise to return and delete any such data, which would include the files he had uploaded to his Personal System. (**Ex. B** at 1.)

53.    These representations were each knowingly false. Defendant not only knew he had not returned or destroyed xAI's documents, property, and information in his possession, but he brazenly absconded with xAI's Confidential Information and trade secrets by downloading them onto his Personal System.

54.    Defendant did not just misrepresent his past compliance in the Termination Certificate. He also falsely promised to protect xAI's Confidential Information going forward while at the same time absconding with the same. He falsely promised to "hold in confidence and [] not disclose, use or publish any of the Company's Confidential Information." (**Ex. B** at 1.)

55.    He also broke his promise in the Termination Certificate that if he had "used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any [xAI] information, including but not limited to, Confidential Information, [he would] provide [xAI] with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems."

56.    And he also broke his promise to provide xAI with "access to [his] system as reasonably requested to verify that the necessary copying and/or deletion is completed." (**Ex. B** at 1.)

57.    Defendant never honored these faithless commitments, but used them to lull xAI into a false sense of security, to give him the opportunity to conceal that he had stolen xAI's Confidential Information.

12

**COMPLAINT**

CASE NO. _____

58.    Specifically, when Defendant signed the Termination Certificate, he (1) retained xAI's Confidential Information on his Personal System while engaged in discussions to join Chat GPT maker OpenAI, xAI's competitor and (2) never deleted the Confidential Information or made his complete Personal System available to xAI.

59.    Defendant made the false promises in the Termination Certificate, intentionally deceiving and defrauding xAI, and induced xAI to permit his departure without any further investigation into his conduct or taking additional steps to protect its Confidential Information, all as part of his plan to violate his obligations to his employer and then cover his tracks.

60.    Defendant's fraudulent scheme worked. Because of the faith and trust Defendant had nurtured as one of xAI's first employees, xAI reasonably relied on Defendant's representations in the Termination Certificate.

61.    xAI has suffered and will continue to suffer injury because of Defendant's actions, including diminished value of its Trade Secrets, loss of its competitive advantage, loss of business and harm to its reputation and goodwill.

**xAI Discovers Defendant's Theft of its Confidential Information**

62.    Defendant took affirmative steps to conceal his exfiltration of data, xAI discovered Defendant's theft of its Confidential Information and trade secrets on August 11, 2025 during a routine review of logs from security software designed to detect and prevent data exfiltration.

63.    That same day, xAI sent a demand letter by email to Defendant regarding his theft of the company's data. The letter advised Defendant that xAI had learned that Defendant had "exfiltrated xAI confidential data" to his Personal System in violation of xAI's "policies and practices, constituting a flagrant violation of his legal and contractual obligations to xAI."

64.    xAI's letter demanded the return and deletion of the data. It also requested that Defendant provide a detailed written description of misappropriated data, a copy of any data still on his Personal System and access to his Personal System. The letter also requested written confirmation as to whether

13

**COMPLAINT**

CASE NO. _____

Defendant made any unauthorized disclosure or use of xAI's confidential, proprietary or trade secret information, and if so, details of that use or disclosure.

65.    Instead of immediately providing the requested information, Defendant retained criminal defense counsel, and then had his criminal attorney with him to meet with xAI in an attempt to talk his way out of facing consequences for his theft.

66.    In that in-person meeting on August 14, 2025 and a subsequent in-person meeting on August 15, 2025, both at the at the offices of Winston & Strawn, LLP at 255 Shoreline Drive, Suite 520, Redwood City, CA 94065, Defendant, in the presence of his criminal defense counsel, admitted to intentionally taking xAI's files and covering his tracks by deleting his system logs, renaming files, and compressing them prior to uploading them. He also admitted to understanding the gravity of his actions. He also provided a handwritten statement with these admissions.

67.    Through multiple days of negotiations from August 14, 2025, through August 18, 2025, Defendant – fully represented by criminal defense and also employment counsel – engaged in more false assurances, fraud and deceit.

68.    After two in-person negotiations on Thursday and Friday, August 14-15, 2025, and further negotiations over the weekend, during a portion of which time Defendant allowed xAI to hold (but not access) two of his personal laptops and his personal cell phone "as a showing of good faith," on Monday, August 18, 2025, Defendant yet again fraudulently entered into a contract with xAI, this time the "Authorization for Access to Accounts and Personal Devices" ("Authorization").

69.    In that Authorization, Defendant authorized a "forensic investigator or expert firm(s) retained by x.AI and/or Winston & Strawn (the "Expert"), to create a forensic image or copy of the Data in [Defendant's] Account and on [Defendant's] Devices for the purposes of investigating [Defendant's] access, possession, and/or transmission of xAI information, including Relevant Data." The Authorization defined "Relevant Data" as: "(i) Confidential Information as defined in the Employee Confidential Information and Invention Assignment Agreement executed on February 26, 2024 and (ii) any

14

**COMPLAINT**

CASE NO. _____

communications, correspondence, notes, data, records, files, or documents–regardless of form or medium– relating to xAI, xAI competitors, artificial intelligence ("AI"), large language models ("LLMs"), or generally within [Defendant's] field of work that does not otherwise constitute Confidential Information." "Data" was broadly defined as "all information residing or stored on Account or Devices, and any files or forensic artifacts located in or on the Account, or on a Device, regardless of file type, content or format of the information, and includes Relevant Data, Personal Data and any information derived from or related to such data, including but not limited to metadata, logs, system-generated attributes, and any other embedded or associated informational elements."  And the "Account" was defined to include all of Li's other online account(s) associated with Xuechen Li, including accounts associated with each of" several specified "email addresses of Xuechen Li" and "associated services."

70.    The Authorization also provided that Li "understand[s] and agree[s] that, in connection with the purposes set forth in this authorization, xAI will search the Data, Account and Devices to locate xAI information, including Relevant Data, and evidence of access, possession and/or transmission of xAI information."

71.    The Authorization also provided that if xAI found its Confidential Information on any of the Defendant's devices or in any of the Defendant's accounts, xAI would be "authorize[d] . . . to delete that Confidential Information from the Account and/or Devices."

72.    In the Authorization, Defendant represented that he was providing  "passwords, credentials, keys, MultiFactor Authentication information, and other information necessary to fully Access [his]Accounts, Devices, and files," which he agreed that he would "not modify until September 15, 2025 (or such date upon which xAI has completed all forensic images [], if later)." "Access" was defined broadly to include: "any access of any kind, including: (i) reading, viewing, editing, examining; (ii) copying (including making a forensic copy); (iii) disclosing, transmitting or distributing (but only to the extent necessary to effectuate the purpose of this Agreement and subject to any restrictions specified herein); or (iv) executing."

**COMPLAINT**

CASE NO. _____

73.    In reliance on Defendant's execution of the Authorization and appearance of cooperation, xAI refrained at that time from filing this suit and seeking other emergency relief.

74.    After Defendant returned the signed Authorization, xAI discovered that the credentials Defendant provided in the Authorization did not include the password (which had been changed by Defendant on August 11, 2025, after he received the demand letter from xAI) for the critical account to which Defendant uploaded xAI's Confidential Information and Trade Secrets, thwarting the very purpose of the Authorization, which was to allow xAI to "investigat[e] [Defendant's] access, possession, and/or transmission of xAI information, including Relevant Data."

