LEELLE B. SLIFER (*pro hac vice*)
lslifer@kslaw.com
JONATHAN HUNG (*pro hac vice*)
jhung@kslaw.com
**KING & SPALDING LLP**
2601 Olive Street, Suite 2300
Dallas, TX 75201
Telephone: (214) 764-4600

KOSTA S. STOJILKOVIC (*pro hac vice*)
kstojilkovic@wilkinsonstekloff.com
JOLEE PORTER (*pro hac vice*)
jporter@wilkinsonstekloff.com
JENNA P. SWARBRICK (*pro hac vice*)
jpswarbrick@wilkinsonstekloff.com
**WILKINSON STEKLOFF LLP**
2001 M Street NW, Floor 10
Washington, D.C. 20036
Telephone: (202) 847-4000

MARK ZAMBARDA (State Bar No. 314808)
mzambarda@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (720) 535-2315

*Attorneys for Plaintiffs X.AI CORP. and X.AI LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X.AI CORP. and X.AI LLC,<br><br>               Plaintiffs,<br><br>    vs.<br><br>OPENAI, INC., OPENAI GLOBAL, LLC, and OPENAI OPCO, LLC,<br><br>               Defendants. | **Case No. 3:25-cv-08133-RFL**<br><br>**XAI'S RESPONSE TO DEFENDANTS' MOTION FOR ATTORNEY'S FEES UNDER 18 U.S.C. § 1836 AND CAL. CIV. CODE § 3426.4**<br><br>Judge: Hon. Rita F. Lin<br>Date: September 8, 2026<br>Time: 10:00 a.m. |

## **TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

FACTS .............................................................................................................................................1

LEGAL STANDARD......................................................................................................................4

ARGUMENT ...................................................................................................................................5

    I.    XAI'S CLAIMS ARE NOT OBJECTIVELY SPECIOUS .....................................5

    II.    XAI DID NOT ACT IN SUBJECTIVE BAD FAITH .............................................8

    III.    OPEN AI'S REQUESTED FEES ARE UNREASONABLE ...............................11

    IV.    XAI'S PENDING APPEAL INDEPENDENTLY WEIGHS AGAINST GRANTING FEES NOW ........................................................................................15

CONCLUSION...............................................................................................................................16

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Agency Solutions.com, LLC v. Trizetto Grp., Inc.*,

2012 WL 2358636 (E.D. Cal. June 20, 2012) ........................................................................8

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,

421 U.S. 240 (1975)................................................................................................................4

*Apple Inc. v. Liu*,

N.D. Cal. Case No. 26-cv-07078, Dkt. 1 (filed July 10, 2026) .................................................2

*Betta Prods., Inc. v. Transglobal Commc'ns*,

2007 WL 4570368 (N.D. Cal. Dec. 26, 2007).........................................................................8

*Christensen v. Stevedoring Servs. of Am.*,

557 F.3d 1049 (9th Cir. 2009) ...............................................................................................5

*Christiansburg Garment Co. v. EEOC*,

434 U.S. 412 (1978)...........................................................................................................1, 10

*CleanFish, LLC v. Sims*,

2020 WL 7353462 (N.D. Cal. Dec. 15, 2020).......................................................................10

*Direct Techs., LLC v. Elec. Arts, Inc.*,

836 F.3d 1059 (9th Cir. 2016) .......................................................................................1, 5, 9

*Fox v. Vice*,

563 U.S. 826 (2011)..............................................................................................................13

*Hensley v. Eckerhart*,

461 U.S. 424 (1983)..........................................................................................12, 13, 14, 15

*InfoSpan, Inc. v. Emirates NBD Bank PJSC*,

2016 WL 8861712 (C.D. Cal. Nov. 22, 2016), *aff'd*, 745 F. App'x 1 (9th Cir.

2018) ....................................................................................................................................8

*Kerr v. Screen Extras Guild, Inc.*,

526 F.2d 67 (9th Cir. 1975) .................................................................................................13

*MACOM Tech. Sols. Inc. v. Litrinium, Inc.*,

    2020 WL 2892614 (C.D. Cal. Apr. 22, 2020) ..........................................................................5

*White v. New Hampshire Dep't of Employment Sec.*,

    455 U.S. 445 (1982)..................................................................................................................15

*X.AI Corp. v. Li*,

    No. 3:25-cv-07292 (N.D. Cal.) ...................................................................................3, 8, 9, 11

*X.AI Corp. v. OpenAI, Inc.*,

    No. 26-4486 (9th Cir.) ................................................................................................................9

**Statutes**

18 U.S.C. § 1836(b)(3)(D)...............................................................................................................1, 4

Cal. Civ. Code § 3426.4.............................................................................................................4, 10, 14

**INTRODUCTION**

OpenAI asks this Court to grant $1,041,859.90 in attorney's fees, but it fails to establish that such an extraordinary award is warranted. Courts may shift fees in trade secret misappropriation cases only upon a showing of objective *and* subjective bad faith. *See* 18 U.S.C. § 1836(b)(3)(D); *Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1071 (9th Cir. 2016). OpenAI has not made—and cannot make—this showing.