75.    While conducting a forensic analysis of the information that could be accessed on Li's personal devices provided to xAI, xAI also discovered that Defendant had a number of other accounts that he did not even disclose, let alone provide passwords for, including accounts to which he uploaded xAI material.    This included other accounts with xAI information, including potentially Confidential Information.

76.    After xAI confronted Defendant about these omitted accounts and credentials, Defendant's counsel merely responded that Defendant did not "remember" the password for the critical account that he had changed only seven days earlier and similarly did not "remember" the other accounts, even though he had used them recently.

77.    Given Defendant's continued fraud and deceit, xAI had no choice but to urgently bring this action to protect its proprietary interests in the Confidential Information and trade secrets misappropriated by Defendant.

16
**COMPLAINT**
CASE NO. _____

### FIRST CAUSE OF ACTION

**(Breach of Contract: Employee Confidential Information and Invention Assignment Agreement)**

78. xAI realleges and incorporates by reference Paragraphs 1 through 77 as though fully set forth herein.

79. Defendant entered into the Agreement with xAI on or about February 26, 2024.

80. The Agreement is a valid and enforceable contract, intended to protect xAI's legitimate business interests, including protection of its proprietary, confidential and trade secret information.

81. xAI hired Defendant and provided him with employment and compensation, in exchange for his execution of the Agreement.

82. Consistent with the Agreement's terms, xAI also granted Defendant access to its Confidential Information to enable him to perform his job duties at xAI.

83. By executing the Agreement, Defendant agreed to (a) preserve the security and confidentiality of xAI's Confidential Information, (b) not use or disclose the Confidential Information, except as authorized in the Agreement, (c) return all Confidential Information in his possession at the end of his employment and (d) delete any copies of the Confidential Information he copied to personal storage accounts during his employment. (Ex. A ¶¶ 1.1, 8.)

84. xAI has fully performed its contractual obligations to Defendant under the Agreement.

85. Defendant breached the Agreement by, among other things, (a) uploading xAI's Confidential Information to his Personal System just three days before announcing his resignation, (b) falsely representing that he had deleted any copies of xAI's Confidential Information when he departed the company, and then (c) refusing to return that Confidential Information to xAI and delete all copies of it upon his departure from xAI.

86. xAI has suffered and will continue to suffer injury because of Defendant's breach of the Agreement, including diminished value of its Confidential Information, loss of its competitive advantage, loss of business, and harm to its reputation and goodwill.

17

**COMPLAINT**

CASE NO. _____

87.    Defendant's breach has caused and will continue to cause immediate and irreparable harm to xAI. Given the nature of the breach and the difficulty in quantifying the competitive and economic impact of Defendant's actions, monetary damages alone would be inadequate, and the full extent of harm may be impossible to assess. Defendant's actions will continue to cause irreparable harm to xAI if not enjoined.

88.    As Defendant acknowledged when he signed the Agreement, his breach has caused and will cause immediate and irreparable injury to xAI, and it may be impossible to assess the damages caused by that breach. Defendant thus agreed that xAI will have the right to enforce the Agreement's terms by injunction, specific performance, or other equitable relief without bond, without prejudice to other rights and remedies available to xAI.

89.    The burden on Defendant of issuing an injunction would be slight compared to the ongoing injury xAI would suffer if injunctive relief is not granted. And granting an injunction will serve, rather than harm, the public interest, including by protecting innovation, competition, and lawful business practices.

## SECOND CAUSE OF ACTION

### (Breach of Contract: Termination Certification)

90.    xAI realleges and incorporates by reference Paragraphs 1 through 89 as though fully set forth herein.

91.    Defendant signed the Termination Certification on August 1, 2025.

92.    The Termination Certification is a valid and enforceable contract.

93.    xAI hired Defendant and provided him with employment and compensation, in exchange for him agreeing to sign the Termination Certification.

94.    xAI has fully performed its contractual obligations to Defendant under the Termination Certification.

18

**COMPLAINT**

CASE NO. _____

95.     By executing the Termination Certificate, Defendant agreed to comply with all of the terms of the Agreement, return all of xAI's documents and data (and all copies thereof), and represented that Defendant will not disclose, use, or publish any of xAI's Confidential Information. Again, the Termination Certification was intended to protect xAI's legitimate business interests, including protection of its proprietary, confidential, and trade secret information.

96.     Defendant breached the Termination Certification by, among other things, (a) uploading a copy of data containing xAI's Confidential Information to his Personal System three days before announcing his resignation, (b) falsely representing that he had deleted any copies of xAI's Confidential Information when he departed the company, and then (c) refusing to return that Confidential Information to xAI and delete all copies of it upon his departure from xAI.

97.     xAI has suffered and will continue to suffer injury because of Defendant's breach of the Termination Certification, including diminished value of its Confidential Information, loss of its competitive advantage, loss of business, and harm to its reputation and goodwill.

98.     Defendant's breach has caused and will continue to cause immediate and irreparable harm to xAI. Given the nature of the breach and the difficulty in quantifying the competitive and economic impact of Defendant's actions, monetary damages alone would be inadequate, and the full extent of harm may be impossible to assess. Defendant's actions will continue to cause irreparable harm to xAI if not enjoined.

99.     The burden on Defendant of issuing an injunction would be slight compared to the ongoing injury xAI would suffer if injunctive relief is not granted. And granting an injunction will serve, rather than harm, the public interest, including by protecting innovation, competition and lawful business practices.

19

**COMPLAINT**

CASE No. _____

**THIRD CAUSE OF ACTION**

**(Trade Secrets Misappropriation, 18 U.S.C. § 1836 *et seq.*)**

100.    xAI realleges and incorporates by reference Paragraphs 1 through 99 as though fully set forth herein.

101.    The Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, ("DTSA") allows an "owner of a trade secret that is misappropriated" to "bring a civil action [if] the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

102.    The DTSA defines a trade secret to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" that "(A) the owner thereof has taken reasonable measures to keep ... secret; and (B) ... derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

103.    The DTSA defines misappropriation to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" and "disclosure or use of a trade secret of another without express or implied consent by a person" who "used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5). "Improper means" include theft, misrepresentation, and "breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6).

104.    The DTSA permits the Court to grant an injunction "to prevent any actual or threatened misappropriation" of the plaintiff's trade secrets, among other remedies. 18 U.S.C. § 1836(b)(3).

105.    xAI dedicated and continues to dedicate substantial time and resources towards developing its trade secrets, as detailed above.

106.    As described above, at all relevant times, xAI has made reasonable efforts to ensure its trade secrets remain confidential, proprietary, secret, and available for xAI's commercial use only.

107.    In his role on xAI's engineering team, Defendant had access to and knowledge of xAI's trade secrets.

**COMPLAINT**

CASE NO. _____

108. Defendant acknowledged that he had a duty to maintain the secrecy of xAI's trade secrets in the Agreement.

109. Despite this, Defendant misappropriated xAI's trade secrets by among other things, (a) uploading a copy of data containing xAI's trade secrets to his Personal System three days before his termination, (b) falsely representing that he had deleted any copies of xAI's trade secrets when he departed the company, and then (c) refusing to return those trade secrets to xAI and delete all copies of it upon his departure from xAI.

110. The xAI trade secrets Defendant misappropriated included without limitation cutting-edge AI technologies with features superior to those offered by ChatGPT and other competing products. Defendant had no legitimate reason to copy the company's data to his Personal System. xAI continues to investigate the full extent of Defendant's misappropriation.

111. This conduct amounted to misappropriation because Defendant acquired xAI's trade secrets by improper means: theft, misrepresentation, and breach of his duty to maintain their secrecy.