Courts have found objective bad faith when a plaintiff has not put forth any evidence of trade secret theft, or where there is no question that the litigation is time barred. These are the only types of cases that OpenAI invokes in support of its motion. But here there is no dispute that multiple employees stole xAI's trade secrets on their way out the door to OpenAI and that at least one shared those trade secrets directly with OpenAI employees. Following that "alarming" and "unprecedented" pattern of theft and disclosure by former employees departing for OpenAI, xAI commenced this action in good faith to safeguard its trade secrets. Second Amended Compl. ("SAC") ¶¶ 13, 154–155. OpenAI's motion ignores this admitted theft and relies on nothing more than the sort of "post hoc reasoning" and "hindsight logic" that courts have found insufficient to justify fee shifting. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421–22 (1978). OpenAI also fails to show subjective bad faith. To the contrary, xAI has already filed a notice of appeal, further supporting that it pursued this litigation in good faith.

Finally, even if (contrary to law and fact) OpenAI could establish that an award of attorney's fees was permissible here, its request for more than $1 million in fees for a case dismissed at the pleading stage is plainly unreasonable.

For all these reasons, and as set forth below, the Court should deny OpenAI's motion.

**FACTS**

In the summer of 2025, xAI overtook the competition in artificial intelligence technology and the computing infrastructure that powers it. xAI released the latest version of its frontier large-language model in July. Because of pathbreaking innovations with respect to reinforcement learning, post-training techniques, and data center optimization, this model overtook its

competitors on benchmarks for complex reasoning. SAC ¶¶ 63, 130, 135. The previous year, xAI had shocked the world with how quickly it had built and deployed its first computing facility and by the spring of 2025, it had announced it was building a second, confirming that xAI was leading the industry in computing infrastructure as well. *Id.* ¶ 45. OpenAI took notice. Shortly after xAI released its new model, OpenAI embarked on a coordinated campaign to poach xAI's superior talent and trade secrets. What followed was documented, admitted theft.

OpenAI's efforts began with Xuechen Li, one of xAI's first twenty engineers and a key contributor to Grok's reinforcement-learning pipeline. *See id.* ¶¶ 55–65. After OpenAI directed Li to deliver a "technical," "detailed" presentation about his "specific contributions" to a prior project, Li prepared and presented a slide deck titled "interview slides 07-13-25" whose first page was marked "confidential material." *Id.* ¶¶ 66–68, 71. The deck reflected xAI's reinforcement-learning training recipes and checkpoints, the sources of problems in post-training, xAI's best-performing training methods, internal training characteristics, and model-behavior training details—all of which is highly confidential, proprietary information. SAC ¶ 71; Second MTD Order at 3–4. An xAI engineer confirmed that the deck disclosed multiple xAI trade secrets relating to Grok 4's reinforcement-learning approach. SAC ¶ 68.[1] Li himself admitted in a handwritten document— prepared with counsel present—that he misappropriated the presentation detailing xAI's training and tuning techniques—as well as xAI's entire Grok source code. *Id.* ¶ 85. And when asked whether he had shared xAI's trade secrets with OpenAI, Li invoked his Fifth Amendment privilege and refused to answer. *Id.* ¶ 100. After Li disclosed xAI's trade secrets during his interview

[1] On July 10, 2026—less than a month after this Court's dismissal of xAI's complaint—Apple Inc. filed a complaint for trade secret misappropriation against OpenAI that similarly alleged OpenAI uses hiring interviews to exploit confidential information about an interviewee's current employer's technology. *See Apple Inc. v. Liu,* N.D. Cal. Case No. 26-cv-07078, Dkt. 1 (filed July 10, 2026) at ¶¶ 6 ("Knowing that OpenAI interviews would involve discussing Apple technology, Mr. Liu advised [Apple employee] on which confidential Apple material about unannounced Apple products she should study before her interview"), 9, 53 ("OpenAI has resorted to exploiting this confidential information, using it to extract still more from Apple's current employees and trusted partners, and to structure its interview processes to try to solicit additional confidential Apple information—all while taking steps to conceal its actions.").

presentation, OpenAI continued to court him. In the days following his interview, Li and an OpenAI recruiter exchanged a series of suggestive messages on an encrypted messaging app. *Id.* ¶¶ 74–83. At the same time, Li uploaded xAI's entire source code to a personal cloud account. *Id.* ¶¶ 76–78. He then deleted his browser history and system logs to conceal what he had done—and later admitted deleting those logs. *Id.* ¶ 78. OpenAI withdrew its multi-million dollar job offer only after xAI obtained a temporary restraining order that prevented Li from working for OpenAI.