112. The trade secrets Defendant took relate to Grok, xAI's advanced AI model. xAI customers, including customers located throughout the U.S. states, access Grok through the internet, including by using web browsers (grok.com), mobile phone apps, and by API access. Internet traffic serving some of these customers crosses state boundaries. Grok is thus a product or service used or intended for use in interstate commerce.

113. The trade secrets identified above and others almost certainly contained on Defendant's Personal System have independent economic value in the AI market. The trade secrets Defendant misappropriated are the result of the culmination of billions of dollars of investment and multiple years of AI development and training.

114. The trade secrets Defendant misappropriated could be weaponized by competitors such as OpenAI to, at a minimum, improve competing products such as ChatGPT with Grok's more innovative

21

**COMPLAINT**

Case No. _____

and imaginative features which make Grok one of the most, if not the most, intelligent generative AI chatbots, undermine xAI's product roadmap, and disrupt its market expansion strategy.

115.    The trade secrets Defendant misappropriated could save OpenAI and other competitors billions in R&D dollars and years of engineering effort, handing any competitor a potential overwhelming edge in the race to dominate the AI landscape.

116.    xAI has suffered and will continue to suffer injury because of Defendant's misappropriation of trade secrets, including diminished value of its Trade Secrets, loss of its competitive advantage, loss of business, and harm to its reputation and goodwill.

117.    xAI has no adequate remedy at law for such present and future harm and is thus entitled to injunctive relief in addition to compensatory relief.

118.    Defendant's breach has caused and will continue to cause immediate and irreparable harm to xAI. Given the nature of the breach and the difficulty in quantifying the competitive and economic impact of Defendant's actions, monetary damages alone would be inadequate, and the full extent of harm may be impossible to assess. Defendant's actions will continue to cause irreparable harm to xAI if not enjoined.

119.    Additionally, because Defendant has committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of xAI's rights, xAI is entitled to recover punitive damages from Defendant, in an amount according to proof at trial.

## **FOURTH CAUSE OF ACTION**

### **(Violation of Comprehensive Computer Data Access and Fraud Act)**

120.    xAI realleges and incorporates by reference Paragraphs 1 through 119 as though fully set forth herein.

121.    California Penal Code § 502(e) provides a civil remedy against anyone who, in violation of California Penal Code § 502(c)(2), "[k]nowingly accesses and without permission takes, copies, or

22

**COMPLAINT**

CASE NO. _____

makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network."

122. Defendant knowingly accessed and without xAI's permission took, copied, and made use of xAI's data from its computer by among other things, (a) uploading a copy of data containing xAI's data to his Personal System three days before his termination, (b) falsely representing that he had deleted any copies of xAI's data when he departed the company, and then (c) refusing to return that data to xAI and delete all copies of it upon his departure from xAI.

123. As a direct and proximate result of his violation of California Penal Code § 502(c)(2), Defendant caused loss to xAI.

124. xAI has no adequate remedy at law for such present and future harm and thus is entitled to injunctive relief in addition to compensatory relief under California Penal Code § 502(e).

125. Defendant's actions will continue to cause irreparable harm to xAI if not enjoined.

126. Additionally, because Defendant has committed the acts alleged herein willfully, in bad faith, maliciously, and in conscious disregard of xAI's rights, xAI is entitled to recover punitive damages from Defendant, in an amount according to proof at trial

127. xAI is also entitled to recover its attorneys' fees pursuant to California Penal Code § 502(e)(2).

## FIFTH CAUSE OF ACTION

### (Fraud: Termination Certificate)

128. xAI realleges and incorporates by reference Paragraphs 1 through 127 as though fully set forth herein.

129. In executing the Termination Certificate, Defendant falsely represented the material fact that he had "complied with all the terms" of the Agreement, which necessarily included the Agreement's

23

**COMPLAINT**

CASE NO. _____

obligation that he "[a]t all times during and after [his] employment … hold in confidence and … not disclose, use, or publish any of [AI's] Confidential Information." (**Ex. B** at 1 (incorporating **Ex. A** at § 1.1).)

130.    He also falsely represented in the Termination Certificate the material fact that he had returned all xAI documents, "including but not limited to [xAI] files, notes, drawings, records, plans, forecasts, reports, studies, analyses, proposals, agreements, financial information, research and development information, sales and marketing information, customer lists, prospect information, pipeline reports, sales reports, operational and personnel information, specifications, code, software, databases [and] computer-recorded information." (**Ex. B** at 1.)

131.    He also falsely represented the material fact that he had "made a diligent search to locate any such documents, property and information" and reiterated his promise to return and delete any such data, which would include the files he had uploaded to his Personal System. (**Ex. B** at 1.)

132.    Each of Defendant's representations in the certification was knowingly false. Defendant knew he had not returned or destroyed xAI's documents, property, and information in his possession. He instead retained xAI's documents, property and information—including xAI's Confidential Information and trade secrets—on his Personal System. Defendant thus also knew that he had not held xAI's data in confidence but instead had misappropriated it for his own use.

133.    Defendant also falsely promised in the Termination Certification that if he had "used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any [xAI] information, including but not limited to, Confidential Information, [he would] agree to provide [xAI] with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems."

134.    He also agreed to provide xAI with "access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed." (**Ex. B** at 1.)

**COMPLAINT**
CASE NO. _____

135. Defendant also repeated his prior promise to "hold in confidence and [] not disclose, use or publish any of [xAI's] Confidential Information" after he left xAI. (**Ex. B** at 1.)

136. Defendant knowingly made these promises falsely with no intent to honor them. Instead, he intended to retain and did retain xAI's Confidential Information on his Personal System, with the intent to use, disclose, and/or publish it. He never intended to delete and did not delete xAI's Confidential Information. And he never intended to provide xAI with access to his Personal System. He instead intended to conceal and did conceal his Personal System from xAI, in order to prevent xAI from discovering his misconduct.

137. Defendant made the knowingly false representations in the Termination Certificate with the intent to deceive and/or defraud xAI and conceal his theft of Confidential Information, and to induce xAI to permit his departure without any further investigation into his conduct or taking additional steps to protect its Confidential Information.

138. xAI reasonably relied on Defendant's representations in the Termination Certificate by refraining from investigating him as an active threat.

139. As a result, Defendant was able to perpetuate and conceal his misappropriation, damaging xAI in an amount to be proven at trial.

140. Defendant's actions will continue to cause irreparable harm to xAI if not enjoined.

141. xAI has no adequate remedy at law for such present and future harm and is thus entitled to injunctive relief in addition to compensatory relief.

142. Defendant performed the foregoing acts, conduct, and omissions fraudulently, oppressively, and maliciously, with the intent and design to damage xAI. By reason of this conduct, xAI is thus entitled to recover punitive damages in an amount to be determined.