Li was not alone. Jimmy Fraiture, xAI's second engineering hire in London, also airdropped vast amounts of xAI source code to his personal devices in July 2025 while OpenAI was courting him via the same recruiter—and the same encrypted messaging platform—it used with Li. *Id.* ¶¶ 107–08, 118, 120–21. The FBI has seized devices from both Li and Fraiture as part of an ongoing criminal investigation into the thefts. *Id.* ¶ 2. Separately, a senior xAI finance executive refused to sign his Termination Certification confirming he would not disclose xAI confidential information, responded to xAI's confidentiality reminders with profanity, and shared a document containing confidential xAI information with OpenAI. *Id.* ¶¶ 4, 133, 142. Several other former xAI employees have similarly refused to abide by their confidentiality obligations and attempted to retain or access confidential materials even after joining OpenAI. *See id.* ¶¶ 143–155.

The timing, volume, similarities in the departing employees' actions, and unquestionable disclosures of these trade secrets and confidential information to OpenAI lead xAI to the good faith, objectively reasonable conclusion that OpenAI knew or should have known that these employees were providing it with xAI's trade secrets. At the same time, OpenAI announced in July 2025 a $300 billion partnership with Oracle to expand its data center capacity, then expanded that deal to $400 billion in September 2025—xAI believed that OpenAI was poaching employees and stealing its trade secrets to be able to make good on that overly ambitious promise. *Id.* ¶¶ 18, 63, 149.

After discovering this alarming pattern of theft and disclosure, xAI moved quickly to protect its trade secrets. It filed this action against OpenAI, along with a separate lawsuit against Li, alleging trade secret misappropriation. *See* Compl.; *X.AI Corp. v. Li*, No. 3:25-cv-07292 (N.D.

Cal.). The Court dismissed xAI's complaint against OpenAI with leave to amend, and xAI added additional allegations to support its misappropriation claim, focusing on the presentation Li gave to OpenAI interviewers. *See* First MTD Order; SAC ¶ 63.

The Court ultimately dismissed xAI's complaint without leave to amend, concluding that the allegations did not permit a plausible inference that OpenAI "knew or should have known" the presentation contained xAI trade secrets, or that OpenAI engaged in sufficiently "active conduct" for misappropriation by acquisition.[2] Second MTD Order at 4–6. The Court found the "confidential" label on the first page required a "multi-step inferential chain" that did not exclude the obvious alternative explanation—that "confidential" referred to Li's NDA with OpenAI rather than to xAI's proprietary information. *Id.* at 4–5. And the Court held that Li's disclosure "could constitute only acquisition by OpenAI and not disclosure or use," because "[t]he mere passive receipt of trade secrets is not enough." *Id.* at 6. The Court's dismissal turned on the sufficiency of the connection between the employees' admitted theft and OpenAI's knowledge and conduct. The Court made no finding that xAI lacked evidence of actual theft by its former employees or that xAI acted in bad faith. There was no discovery in this case, no depositions, no expert reports, no summary judgment, and no trial. The entire matter was resolved on the pleadings.

After the Court dismissed the Second Amended Complaint with prejudice, xAI timely appealed that ruling to the Ninth Circuit. *See* Notice of Appeal. xAI's appeal remains pending, and its opening brief is presently due August 24, 2026.

## LEGAL STANDARD

Litigants ordinarily bear their own attorney's fees in the United States. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). Fee-shifting is a narrow, punitive exception to this bedrock principle. The DTSA provides that a court "may" award fees only "if a claim of the misappropriation is made in bad faith." 18 U.S.C. § 1836(b)(3)(D). CUTSA similarly authorizes fees only "[i]f a claim of misappropriation is made in bad faith." Cal. Civ. Code

---

[2] Any recitation of the Court's reasoning in dismissing the Second Amended Complaint should not be taken as xAI waiving any arguments on appeal.

§ 3426.4. To satisfy the bad-faith requirement, the movant must prove both (1) "objective speciousness of the plaintiff's claim, as opposed to frivolousness," and (2) plaintiff's "subjective bad faith in bringing or maintaining the claim." *Direct Techs.*, 836 F.3d at 1071.

Moreover, even where the high bar for bad faith is established, the fee award must be reasonable. To ensure reasonableness, the court calculates the lodestar—reasonable hours multiplied by a reasonable rate—and excludes hours that are excessive, redundant, or otherwise unnecessary. *Christensen v. Stevedoring Servs. of Am.*, 557 F.3d 1049, 1053 (9th Cir. 2009).