<u>**PRAYER FOR RELIEF**</u>

xAI prays for the following relief:

25
**COMPLAINT**
CASE NO. _____

1. a Temporary Restraining Order against Defendant ordering him to, within three business days of the execution of this Order,

   a. temporarily surrender control and access (for a period of 14 days to allow for a forensic examination to identify, remediate, and/or delete Confidential Information belonging to xAI) to any personal electronic devices (e.g., cellular devices, computers), online storage repositories (e.g., Gmail, Google Drive, iCloud), or other electronic storage devices that are currently accessible by Defendant or in Defendant's possession, custody, or control;

   b. return to xAI, through its counsel of record, all Confidential Information belonging to xAI currently in Defendant's possession, custody, or control, that exists in any physical form (e.g., notepad, paper files);

   c. provide a written statement identifying all personal locations, personal devices, personal accounts, or personal storage media–whether physical or electronic–where any Confidential Information belonging to xAI is or has been stored, maintained, or accessed;

   d. provide, and not modify for the 14-day period referenced in (A) above, the passwords, credentials, keys, MultiFactor Authentication information, and other information necessary to fully access all devices, repositories, storage media, and accounts listed in (A); and

   e. for any password or credentials listed in relation to (A) which Defendant claims he has forgotten or is unsure how to readily access, cooperate and work with xAI to reset or recover the same and/or to otherwise cooperate with xAI as necessary to provide xAI access to such accounts and devices listed in (A).

2. a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction enjoining Defendant, his agents, employees, partners, and any others acting in concert with him or on his behalf, from:

   a. Controlling, logging into, or otherwise accessing (other than as required by 1(E) above) any personal electronic devices (e.g., cellular devices, computers), online storage

26

**COMPLAINT**

CASE No. _____

repositories (e.g., Gmail, Google Drive, iCloud), or other electronic storage devices that are currently accessible by Defendant or in Defendant's possession, custody, or control;

b. Possessing, using, copying, reproducing, disclosing, transferring (including to a third party), disseminating, or otherwise exploiting, any Confidential Information, including the xAI files uploaded to his Personal System, and any copies, derivatives, or materials created therefrom;

c. Destroying, deleting, changing, altering, or otherwise eliminating any version (whether hard copy, native, or electronic) of any documents or electronically stored information on any device or in any account (whether in printed form or downloaded to any remote storage system, computer, hard drive, server, disk drive, flash drive, cellular telephone, CD, DVD, USB drive, or any other device that can be used to electronically store data or information) relating to the Confidential Information;

d. Disposing of, deleting, changing, altering, wiping, tampering with, or destroying any remote storage systems (including cloud storage accounts), computers, hard drives, servers, disk drives, flash drives, cellular telephones, CDs, DVDs, USB drives, and any other devices that can be used to electronically store data or information that are: (a) currently accessible by Defendant or in Defendant's possession, custody, or control; or (b) have been accessible by Defendant or in Defendant's possession, custody, or control, since February 26, 2024, and any data, files, information, forensic remnants or digital artifacts, stored on or within the device;

e. Destroying, deleting, changing, altering, or otherwise eliminating any emails to or from any email accounts used by Defendant since February 26, 2024, either in printed form or downloaded to any computers, laptops, online storage repositories, cloud storage, or electronic storage devices;

27

**COMPLAINT**

CASE NO. _____

    f.   Destroying, deleting, changing, altering, or otherwise eliminating any text, electronic postings, or other application messages from any cellular telephones or devices, computers, laptops, online storage repositories, cloud storage, or electronic storage devices (a) currently accessible by Defendant or in Defendant's possession, custody, or control; or (b) have been accessible by Defendant, or in Defendant's possession, custody, or control, since February 26, 2024; and

    g.   Violating, aiding, or participating in the violation of any terms of the Agreement or Termination Certification;

3.  a Temporary Restraining Order and Preliminary Injunction enjoining Defendant from having any role or responsibility at OpenAI or any other competitor of xAI pertaining to generative AI, including without limitation OpenAI's ChatGPT until xAI has confirmed that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted;

4.  a Temporary Restraining Order and Preliminary Injunction enjoining Defendant from having any communication on the subject of generative AI with any officer, director, employee, agent, supplier, consultant, or customer of OpenAI or any other competitor of xAI until xAI has confirmed that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted;

5.  actual, compensatory, treble, punitive, and exemplary damages to be determined at trial;

6.  attorneys' fees and costs; and

7.  such other and further relief the Court deems as just.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all appropriate issues raised in this Complaint.

28

**COMPLAINT**

Case No. _____

Dated:  August 28, 2025

**WINSTON & STRAWN LLP**


By: _/s/ Kathi Vidal_____
    KATHI VIDAL
    ALEXANDER COTE
    CARSON SWOPE

Attorneys for Plaintiffs X.AI Corp. and X.AI LLC

29

**COMPLAINT**

# EXHIBIT A

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

## EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

As a condition of my becoming employed (or my continued employment) by **X.AI Corp.**, a Nevada corporation, or any of its current or future subsidiaries, parents, affiliates, successors or assigns (collectively, the "**Company**"), which I acknowledge to be good and valuable consideration for my obligations hereunder, I hereby enter into this Employee Confidential Information and Invention Assignment Agreement (the "**Agreement**") and agree as follows:

1. **Confidential Information Protections.**

    1.1.  **Recognition of Company's Rights; Nondisclosure.** I understand and acknowledge that my employment by Company creates a relationship of confidence and trust with respect to Company's Confidential Information (as defined below) and that Company has a protectable interest therein. At all times during and after my employment, I will hold in confidence and will not disclose, use, or publish any of Company's Confidential Information, except as such disclosure, use or publication may be required in connection with my work for Company, or unless an officer of Company expressly authorizes such disclosure. I will obtain Company's written approval before publishing or submitting for publication any material (written, oral, or otherwise) that discloses and/or incorporates any Confidential Information. I hereby assign to Company any rights I may have or acquire in such Confidential Information and recognize that all Confidential Information shall be the sole and exclusive property of Company and its assigns. I will take all reasonable precautions to prevent the inadvertent accidental disclosure of Confidential Information. Notwithstanding the foregoing, pursuant to 18 U.S.C. Section 1833(b), I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

    1.2.  **Confidential Information.** The term "**Confidential Information**" shall mean any and all confidential knowledge, data or information of Company. By way of illustration but not limitation, "Confidential Information" includes (a) trade secrets, proprietary technology, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques, and any other work product of any nature and all Intellectual Property Rights (as defined below) therein (collectively, "**Inventions**"), including all Company Inventions (as defined below); (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of Company and other non-public information relating to customers and potential customers; (d) information regarding any of Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by Company, and other non-public information relating to business partners; (e) non-public information regarding other Company personnel, consultant lists, employee lists, compensation and employee and consultant skills that have not been disclosed by the individuals themselves; (f) information regarding stockholders, affiliates of stockholders and sponsors of Company; and (g) any other non-public information that a competitor of Company could use to Company's competitive disadvantage.

    1.3.  **Permitted Communications and Activities.** Notwithstanding the foregoing, Company agrees that I am free to use information that I knew prior to my employment with Company or that is, at the time of use, generally known in the trade or industry through no breach of this Agreement or act or omission by me. I understand that nothing in this Agreement prevents me from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that I have

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

reason to believe is unlawful. Company further agrees that this Agreement does not limit my right to discuss my compensation or the compensation of others in a manner consistent with each employee's right to privacy, to disclose other terms and conditions of my employment, to report possible information about reasonably suspected violations of law or regulation to the Equal Employment Opportunity Commission, the United States Department of Labor, the National Labor Relations Board, the Securities and Exchange Commission, or any other federal, state or local government or law enforcement agency (unless subject to the attorney-client privilege), or public body or other third parties, to disclose information about suspected violations of the law to persons in the Company who have authority to address the violation, to engage in any communications or other activity protected by Section 7 of the National Labor Relations Act, to engage in political speech or activities in my own personal capacity, or to make other disclosures expressly protected under the applicable provisions of law or regulation, including but not limited to "whistleblower" statutes and any applicable statutes that protect political speech or activities.