**ARGUMENT**

## I.     xAI's Claims Are Not Objectively Specious

"Objective speciousness exists where . . . there is a complete lack of evidence to support the claim." *MACOM Tech. Sols. Inc. v. Litrinium, Inc.*, 2020 WL 2892614, at *3 (C.D. Cal. Apr. 22, 2020). xAI's misappropriation claim is not wholly lacking in evidentiary support—to the contrary, it is supported by significant evidence of trade secret theft and improper disclosure.

There is no dispute that multiple key xAI engineers who departed for OpenAI stole xAI's trade secrets on their way out the door. Li admitted in a handwritten document—prepared with his attorney present—that he misappropriated xAI's source code and a presentation detailing xAI's training and tuning techniques. SAC ¶¶ 55, 56, 64, 85. Li then shared that presentation with OpenAI. *Id.* ¶¶ 68, 71. When asked in separate litigation whether he had shared xAI's trade secrets with OpenAI, Li invoked his Fifth Amendment privilege and refused to answer. *Id.* ¶ 100. Fraiture also stole xAI source code by airdropping it to his personal devices while being recruited by OpenAI through the same recruiter and encrypted messaging platform used to court Li. *Id.* ¶¶ 107–08, 118, 120–21, 128. The FBI seized devices from both Li and Fraiture—including Fraiture's *OpenAI-issued devices*—as part of an ongoing criminal investigation into their conduct. *Id.* ¶¶ 3, 72.

This was not just one theft (or attempted theft) by one departing employee who went to OpenAI—it was several employees who all left xAI for OpenAI within a matter of weeks. Between

July and September 2025, OpenAI poached no fewer than eight xAI employees with access to the confidential information OpenAI most needed: Li and Fraiture had developed Grok's source code and reinforcement-learning techniques—exactly where OpenAI was "lagging"; a senior finance executive knew xAI's data center "secret sauce," including vendor relationships, procurement strategies, and GPU installation techniques; and engineers Ruddarraju, Pham, and Knight had detailed knowledge of xAI's data center infrastructure and software. SAC ¶¶ 9, 14, 20, 63, 134–35, 143–45, 155.

It is also undisputed that at least some of these trade secrets were disclosed directly to OpenAI, in breach of confidentiality obligations owed to xAI. During his July 2025 interviews with OpenAI, Li created a slide deck titled "interview slides 07-13-25" that was conspicuously marked "confidential material" on its first page. SAC ¶¶ 68, 71. The slides contained detailed trade secrets about xAI's reinforcement-learning techniques for Grok 4, including xAI's training recipes and checkpoints, the sources of problems in post-training AI models, xAI's experience with different training methods, and details of xAI's model-behavior training. *Id.* ¶ 71. That the slide deck contained trade secrets was hardly subtle—the slides made express, repeated references to Grok and the techniques used to develop it. The Court accepted that Li presented slides that disclosed xAI trade secrets, holding only that xAI had not sufficiently alleged that OpenAI knew or should have known that this "confidential material" was xAI's. Second MTD Order at 4, 6.

Courts have declined to find even far weaker claims objectively specious. In *Johnson Matthey Process Techs., Inc. v. G.W. Aru LLC*, the court denied DTSA fees after dismissing the complaint, holding that the claim was not objectively specious even though the plaintiff lacked evidence that the competitor participated in the misappropriation and had shown only that its former employee took the trade secrets—because the plaintiff had come forward with evidence supporting other elements of its claim. 603 F. Supp. 3d 1374, 1381–82 (S.D. Ga. 2022). Likewise, in *HCC Insurance Holdings, Inc. v. Flowers*, the court denied fees even after granting summary judgment against the plaintiff, explaining that "some evidence, albeit circumstantial" defeated any finding of objective speciousness. 2017 WL 5118224, at *2–3 (N.D. Ga. Nov. 6, 2017). And in

*Zebra Strategies, Inc. v. Gonzalez-Nazario*, the court denied DTSA fees and rejected an attorney affidavit asserting that the complaint's allegations were false, noting that "the fact that the allegations of a complaint are ultimately proven to be false does not by itself reflect objective bad faith." 800 F. Supp. 3d 592, 600–01 (S.D.N.Y. 2025).

Although this Court found that xAI's allegations did not state a DTSA claim, nothing in the Court's decision indicated that xAI's claim was objectively specious. That decision turned on two narrow, technical grounds: that xAI's allegations did not permit a plausible inference that OpenAI "knew or should have known" the presentation contained xAI's trade secrets, and that Li's disclosure was not enough to show "acquisition" of a trade secret because the DTSA requires "active conduct." Second MTD Order at 4–6. Neither ground reflects the "complete lack of evidence" that objective speciousness requires.