1.4. **Third Party Information.** I understand, in addition, that Company has received and, in the future, will receive from third parties their confidential and/or proprietary knowledge, data or information ("**Third Party Information**") subject to a duty on Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for Company) or use Third Party Information, except in connection with my work for Company, or unless expressly authorized by an officer of Company in writing.

1.5. **Term of Nondisclosure Restrictions.** I understand that Confidential Information and Third Party Information is never to be used or disclosed by me, except as expressly provided in this Section 1, and I agree that the restrictions in Section 1 are intended to continue indefinitely, even after my employment by Company ends. If a temporal limitation on my obligation not to use or disclose such information is required under applicable law, and the Agreement or its restriction(s) cannot otherwise be enforced, I agree and Company agrees that the two year period after the date my employment ends will be the temporal limitation relevant to the contested restriction; provided, however, that my obligation not to disclose or use trade secrets that are protected without time limitation under applicable law shall continue indefinitely.

1.6. **No Improper Use of Information of Prior Employers and Others.** During my employment by Company, I will not improperly use or disclose confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person.

2. **Assignments of Inventions.**

2.1. **Definitions.** As used in this Agreement, the term "**Intellectual Property Rights**" means all trade secrets, Copyrights, trademarks, mask work rights, patents and other intellectual property rights recognized by the laws of any jurisdiction or country; the term "Copyright" means the exclusive legal right to reproduce, perform, display, distribute and make derivative works of a work of authorship (as a literary, musical, or artistic work) recognized by the laws of any jurisdiction or country; and the term "**Moral Rights**" means all paternity, integrity, disclosure, withdrawal, special and any other similar rights recognized by the laws of any jurisdiction or country.

2.2. **California Labor Code Section 2870(a) Notice.** I acknowledge that California Labor Code section 2870(a) (the "**Specific Inventions Law**") provides that I cannot be required to assign to Company any Invention that I develop entirely on my own time without using Company's equipment, supplies, facilities or trade secret information, except for Inventions that either (a) relate at the time of conception or reduction to practice to Company's business, or actual or demonstrably anticipated research or development, or (b) result from any work performed by me for Company (the "**Non-Assignable Inventions**"). To the extent that a provision in this Agreement purports to require me to assign an Invention otherwise excluded in this Section 2.2 to Company, the provision is against the public policy of the state of California and is

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

unenforceable. This limited exclusion does not apply to any patent or Invention covered by a contract between Company and the United States or any of its agencies requiring full title to such patent or Invention to be in the United States.

2.3.  **Excluded Inventions**. Attached hereto as Exhibit A is a list describing all existing Inventions, if any, that (a) are owned by me or in which I have an interest and were made or acquired by me prior to my date of first employment by Company, and (b) may relate to Company's business or actual or demonstrably anticipated research or development, and (c) are not to be assigned to Company ("**Excluded Inventions**"). If no such list is attached, I agree that no Inventions that would be classified as Excluded Inventions exist as of the date of this Agreement. I acknowledge and agree that if I use any Excluded Inventions and/or Non-Assignable Inventions in the scope of my employment, or if I include any Excluded Inventions and/or Non-Assignable Inventions in any product or service of Company, or if my rights in any Excluded Inventions and/or any Non-Assignable Inventions may block or interfere with, or may otherwise be required for, the exercise by Company of any rights assigned to Company under this Agreement, (i) I will immediately notify Company in writing and (ii) unless Company and I agree otherwise in writing, I hereby grant to Company, in such circumstances (whether or not I give Company notice as required above), a non-exclusive, perpetual, transferable, fully-paid, royalty-free, irrevocable, worldwide license, with rights to sublicense through multiple levels of sublicensees, to reproduce, make derivative works of, distribute, publicly perform, and publicly display in any form or medium, whether now known or later developed, make, have made, use, sell, import, offer for sale, and exercise any and all present or future rights in, such Excluded Inventions or Non-Assignable Inventions. To the extent that any third parties have any rights in or to any Excluded Inventions or any such Non-Assignable Inventions, I hereby represent and warrant that such third party or parties have validly and irrevocably granted to me the right to grant the license stated above.

2.4.  **Assignment of Company Inventions**. Inventions assigned to Company in this subsection or to a third party as directed by Company pursuant to Section 2.6 are referred to in this Agreement as "**Company Inventions**." Except for Excluded Inventions and Non-Assignable Inventions, I hereby assign to Company all my right, title, and interest in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made, conceived, developed, prepared, produced, authored, edited, amended, reduced to practice, or learned or set out in any tangible medium of expression or otherwise created, in whole or in part, by me, either alone or with others, during my employment by Company, and all printed, physical, and electronic copies, and other tangible embodiments of Inventions. To the extent required by applicable Copyright laws, I agree to assign in the future (when any copyrightable Inventions are first fixed in a tangible medium of expression) my Copyright rights in and to such Inventions. Any assignment of Company Inventions (and all Intellectual Property Rights with respect thereto) hereunder includes an assignment of all Moral Rights. To the extent such Moral Rights cannot be assigned to Company and to the extent the following is allowed by the laws in any country where Moral Rights exist, I hereby unconditionally and irrevocably waive the enforcement of such Moral Rights, and all claims and causes of action of any kind against Company or related to Company's customers, with respect to such rights. I further acknowledge and agree that neither my successors-in-interest nor legal heirs retain any Moral Rights in any Company Inventions (and any Intellectual Property Rights with respect thereto).

2.5.  **Obligation to Keep Company Informed**. During the period of my employment, I will promptly and fully disclose to Company in writing all Inventions authored, conceived, or reduced to practice by me, either alone or jointly with others. At the time of each such disclosure, I will advise Company in writing of any Inventions that I believe constitute Non-Assignable Inventions; and I will at that time provide to Company in writing all evidence necessary to substantiate that belief. Company will keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to Company pursuant to this Agreement relating to Non-Assignable Inventions. I will preserve the confidentiality of any Invention that does not fully qualify for protection under the Specific Inventions Law.

2.6.  **Government or Third Party**. I agree that, as directed by Company, I will assign to a third party, including without limitation the United States, all my right, title, and interest in and to any particular Company Invention.

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

2.7. **Ownership of Work Product.** I agree that Company will exclusively own all work product that is made by me (solely or jointly with others) within the scope of my employment, and I hereby irrevocably and unconditionally assign to Company all right, title and interest worldwide in and to such work product. I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by Copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101). I understand and agree that I have no right to publish on, submit for publishing, or use for any publication any work product protected by this Section, except as necessary to perform services for Company.

2.8. **Enforcement of Intellectual Property Rights and Assistance.** I will assist Company in every proper way to obtain, and from time to time enforce, United States and foreign Intellectual Property Rights and Moral Rights relating to Company Inventions in any and all countries. To that end, I will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Intellectual Property Rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such Intellectual Property Rights to Company or its designee, including the United States or any third party designated by Company. My obligation to assist Company with respect to Intellectual Property Rights relating to such Company Inventions in any and all countries will continue beyond the termination of my employment, but Company will compensate me at a reasonable rate after my termination for the time actually spent by me at Company's request on such assistance. In the event Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in this paragraph, I hereby irrevocably designate and appoint Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act for and on my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this Agreement with the same legal force and effect as if executed by me. I hereby waive and quitclaim to Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Intellectual Property Rights assigned under this Agreement to Company.