None of the cases that OpenAI relies on shows otherwise. In every one of those cases, the plaintiff either had no evidence of actual misappropriation or pursued a claim that was plainly time-barred. In *RBC Bearings*, for instance, the plaintiff's "only evidence of misappropriation consisted of the individual defendants' access to [its] trade secrets during the course of their employment" and there was no other "evidence of any trade secret misappropriation." 2016 WL 6562068, at *11–12 (C.D. Cal. Aug. 1, 2016). In *Cherokee Chemical*, the plaintiff "never identified a trade secret" with reasonable particularity across eighteen months of litigation. 2022 WL 2036305, at *3–4 (C.D. Cal. Apr. 27, 2022). In *Cypress Semiconductor*, no employee took any trade secret, and the "only colorably actionable conduct" was lawful recruitment. 236 Cal. App. 4th 243, 261 (2015). And in *Mintz*, the court awarded fees because the claimant had "no proof that [its] purported trade secrets are worth anything" and no evidence that a trade secret had been stolen. 2013 WL 12182602, at *3 (C.D. Cal. June 14, 2013).

The other cases that OpenAI cites involved time-barred claims: in *Teetex* and *Elite Semiconductor*, the plaintiffs sued years—or nearly a decade—after the alleged theft, on a three-year limitations period. 2022 WL 2439176, at *5 (N.D. Cal. July 5, 2022); 2025 WL 2209999, at *5 (N.D. Cal. Aug. 4, 2025). So too in *Alamar Biosciences*, where fees turned on a claim that was

"clearly time-barred," brought years late and pursued after opposing counsel spelled out the limitations bar. 1996 WL 784495, at *1, *8 (E.D. Cal. Feb. 27, 1996).

In sum, xAI's claims cannot be objectively specious given the admitted evidence of a pattern of multiple thefts by several employees and the disclosure of trade secrets and confidential information to OpenAI. The fact that xAI's claims are not objectively specious alone defeats OpenAI's motion for fees.

## II.    xAI Did Not Act in Subjective Bad Faith

OpenAI also cannot establish subjective bad faith, which is an independent bar to attorney's fees. "[S]ubjective bad faith" occurs when the plaintiff "intended to cause unnecessary delay, filed the action to harass the opposing party, or harbored improper motive." *Agency Solutions.com, LLC v. Trizetto Grp., Inc.*, 2012 WL 2358636, at *2 (E.D. Cal. June 20, 2012) (cleaned up). "[T]he absence of evidence *alone*, even after discovery, does not support a finding of subjective bad faith." *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, 2016 WL 8861712, at *10 (C.D. Cal. Nov. 22, 2016), *aff'd*, 745 F. App'x 1 (9th Cir. 2018). Instead, subjective bad faith turns on "the plaintiff's subjective state of mind"—whether the plaintiff "believe[d] the action was valid" and "[w]hat was his or her intent or purpose in pursuing it." *Betta Prods., Inc. v. Transglobal Commc'ns*, 2007 WL 4570368, at *2 (N.D. Cal. Dec. 26, 2007).

xAI acted in good faith when it initiated this action. Upon discovering an alarming pattern of trade secret theft tied back to OpenAI, xAI took swift efforts against multiple culpable parties to protect its trade secrets. *See* Compl., Dkt. No. 1; *X.AI Corp. v. Li*, No. 3:25-cv-07292 (N.D. Cal.). When the Court identified what it perceived as pleading defects, xAI promptly amended its complaint to add additional supporting allegations based on what it had learned from the litigation against Li, where it had been successful in obtaining a temporary restraining order to prevent Li

from working at OpenAI. *See* SAC ¶ 99; *X.AI Corp. v. Li*, Ex. 6 ¶ 3.[3] And when the Court denied leave to amend and dismissed the SAC with prejudice, xAI promptly appealed that ruling to the Ninth Circuit, where it will soon file its opening brief explaining why dismissal was unwarranted. *See* Notice of Appeal, Dkt. No. 114; *X.AI Corp. v. OpenAI, Inc.*, No. 26-4486 (9th Cir.).

Courts have rejected spurious claims of bad faith in similar circumstances. In *Johnson Matthey*, the court denied DTSA fees for lack of subjective bad faith after dismissing the complaint, because the plaintiff had a "legitimate concern" about protecting its trade secrets, did not sue until remediation efforts failed, and did not appear to have filed suit "with intent to harass or any other improper motive." 603 F. Supp. 3d at 1382–83. In *Zebra Strategies,* the court denied DTSA fees because the movant failed to show the plaintiff "subjectively acted with an improper purpose," such as "harassment or delay," even where the plaintiff sought to stay discovery—which the Court found did "not meet [Defendants'] burden to show subjective bad faith." 800 F. Supp. 3d at 598–600. And in *Indigo Group USA, Inc. v. Polo Ralph Lauren Corp.*, the court denied fees because it rejected the argument that the claimant acted with subjective bad faith—rather, the claimant's continued pursuit of its position after dropping a breach of confidence claim was "indicative of its subjective good faith." 2014 WL 12573380, at *8 (C.D. Cal. Mar. 17, 2014). Likewise, in *Direct Tech.,* the Ninth Circuit affirmed the denial of CUTSA fees because the plaintiff "had reason to believe its action against Defendants was valid" and there was no evidence it pursued the claim "for an improper purpose such as to extort a settlement." 836 F.3d 1059, 1071 (9th Cir. 2016).