2.9. **Incorporation of Software Code.** I agree that I will not incorporate into any Inventions, including Company software, or otherwise deliver to Company any software code licensed under the GNU General Public License or Lesser General Public License or any other license that, by its terms, requires or conditions the use or distribution of such code on the disclosure, licensing, or distribution of any source code owned or licensed by Company, except in strict compliance with Company's policies regarding the use of such software.

3. **Records.** I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that is required by Company) of all Confidential Information developed by me and all Company Inventions made by me during the period of my employment at Company, which records will be available to and remain the sole property of Company at all times.

4. **Duty of Loyalty During Employment.** I agree that during the period of my employment by Company, I will not, without Company's express written consent, directly or indirectly engage in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my employment by Company.

5. **No Solicitation of Employees, Consultants or Contractors.** To the extent permitted by applicable law, I agree that during the period of my employment and for the one year period after the date my employment ends for any reason, including but not limited to voluntary termination by me or involuntary termination by Company, I will not, as an officer, director, employee, consultant, owner, partner, or in any other capacity, either directly or through others, except on behalf of Company, solicit, induce, encourage, or participate in soliciting, inducing or encouraging any person known to me to be an employee, consultant, or independent contractor of Company to terminate his or her relationship with Company, even if I did not initiate the discussion or seek out the contact.

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

6. **Reasonableness of Restrictions.**

   6.1.    I have read this entire Agreement and understand it. I agree that this Agreement does not prevent me from earning a living or pursuing my career. I agree that the restrictions contained in this Agreement are reasonable, proper, and necessitated by Company's legitimate business interests. I represent and agree that I am entering into this Agreement freely and with knowledge of its contents with the intent to be bound by this Agreement and the restrictions contained in it.

   6.2.    In the event that a court finds this Agreement, or any of its restrictions, to be ambiguous, unenforceable, or invalid, I and Company agree that the court will read this Agreement as a whole and interpret the restriction(s) at issue to be enforceable and valid to the maximum extent allowed by law.

   6.3.    If the court declines to enforce this Agreement in the manner provided in subsection 6.2, Company and I agree that this Agreement will be automatically modified to provide Company with the maximum protection of its business interests allowed by law and I agree to be bound by this Agreement as modified.

7. **No Conflicting Agreement or Obligation.** I represent that my performance of all the terms of this Agreement and as an employee of Company does not and will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement.

8. **Return of Company Property.** When I leave the employ of Company, I will deliver to Company any and all drawings, notes, memoranda, specifications, devices, formulas and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Confidential Information of Company. I agree that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and I agree to provide Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed. I further agree that any property situated on Company's premises and owned by Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company's personnel at any time with or without notice. Prior to leaving, I agree to: (a) provide Company any and all information needed to access any Company property or information returned or required to be returned pursuant to this paragraph, including without limitation any login, password, and account information; (b) cooperate with Company in attending an exit interview; and (c) completing and signing Company's termination statement if required to do so by Company.

9. **Legal and Equitable Remedies.**

   9.1.    I agree that it may be impossible to assess the damages caused by my violation of this Agreement or any of its terms. I agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to Company, and Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that Company may have for a breach or threatened breach of this Agreement.

   9.2.    In the event Company enforces this Agreement through a court order, I agree that the restrictions of Section 5 will remain in effect for a period of 12 months from the effective date of the Order enforcing the Agreement.

10. **Notices.** Any notices required or permitted under this Agreement will be given to Company at its headquarters location at the time notice is given, labeled "Attention Chief Executive Officer," and to me at my address as listed on Company payroll, or at such other address as Company or I may designate by written notice to the other. Notice will be effective upon receipt or refusal of delivery. If delivered by certified or registered mail, notice will

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

be considered to have been given five business days after it was mailed, as evidenced by the postmark. If delivered by courier or express mail service, notice will be considered to have been given on the delivery date reflected by the courier or express mail service receipt.

## 11. Publication of This Agreement to Subsequent Employer or Business Associates of Employee.

11.1. If I am offered employment or the opportunity to enter into any business venture as owner, partner, consultant or other capacity while the restrictions described in Section 5 of this Agreement are in effect, I agree to inform my potential employer, partner, co-owner and/or others involved in managing the business with which I have an opportunity to be associated of my obligations under this Agreement and also agree to provide such person or persons with a copy of this Agreement.

11.2. I agree to inform Company of all employment and business ventures which I enter into while the restrictions described in Section 5 of this Agreement are in effect and I also authorize Company to provide copies of this Agreement to my employer, partner, co-owner and/or others involved in managing the business with which I am employed or associated and to make such persons aware of my obligations under this Agreement.

## 12. General Provisions.

12.1. **Governing Law; Consent to Personal Jurisdiction**. This Agreement will be governed by and construed in accordance with the laws of the state of your primary work location ("**State Law**"). I hereby expressly consent to the personal jurisdiction and venue of the state and federal courts located in the state of my primary work location for any lawsuit filed there against me by Company arising from or related to this Agreement.

12.2. **Severability**. In case any one or more of the provisions, subsections, or sentences contained in this Agreement will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect the other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained in this Agreement. If moreover, any one or more of the provisions contained in this Agreement will for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it will be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it will then appear.

12.3. **Successors and Assigns**. This Agreement is for my benefit and the benefit of Company, its successors, assigns, parent corporations, subsidiaries, affiliates, and purchasers, and will be binding upon my heirs, executors, administrators and other legal representatives.

12.4. **Survival**. This Agreement shall survive the termination of my employment, regardless of the reason, and the assignment of this Agreement by Company to any successor in interest or other assignee.

12.5. **Employment At-Will**. I agree and understand that nothing in this Agreement will change my at-will employment status or confer any right with respect to continuation of employment by Company, nor will it interfere in any way with my right or Company's right to terminate my employment at any time, with or without cause or advance notice.

12.6. **Waiver**. No waiver by Company of any breach of this Agreement will be a waiver of any preceding or succeeding breach. No waiver by Company of any right under this Agreement will be construed as a waiver of any other right. Company will not be required to give notice to enforce strict adherence to all terms of this Agreement.

12.7. **Export**. I agree not to export, reexport, or transfer, directly or indirectly, any U.S. technical data acquired from Company or any products utilizing such data, in violation of the United States export laws or regulations.

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

12.8. **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

12.9. **Advice of Counsel**. I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT WILL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION OF THIS AGREEMENT.

12.10. **Entire Agreement**. The obligations pursuant to Sections 1 and 2 of this Agreement will apply to any time during which I was previously engaged, or am in the future engaged, by Company as a consultant if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter of this Agreement and supersedes and merges all prior discussions between us. No modification of or amendment to this Agreement will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

This Agreement is effective as of the date of Employee's signature.

COMPANY

EMPLOYEE

Signature: _Robert Ochoa_

Signature: _Xuechen Li_
DocuSigned by:
3760BBD30E30414

Name: ~o' er ~c' oa

Name: Xuechen Li

Title: Human Resources

Date: 2/26/2024

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

## EXHIBIT A

### EXCLUDED INVENTIONS

1. Excluded Inventions Disclosure.  Except as listed in Section 2 below, the following is a complete list of all Excluded Inventions:

The complete list of prior inventions attached in the next pages.

2. Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to the Excluded Inventions generally listed below, the intellectual property rights and duty of confidentiality with respect to which I owe to the following party(ies):

Excluded Invention:

Party(ies):

Relationship:

Page 8 of 8

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

# List of Prior Inventions

1. **A Simulation Framework for Methods that Learn from Human Feedback**
   a. publications/research articles:
      i. Dubois, Yann, Chen Xuechen Li, Rohan Taori, Tianyi Zhang, Ishaan Gulrajani, Jimmy Ba, Carlos Guestrin, Percy S. Liang, and Tatsunori B. Hashimoto. "Alpacafarm: A simulation framework for methods that learn from human feedback." *Advances in Neural Information Processing Systems* 36 (2024).
      ii. Alpaca: A Strong, Replicable Instruction-Following Model. Rohan Taori* and Ishaan Gulrajani* and Tianyi Zhang* and Yann Dubois* and Xuechen Li* and Carlos Guestrin and Percy Liang and Tatsunori B. Hashimoto.
   b. code: https://github.com/tatsu-lab/alpaca_farm
   c. abstract: A simulator for research and development for learning from feedback at a low cost. The simulator mimics human feedback with large language models, analyzes the performance of methods, and provides a fast and cheap automated evaluation that reflects human judgement.

2. **Methods, Software Implementations, and Applications for Differentially Private Machine Learning**
   a. publications:
      i. He, Jiyan, Xuechen Li, Da Yu, Huishuai Zhang, Janardhan Kulkarni, Yin Tat Lee, Arturs Backurs, Nenghai Yu, and Jiang Bian. "Exploring the limits of differentially private deep learning with group-wise clipping." The Eleventh International Conference on Learning Representations.
      ii. Li, Xuechen, Florian Tramer, Percy Liang, and Tatsunori Hashimoto. "Large language models can be strong differentially private learners." The Tenth International Conference on Learning Representations.
      iii. Yue, Xiang, Huseyin A. Inan, Xuechen Li, Girish Kumar, Julia McAnallen, Hoda Shajari, Huan Sun, David Levitan, and Robert Sim. "Synthetic text generation with differential privacy: A simple and practical recipe." The 61st Annual Meeting of the Association for Computational Linguistics.
   b. code: https://github.com/lxuechen/private-transformers
   c. abstract: Methods for improving the run time and memory efficiency of differentially private machine learning. Software implementation techniques for scaling the technical approaches to very large neural

DocuSign Envelope ID: 02A2DC56-D063-4EB4-BCFB-E488C6E5BB9F

network models. Applications to generate synthetic data to preserve privacy.

3. **Methods and software implementation for scalable training of neural network models with differential equations**
   a. publications:
      i. Li, Xuechen, Ting-Kam Leonard Wong, Ricky TQ Chen, and David Duvenaud. "Scalable gradients for stochastic differential equations." In *International Conference on Artificial Intelligence and Statistics*, pp. 3870-3882. PMLR, 2020.
      ii. Kidger, Patrick, James Foster, Xuechen Li, and Terry J. Lyons. "Neural sdes as infinite-dimensional gans." In *International conference on machine learning*, pp. 5453-5463. PMLR, 2021.
      iii. Xu, Winnie, Ricky TQ Chen, Xuechen Li, and David Duvenaud. "Infinitely deep bayesian neural networks with stochastic differential equations." In *International Conference on Artificial Intelligence and Statistics*, pp. 721-738. PMLR, 2022.
      iv. Kidger, Patrick, James Foster, Xuechen Chen Li, and Terry Lyons. "Efficient and accurate gradients for neural sdes." Advances in Neural Information Processing Systems 34 (2021): 18747-18761.
   b. code: https://github.com/google-research/torchsde
   c. abstract: Methods and software implementation for scalable gradient estimation through stochastic differential equations.

4. **Methods and evaluation protocols for unsupervised training of neural generative models with disentangled latent factors**
   a. publication: Chen, Ricky TQ, Xuechen Li, Roger B. Grosse, and David K. Duvenaud. "Isolating sources of disentanglement in variational autoencoders." *Advances in neural information processing systems* 31 (2018).
   b. abstract: Methods for training variational autoencoders with disentangled latent factors and novel evaluation metrics for the performance of approaches for disentangling.

# EXHIBIT B



# Termination Certification

This is to certify that I have complied with all the terms of X.AI LLC's ("xAI" or the "Company") Employee Confidential Information and Invention Assignment Agreement ("ECIIAA") signed by me, including the reporting of any inventions and original works of authorship conceived or made by me (solely or jointly with others) covered by that agreement.

I also certify that I have returned to the Company all Company documents (and all copies thereof) and other Company property in my possession or control, including but not limited to Company files, notes, drawings, records, plans, forecasts, reports, studies, analyses, proposals, agreements, financial information, research and development information, sales and marketing information, customer lists, prospect information, pipeline reports, sales reports, operational and personnel information, specifications, code, software, databases, computer-recorded information, tangible property and equipment (including, but not limited to, computers, mobile telephones, servers, credit cards, entry cards, identification badges and keys), and any materials of any kind which contain or embody any confidential or proprietary information of the Company (and all reproductions thereof in whole or in part). I represent that I have made a diligent search to locate any such documents, property and information. I agree that I have not and will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to the Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and I agree to provide Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed.

I further agree that, in compliance with the ECIIAA, I will hold in confidence and will not disclose, use or publish any of the Company's Confidential Information. "Confidential Information" shall mean any and all confidential knowledge, data or information of the Company. By way of illustration but not limitation, Confidential Information includes (a) trade secrets, proprietary technology, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques, and any other work product of any nature and all Intellectual Property Rights (as defined in the ECIIAA) therein (collectively, "Inventions"), including all Company Inventions (as defined in the ECIIAA); (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and

potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of Company and other non-public information relating to customers and potential customers; (d) information regarding any of Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by Company, and other non public information relating to business partners; (e) non- public information regarding other Company personnel, consultant lists, employee lists, compensation and employee and consultant skills that have not been disclosed by the individuals themselves; (f) information regarding stockholders, affiliates of stockholders and sponsors of Company; and (g) any other non-public information that a competitor of Company could use to Company's competitive disadvantage.

**READ, UNDERSTOOD AND AGREED**

Name (Print): Xuechen Li

Signature:

Date: August 1, 2025

# ATTACHMENT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X.AI Corp, a Nevada corporation. and X.AI LLC, a Nevada limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>XUECHEN LI, an individual,<br><br>Defendant. | Case No.  3:25-cv-07292-RFL<br><br>[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PERMITTING EXPEDITED DISCOVERY AS MODIFIED |

United States District Court
Northern District of California

**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PERMITTING EXPEDITED DISCOVERY AS MODIFIED**

Having considered the Motion for Temporary Restraining Order, Order to Show Cause Why a Preliminary Injunction Should Not Issue, and Order Permitting Expedited Discovery ("Motion") filed by Plaintiffs X.AI Corp. and X.AI LLC (collectively, "Plaintiffs" or "xAI") seeking to immediately enjoin Defendant Xuechen Li's ("Defendant" or "Li") from engaging in certain acts in breach of his Employee Confidential Information and Invention Assignment Agreement signed by Li on February 26, 2024 (the "Agreement"),[1] and for the reasons set forth on the record at the September 2, 2025 hearing, the Court finds that the evidence establishes the elements necessary for the issuance of a temporary restraining order and good cause for permitting expedited discovery.