OpenAI's contrary claims are unavailing. At the threshold, OpenAI's motion leans heavily on a declaration from its attorney, Ms. Luedtke, to inject factual assertions—about its pre-suit investigation, its correspondence with xAI, and its dealings with departed employees—that were

---

[3] At the hearing on OpenAI's motion to dismiss the First Amended Complaint, the Court asked about the availability of discovery in the litigation against Li. xAI then sought a motion to stay this litigation believing that the Court was suggesting such a stay might be prudent, not because xAI believed it needed additional discovery to sufficiently plead its claims. In any event, believing that additional facts could further bolster a claim does not imply that the claim is frivolous or being pursued in bad faith.

never before the Court when it dismissed the SAC on the pleadings. Luedtke Decl., Dkt. No. 115-1. But whether a claim was brought in bad faith "begins with an examination of the plaintiff's own pleadings." *See RBC Bearings*, 2016 WL 6562068, at *4 (quoting *Cypress*, 236 Cal. App. 4th at 260). OpenAI cannot establish subjective bad faith through an attorney declaration asserting that xAI's allegations are false. In addition, OpenAI's arguments rely on the exact "post hoc reasoning" the Supreme Court has forbidden. The Supreme Court cautioned to "resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Christiansburg*, 434 U.S. at 421–22. "This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success." *Christiansburg*, 434 U.S. at 422.

OpenAI's argument that xAI did not address the alleged shortcomings of its complaint also fails. OpenAI's pre-complaint and October 3 letters proclaiming xAI's claims meritless show nothing: "[a] plaintiff's decision to pursue its claims despite [a] [d]efendant's insistence that the claims lacked merit does not establish subjective bad faith." *CleanFish, LLC v. Sims*, 2020 WL 7353462, at *1 (N.D. Cal. Dec. 15, 2020). Nor does xAI's request for a stay to complete discovery reflect an improper motive: "At the outset of a case, the plaintiff does not always know what discovery will reveal," and courts are "sensitive to the common scenario where the trade secrets plaintiff may not know which parts of its trade secrets have been misappropriated or cannot determine the full scope of its claims until it gains a better understanding of how a defendant operates." *Zebra Strategies*, 800 F. Supp. 3d at 601 (citation omitted). That xAI filed the SAC and added additional allegations regarding the very things this Court requested rather than abandon its claims reflects its continued good-faith belief in the merits, not bad faith; a plaintiff is "not required to abandon its claim the instant [the opposing party] produced evidence tending to refute the claim." *Indigo Group*, 2014 WL 12573380, at *8 (denying fees under § 3426.4). That the Court disagreed with xAI's plausible interpretation of these additional facts in the SAC is not evidence of subjective bad faith.

OpenAI's "improper motive" arguments also fail. OpenAI cites *Cypress Semiconductor* for the proposition that a press release may evidence bad faith, but that case involved a press release after dismissal claiming victory and threatening future suits. 236 Cal. App. 4th at 269-70. OpenAI's reliance on Elon Musk's statements on X does not show that xAI filed this litigation to harass or thwart competition; a party's public statements about litigation it has a good-faith basis to bring do not establish bad faith. And OpenAI's contention that xAI shows bad faith by naming former employees in its publicly filed complaint is unpersuasive as well. Several of those employees that xAI named are the same individuals who admitted to stealing xAI's trade secrets, and identifying them is necessary to plead misappropriation.

OpenAI's assertion that xAI took "insufficient steps to protect" its trade secrets is also both inaccurate and beside the point: xAI obtained a temporary restraining order against Li to prevent him from working at OpenAI until xAI's confidential information was deleted. *See* SAC ¶ 99; *X.AI Corp. v. Li*, Ex. 6 ¶ 3. xAI's decision not to seek a preliminary injunction against OpenAI reflects litigation strategy, not improper purpose. And xAI's efforts to confirm that Knight and Pham deleted its confidential information are consistent with a trade-secret owner protecting its rights. Although OpenAI points out that its forensic litigation vendor maintains a preservation copy of Knight and Pham's information, it never tries to explain how that shows that xAI took insufficient steps to protect its trade secrets.

In short, there is no evidence of subjective bad faith on the part of xAI, and the Court should accordingly deny OpenAI's motion for this additional reason.

## III.   OpenAI's Requested Fees Are Unreasonable

Even if OpenAI could establish both objective speciousness *and* subjective bad faith— which it cannot—the Court should still reject OpenAI's requested fees as unreasonable.