Accordingly, the Court hereby **GRANTS** xAI's Motion and **ORDERS** the following relief:

1.    Li shall, within three business days of the issuance of this Order,

    a.    temporarily surrender control and access (for a period of 14 days or less to allow for a forensic examination to identify, remediate, and/or delete Confidential Information belonging to xAI) to any personal electronic devices (e.g., cellular devices, computers), online storage repositories (e.g., Gmail, Google Drive, iCloud), or other electronic storage devices that are currently accessible by Li or in Li's possession, custody, or control, but he may procure new devices and create new accounts going forward, so long as nothing is moved there from his existing devices and accounts;

    b.    return to xAI, through its counsel of record, all Confidential Information belonging to xAI currently in Li's possession, custody, or control, that exists in any physical form (e.g., notepad, paper files);

    c.    provide a written statement identifying all personal locations, personal devices, personal accounts, or personal storage media–whether physical or electronic–where any Confidential Information belonging to xAI is or has been stored, maintained,

---

[1] A copy of the Agreement shall be provided to Defendant Li along with this Temporary Restraining Order so that Defendant Li has full knowledge of the information, including the definition of Confidential Information.

or accessed;

    d.   provide, and not modify for the 14-day period referenced in (a) above, the passwords, credentials, keys, MultiFactor Authentication information, and other information necessary to fully access all devices, repositories, storage media, and accounts listed in (a); and

    e.   for any password or credentials listed in relation to (a) which Defendant claims he has forgotten or is unsure how to readily access, cooperate and work with xAI to reset or recover the same and/or to otherwise cooperate with xAI as necessary to provide xAI access to such accounts and devices listed in (a).

2.    Li, his agents, employees, partners, and any others acting in concert with him or on his behalf, are hereby enjoined from:

    a.   controlling, logging into, or otherwise accessing (other than as required by 1(e) above) any personal electronic devices (e.g., cellular devices, computers), online storage repositories (e.g., Gmail, Google Drive, iCloud), or other electronic storage devices that are currently accessible by Defendant or in Defendant's possession, custody, or control, but he may procure new devices and create new accounts going forward, so long as nothing is moved there from his existing devices and accounts;

    b.   possessing, using, copying, reproducing, disclosing, transferring (including to a third party), disseminating, or otherwise exploiting, any Confidential Information (as defined in the Agreement), including the xAI files uploaded to his Personal System, and any copies, derivatives, or materials created therefrom;

    c.   destroying, deleting, changing, altering, or otherwise eliminating any version (whether hard copy, native, or electronic) of any documents or electronically stored information on any device or in any account (whether in printed form or downloaded to any remote storage system, computer, hard drive, server, disk drive, flash drive, cellular telephone, CD, DVD, USB drive, or any other device that can be used to electronically store data or information) relating to the Confidential

Information;

d.  disposing of, deleting, changing, altering, wiping, tampering with, or destroying any remote storage systems (including cloud storage accounts), computers, hard drives, servers, disk drives, flash drives, cellular telephones, CDs, DVDs, USB drives, and any other devices that can be used to electronically store data or information that are (a) currently accessible by Defendant or in Defendant's possession, custody, or control; or (b) have been accessible by Defendant or in Defendant's possession, custody, or control, since February 26, 2024, and any data, files, information, forensic remnants, or digital artifacts stored on or within the device;

e.  destroying, deleting, changing, altering, or otherwise eliminating any emails to or from any email accounts used by Defendant since February 26, 2024, either in printed form or downloaded to any computers, laptops, online storage repositories, cloud storage, or electronic storage devices;

f.  destroying, deleting, changing, altering, or otherwise eliminating any text, electronic postings, or other application messages from any cellular telephones or devices, computers, laptops, online storage repositories, cloud storage, or electronic storage devices (a) are currently accessible by Defendant or in Defendant's possession, custody or control; or (b) have been accessible by Defendant, or in Defendant's possession, custody or control, since February 26, 2024; and

g.  Violating, aiding, or participating in the violation of any terms of the Agreement or Termination Certification, as detailed in the Complaint;

3.  Li is hereby enjoined from having any role or responsibility at OpenAI or any other competitor of xAI pertaining to generative AI including without limitation OpenAI's ChatGPT until xAI has confirmed that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted.

4.  Li is hereby enjoined from having any communication on the subject of generative AI

with any officer, director, employee, agent, supplier, consultant, or customer of OpenAI or any other competitor of xAI until xAI has confirmed that all of xAI's Confidential Information in Li's possession, custody, or control has been deleted.

5.    xAI is granted leave to propound expedited discovery immediately in aid of preliminary injunction proceedings before this Court as follows, and Li is ordered to respond and comply with such discovery, as follows:

  a.  Li shall respond to xAI's First Set of Interrogatories (attached hereto as **Exhibit A**) under oath within seven days of entry of this Order;

  b.  Li shall respond to and comply with xAI's First Set of Requests for Production (attached hereto as **Exhibit B**) within seven days of entry of this Order; and

  c.  Li is to sit for deposition at a time and place mutually agreed between the parties, but no later than ten (10) days of entry of this Order.[2]

**IT IS FURTHER ORDERED** that the accounts and devices subject to the above provisions are limited to the those that Li created or accessed on or after the date that he started working for xAI.

**IT IS FURTHER ORDERED** that if Li objects to complying with any of the above-described relief on the basis of the attorney-client privilege, then he must:  (1) provide a privilege log; and (2) produce the non-privileged information by another means  (*e.g.*, conducting third-party forensic imaging of devices which will be produced with redactions).

**IT IS FURTHER ORDERED** that, if Defendant refuses to comply with any of the relief described in Paragraphs 1 and 5 above based on his assertion of the right against self-incrimination under the Fifth Amendment, Defendant shall identify the specific portions with which he refuses to comply by **September 3, 2025**.  The relief described in Paragraphs 2-4 does not appear to implicate the Fifth Amendment.  The Parties shall file simultaneous briefing of no longer than 10 pages by **September 8, 2025,** on the issue of whether the Court should nonetheless order compliance despite Li's Fifth Amendment objections, and the Court will schedule a hearing if necessary.  Any forthcoming order resolving the Fifth Amendment issue will address xAI's request at the September 2 hearing for an early

---

[2] Li remains free to object to xAI's discovery requests as permitted under the ordinary rules of discovery, but any objections must be submitted within the deadlines set forth in Paragraph 5 above.

Rule 26 conference.

**IT IS FURTHER ORDERED** that Li must show cause why a preliminary injunction should not issue at a hearing on **October 7, 2025, at 10:00 a.m.** Li shall file his opposition by **September 16, 2025**, and xAI shall file its reply by **September 23, 2025.** If the Parties wish to stipulate to further extend the hearing date, they must file their stipulation and proposed order by no later than **September 23, 2025.** Any such stipulation and proposed order shall: (a) confirm the Parties' agreement that there is good cause to extend this Temporary Restraining Order through the newly proposed hearing date; (b) require submission of the reply brief at least 14 days prior to the newly proposed hearing date; and (c) select the newly proposed hearing date after confirming the Court's availability either through the public calendar or communications with the Courtroom Deputy.

**IT IS FURTHER ORDERED** that, if the Parties believe referral to a magistrate judge for an emergency settlement conference would be productive, the Parties may submit a stipulation and proposed order to that effect.

**IT IS FURTHER ORDERED** that this Temporary Restraining Order, unless extended for good cause or by agreement of the Parties, will expire by its terms at 9:00 p.m. on October 7, 2025. The Court finds good cause to extend this Order to that date, based on the Parties' stipulation at the hearing and the complexity of the issues.

DATE: September 2, 2025

RITA F. LIN
United States District Judge