OpenAI has not even provided the information needed to assess reasonableness. A movant "bears the burden of establishing the hours expended" and "must provide detailed time records documenting the tasks completed and the amount of time spent." *Teetex*, 2022 WL 2439176, at

*6. Even where the opposing party does not object, the court "may not uncritically accept a fee request" but must independently "review the time billed and assess whether it is reasonable in light of the work performed," excluding hours that are "excessive, redundant, or otherwise unnecessary." *Id.*; *see Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983). OpenAI supports its seven-figure request not with its contemporaneous time entries, but with a summary spreadsheet reporting only aggregate hours by timekeeper across three broad "phases." Luedtke Decl., Dkt. No. 115-1, at ¶¶ 94–95 & Ex. 24, Dkt. 115-24. That summary does not identify the individual tasks performed, the time devoted to each, or which hours were duplicative—precisely the information the Court needs to conduct the required review. On a comparable record, the court in *Mintz* deemed the fee submission "defective with respect to both the rates charged and the hours billed" and declined to award any fees until counsel cured the deficiency. 2013 WL 12182602, at *8. The same result is warranted here.

At a minimum, the Court should require OpenAI to produce its contemporaneous time records and invoices before awarding any fees. Civil Local Rule 54-5(b)(2) requires a fee motion to be supported by "a statement of the services rendered by each person for whose services fees are claimed, together with a summary of the time spent by each person, and a statement describing the manner in which time records were maintained," and expressly provides that, "[d]epending on the circumstances, the Court may require production of an abstract of or the contemporary time records for inspection, including in camera inspection, as the Judge deems appropriate." Civil L.R. 54-5(b)(2). Here, OpenAI seeks more than $1 million in fees for a dispute that never advanced past the pleadings and turned on a single, recurring question of legal sufficiency based on the cursory declaration of one of its lawyers. The stark mismatch between the size of the request and the limited complexity of the work—particularly where OpenAI has offered only aggregate, phase-level totals rather than task-level detail—makes review of the underlying contemporaneous time records and invoices essential to test whether the claimed hours were actually incurred and reasonably necessary.

Even setting aside these documentation issues, OpenAI's requested fees of $1,041,859.90 are unreasonable on their own terms. In the Ninth Circuit, courts consider the *Kerr* factors to evaluate requests for attorney's fees:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir. 1975). The *Kerr* factors do not support OpenAI's fees request.

This case was resolved entirely at the Rule 12(b)(6) stage with no discovery. Three rounds of substantially similar 12(b)(6) briefing—each addressing the extent to which trade secret misappropriation could be attributed to OpenAI under the same legal standard—and only a single hearing should not generate independent, full-staffing fee claims. Indeed, the motions presented straightforward questions of legal sufficiency—not novel issues requiring extraordinary effort. OpenAI's counsel recycled the same arguments across successive motions and those hours should reflect that efficiency.

Indeed, a court "should exclude hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. The Court "need not, and indeed should not, become [a] green-eyeshade accountant[]." *Fox v. Vice*, 563 U.S. 826, 838 (2011). The goal is "to do rough justice, not to achieve auditing perfection." *Id.* Rough justice here requires no fee award to OpenAI. But if the Court were to award OpenAI's fees, its proposal requires substantial reduction. OpenAI filed three motions to dismiss addressing the same attribution issue: whether xAI sufficiently alleged that OpenAI itself knew of or induced the employees' misappropriation. The second and third motions recycled the analysis of the first, with only incremental refinements responding to xAI's amended complaints. *Hensley* requires exclusion of "redundant" hours, 461

U.S. at 434, and the Court should treat the successive briefing as what it was: iterative refinement, not independent work product.

Even if OpenAI can overcome the significant hurdles to proving that punitive attorney's fees are warranted, at minimum this Court should exercise its discretion to impose a substantial reduction. Courts awarding fees under the trade secret statutes routinely trim requests for excessive, redundant, or duplicative work—including through percentage reduction. In *Cherokee Chemical*, the court awarding fees under the DTSA and Section 3426.4 imposed a "ten percent reduction" to the movant's request "based on its exercise of discretion and without a more specific explanation," and separately sustained objections to particular billing entries. 2022 WL 2036305, at *5. Likewise, in *Mintz*, the court declined to accept a Section 3426.4 fee request at face value, rejecting the claimed hours as excessive and requiring counsel to apportion and substantiate its time before any award would issue. 2013 WL 12182602, at *8–*10.

OpenAI's own supporting declaration confirms the redundancy that warrants a reduction here. First, OpenAI seeks $1,041,859.90 for 869.8 hours—all expended at the Rule 12(b)(6) stage, with no discovery, no depositions, and no trial—an excessive amount of time given the stage of the litigation. Luedtke Decl. ¶ 94 & Ex. 24. The bulk of those hours went to three successive motions to dismiss directed at the same attribution question, layered with duplicative staffing: Ms. Luedtke oversaw and "reviewed and revised" all three motions (¶¶ 97–98); Mr. Shikman "played a leading role in the drafting" of the motions (¶ 98); Mr. Bronshteyn "played a leading role in legal research and drafting" on the first and second motions (¶ 99); Mr. Glynn "played a leading role in legal research and drafting" on all three (¶ 100); Mr. Allen was added in 2026 to "assist[] with research and drafting on the third Motion to Dismiss" (¶ 101); and Ms. Hudson "review[ed] and revis[ed] drafts of the Motions to Dismiss" (¶ 102). The third motion to dismiss illustrates the problem starkly: although it recycled the analysis of the first two, OpenAI's own phase summary attributes roughly <u>337</u> hours to that round of briefing alone—including <u>183.6</u> hours from a single associate. Ex. 24; ¶ 95. Having multiple senior lawyers re-brief and re-review the same attribution

argument three times is precisely the "excessive, redundant, or otherwise unnecessary" work that *Hensley* directs courts to exclude. 461 U.S. at 434.

Second, OpenAI's supporting declaration confirms that its lawyers generated unnecessary work in this matter. For instance, the declaration notes that xAI's counsel, Ms. Slifer, often responded to OpenAI's lengthy correspondence by saying that the parties did not need to waste time on writing long emails or letters to one another regarding the allegations, and instead counsel should pick up the phone for a call—a usually much more productive and efficient method of communication. Luedtke Decl., Dkt. No. 115-1, at ¶¶ 35, 44, and Ex. 16, Dkt No. 115-16. Indeed, that it takes thirteen pages to describe the parties' correspondence in this case shows that OpenAI's fees request includes many hours for excessive, redundant, or otherwise unnecessary work.

Even if the Court believes OpenAI has proven both objective speciousness and subjective bad faith and also awards OpenAI fees, it should significantly reduce the amount requested by OpenAI.

## IV.    xAI's Pending Appeal Independently Weighs Against Granting Fees Now

Even apart from the merits, the Court should deny or defer the Fee Motion on the independent ground that xAI's appeal is pending before the Ninth Circuit.

Fee-shifting under § 1836(b)(3)(D) and § 3426.4 requires consideration of whether the claim was "made in bad faith" and "objectively specious." That question overlaps factually with the question presented by xAI's appeal: were the claims against OpenAI sufficiently pleaded? The Supreme Court has recognized that "piecemeal" appellate review of fee awards is undesirable, and that fee appeals should be "considered together with any appeal from a final judgment on the merits." *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 454 (1982). That guidance is best served here by deferring the fee determination until the Ninth Circuit resolves xAI's appeal—at which point any fee dispute can (if still necessary) be consolidated with the merits appeal rather than generating separate, potentially conflicting appellate proceedings.

Practical considerations confirm the approach. If the Ninth Circuit reverses, OpenAI is no longer the prevailing party, and this motion is moot—or any fee award would need to be vacated. Thus, judicial economy favors waiting. Moreover, OpenAI itself anticipated further appellate litigation, "reserv[ing] the right to seek additional attorney's fees incurred on appeal." Fee Motion at 15 n.8. OpenAI cannot simultaneously claim the judgment is final enough to warrant a fee award and reserve the right to seek additional fees from ongoing proceedings.

## CONCLUSION

The Court should deny OpenAI's Motion for Attorney's Fees.

Dated: August 10, 2026

Respectfully submitted,

/s/ LeElle Slifer

LEELLE B. SLIFER (*pro hac vice*)
lslifer@kslaw.com
JONATHAN HUNG (*pro hac vice*)
jhung@kslaw.com
**KING & SPALDING LLP**
2601 Olive Street, Suite 2300
Dallas, TX 75201
Telephone: (214) 764-4600
Facsimile: (214) 764-4601

MARK ZAMBARDA (SBN 314808)
mzambarda@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (720) 535-2315
Facsimile: (720) 535-2400

ANGELA TARASI (*pro hac vice*)
atarasi@kslaw.com
**KING & SPALDING LLP**
1401 Lawrence Street, Suite 1900
Denver, CO 80202
Telephone: (720) 535-2300
Facsimile: (720) 535-2400
LAUREN MYERS (*pro hac vice*)
lmyers@kslaw.com
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600

Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

KOSTA S. STOJILKOVIC (*pro hac vice*)
kstojilkovic@wilkinsonstekloff.com
JOLEE PORTER (*pro hac vice*)
jporter@wilkinsonstekloff.com
JENNA P. SWARBRICK (*pro hac vice*)
jpswarbrick@wilkinsonstekloff.com
**WILKINSON STEKLOFF LLP**
2001 M Street NW, Floor 10
Washington, D.C. 20036
Telephone: (202) 847-4000